# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 1, 2013 Session

## ROBERT FAULKNER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 99-07635     W. Otis Higgs, Jr., Judge**

---

**No. W2012-00612-CCA-R3-PD  - Filed August 29, 2014**

---

The Petitioner, Robert Faulkner, appeals the denial of his petition for post-conviction relief from his conviction of first degree premeditated murder and resulting sentence of death.  On appeal, the Petitioner contends that (1) the jury foreperson demonstrated bias and violated the Petitioner's right to a fair and impartial jury; (2) he is intellectually disabled and, thus, ineligible for the death penalty; (3) he received the ineffective assistance of counsel during the guilt and penalty phases of trial; (4) the prosecution failed to disclose exculpatory evidence; (5) the prosecution presented false and misleading testimony; (6) the trial court demonstrated bias; (7) the "acquittal-first instruction" violated his due process rights; (8) Tennessee's death penalty scheme is unconstitutional; and (9) cumulative error warrants a new trial.  We conclude that due to the jury foreperson's false statements about past domestic violence, the Petitioner was denied his constitutional right to a fair and impartial jury.  Accordingly, we reverse the judgment of the post-conviction court, vacate the Petitioner's conviction and death sentence, and remand the case to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed;**
**Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Daniel E. Kirsch and Kertyssa Delynn Smalls, Nashville, Tennessee, for the appellant, Robert Faulkner.

Robert E. Cooper, Jr., Attorney General & Reporter; Andrew Craig Coulam, Assistant Attorney General; Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

A Shelby County Criminal Court Jury convicted the Petitioner of the first degree premeditated murder of his wife, Shirley Faulkner. The jury sentenced him to death based upon the aggravating circumstance that he was previously convicted of one or more violent felonies. See Tenn. Code Ann. § 39-13-204(i)(2). The Tennessee Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal of his conviction. See State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005).

The Petitioner subsequently sought post-conviction relief. Following an evidentiary hearing, the post-conviction court entered an order denying relief. This appeal followed.

## A. Trial Evidence

The Tennessee Supreme Court summarized the evidence presented at trial in its opinion on direct appeal as follows:

At the guilt phase of the trial, the State's proof showed that the defendant, Robert Faulkner, and the victim, Shirley Faulkner, married in September 1998 and separated in December 1998. Faulkner moved in with his grandmother while the victim continued to live at her house in Memphis. On January 18, 1999, the victim filed a complaint with the Memphis Police Department alleging that on the previous night Faulkner struck her with his fist, held an ashtray over her head, and threatened to kill her. According to the victim, who suspected that Faulkner had been high on cocaine, Faulkner also called her several times on the morning of January 18, again threatening to kill her. The officer who took the report testified that the victim was nervous and shaking and that her left temple was swollen. On January 19, the victim visited a physician, who treated her for trauma to the left side of her face. The victim reported to the physician that she had been hit in the face on Sunday, which was January 17.

At approximately 11:00 p.m. on January 21, the victim clocked out from her shift as a cashier at a grocery store. Before leaving, she purchased groceries. Although the victim's supervisor testified that the victim appeared normal when she left, a security guard who escorted the victim to her car described her as shaking and crying. The victim told the guard that she was afraid to go home because her husband might be waiting there. The victim

-2-

refused the guard's offer to escort her home and left by herself. That same night, the victim's son-in-law, Andre King, decided to check on the victim because a tornado watch was in effect for Memphis. When Mr. King arrived shortly after midnight, he noticed that the lights were on in the victim's house but that no car was in the driveway. Mr. King waited outside for approximately thirty minutes and then left.

The next day, January 22, the victim's friend, Joe Ann Stewart, learned that the victim had not reported for work at her second job as a housekeeper for an apartment complex. Ms. Stewart called the victim's daughter, Twyla King, and asked her to meet Ms. Stewart at the victim's house. Ms. Stewart also contacted the police. Two officers arrived and used Ms. King's key to enter the house, which showed no signs of forced entry. The officers observed bags of groceries in the doorway of the kitchen. The lights were on in the library and the kitchen, and the television was on in the den. However, the victim's bedroom at the back of the house was dark, and the door was closed. When the officers entered the bedroom, they discovered the victim's body which was badly beaten about the head and lying face up on the floor.

Dr. O'Brien Cleary [O.C.] Smith, the Shelby County Medical Examiner, testified that the trauma to the victim was entirely focused on her head. The victim suffered at least thirteen blows to her head, most of them to her face. She had numerous bruises and tears to the skin and fractures of the facial bones. The injuries produced bruising of the brain, and some of the bone fragments cut into the base of her brain. The victim's facial bones were so fragmented that Dr. Smith could not count the fractures or determine the sequence of the blows. The victim's upper denture plate had been split in half. One piece was found on the floor; the other was still in her mouth. In addition, after inhaling her own blood, the victim's efforts to breathe caused a red frothy foam to obstruct her airway. The victim also swallowed over a pint of blood. Dr. Smith testified that the victim must have been alive, although not necessarily conscious, to have swallowed that amount of blood.

Dr. Smith concluded that the cause of death was blunt trauma to the head. He found no defensive injuries on the victim's body or any evidence that she had tried to escape the beating. Blood stains indicated that her head had moved after the beating began but her arms had not. Based on blood-splatter evidence indicating that the attack occurred while the victim was lying on the floor, Dr. Smith opined that the victim had been stunned or rendered unconscious by an initial blow or blows to the back of the head and

may have felt nothing after she was first struck. Because the victim's blood had clotted before the end of the attack, Dr. Smith concluded that the beating had lasted six minutes, the minimum time necessary for clotting.

The crime scene unit of the Memphis Police Department discovered blood in the victim's bedroom, in the foyer next to the bedroom, and in the hallway running the entire length of the house. Blood was smeared on the handles of two grocery bags, in the kitchen doorway, and on the inside and outside knobs of the front door. Officers found a broken handle from a skillet on the bed near the victim's body. The rest of the skillet was never located. The victim's car was also missing and was discovered the day after the murder near the residence of Faulkner's sister. Blood stains were found inside the car.

On Sunday morning, January 24, Faulkner went to the fugitive office of the Shelby County Sheriff's Department and announced that he wanted to turn himself in for killing his wife on Thursday. Faulkner was transferred to Sergeant William Ashton of the Memphis Police Department. According to Sergeant Ashton, Faulkner was "very calm and very rational" during the interview. After informing Faulkner of his Fifth Amendment rights and receiving a written waiver, Sergeant Ashton asked Faulkner if he went by any other names. Faulkner replied, "Yes, Skillet." He then grinned and said, "That's what I hit her with, too." Faulkner stated that the incident occurred around 12:00 to 12:30 a.m. on the night of January 21 and 22. He said that he hit his wife with a frying pan and a metal horseshoe. Faulkner claimed that his wife had called him at lunchtime on January 21 and asked him to meet her at her house that evening. Faulkner described what happened:

> My conversation with my wife was reconciling, and she had on her mind divorce. She said she just wanted the divorce, and I asked her why didn't she just call me on the phone and tell me that. I said, you didn't have to make me walk all the way from Shasta Street in the rain just to tell me you wanted a divorce. I sat back down on the bed and explained to her that I had enough problems already over my head and had to bury my brother on Monday. Everything I've tried to do since being out has just collapsed. I've lost my job, I've lost my wife, I was subject to being sent back to the penitentiary because I can't be without a job for 30 days. And you called me back here to discuss a divorce, and I only came to reconcile and ask we set aside our differences and go to my brother's funeral together. And she

-4-

responded she was going, but she wasn't going with me.

\* \* \*

So as we were finishing our conversation that was turning into an argument, I proceeded to walk from her bedroom to the front door as I was leaving. She walked behind me and asked me not to come back while I was standing in the hallway and everything just exploded. And I pushed her back off me and grabbed the two items that I seen, and I struck her repeatedly across the head.

Faulkner estimated that he struck his wife between seven and eight times. He acknowledged that the victim fell to the floor after the second blow and that he continued to hit her while she was on the floor. After the attack, Faulkner put the murder weapons in a bag and drove away in the victim's car. He threw the murder weapons and his bloody clothes into a flooded viaduct and then parked the car where it was later found. He slept in empty houses instead of returning to his grandmother's house. Faulkner concluded his statement by professing, "I loved my wife with all my heart. I never meant to take her life. Everything that I had ever tried to do right turned out wrong. Under all the pressure, stress and strain, I made a wrong decision. I only like to say that I'm sorry." Faulkner requested that he be placed on suicide watch in jail.

Faulkner's proof at the guilt phase consisted in part of testimony showing that the security guard who had escorted the victim from the grocery store to her car did not know Faulkner as the guard had claimed and that the guard had been fired for carrying an unauthorized weapon. Evidence was introduced that Faulkner had lost his job on January 3 and that Jimmy Osby, a close friend whom Faulkner called his "brother," had committed suicide on January 21. A Shelby County jailer testified that Faulkner was placed on suicide precaution on January 24.

Based upon the above evidence, the jury convicted Faulkner of first degree premeditated murder. A sentencing hearing was conducted to determine punishment.

At the penalty phase, the State presented proof that in March 1976 Faulkner was convicted of assault with intent to commit first degree murder,

-5-

assault with intent to commit robbery, and assault with intent to commit voluntary manslaughter. Evidence also showed that Faulkner was convicted of four robberies in September 1984 and second degree murder in October 1984.

Paulette Sutton, a forensic serologist and blood-stain expert, testified that based on her analysis of blood-stain patterns, the victim had collapsed fairly quickly but that the attack continued for six minutes. Sutton theorized that the victim's arms had not moved because Faulkner was straddling her during part of the assault, not because she was unconscious.

The final witness for the State was the victim's daughter, Twyla King. Ms. King testified that she had two brothers: Musenda Spencer, age twenty-one, and Jamil Spencer, age seventeen. Musenda was a freshman in college at the time of the murder. Because of the loss of his mother's financial support, Musenda now had to work while attending school. Jamil had "problems" and was incarcerated at the time of the murder. Taking custody of her younger brother affected Ms. King emotionally and financially. Ms. King testified that she and her husband had three daughters. The oldest daughter had been very close to her grandmother, suffered emotionally because of the murder, and was in counseling at the time of the trial. Ms. King concluded by stating that she missed her mother's emotional support.

In mitigation, the defense presented two witnesses. The first witness was Dr. Fred Steinberg, a forensic and clinical psychologist who had interviewed and tested Faulkner for twelve hours. Dr. Steinberg opined that Faulkner was not malingering. Dr. Steinberg testified that Faulkner had experienced a very rough childhood. He was neglected and abused. Both his parents were alcoholics, and one of them abused drugs. Faulkner lived with foster parents at times. Dr. Steinberg testified that Faulkner suffered from chronic substance abuse. According to Dr. Steinberg, on the night of the murder Faulkner's predisposition toward impulsive behavior was made significantly worse by a number of stressors: his attempt to establish himself outside of prison, his difficult relationship with his wife, the loss of his job in early January, his grandmother's hospitalization in early January due to Alzheimer's disease, his friend's suicide the day before the murder, and his frequent use of cocaine. Dr. Steinberg defined "stressor" as a life change that impacts an individual and has an effect upon his psychological and physiological condition. Dr. Steinberg stated that Faulkner had the ability to form intent but that he could not suppress his emotions and that his ability to

"cap" his behavior was diminished. Conceding that Faulkner had no mental disease or defect and was sane and competent, Dr. Steinberg diagnosed him as having mixed personality features and exhibiting paranoid thinking typical of cocaine usage. On cross-examination, the State elicited information concerning Faulkner's record of fighting with fellow inmates, possessing weapons, and threatening officers while incarcerated.

The second witness was Patricia McNealy, a counselor at an alcohol and chemical abuse center, who had worked with Faulkner beginning in November 1998 when he tested positive for cocaine while on parole. McNealy testified that Faulkner attended classes twice a week. She had noticed the stress in his life and observed that Faulkner began using cocaine again after losing his job in early January 1999. Around January 20, Faulkner called McNealy to tell her that he would not attend his next group session because his "brother" had committed suicide. Faulkner admitted during the call to McNealy that he had been using cocaine.

Based upon this proof, the jury found that the State had proven the statutory aggravating circumstance that the "defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2) (1997).[1] The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstance outweighed any mitigating circumstances. As a result, the jury sentenced Faulkner to death for the murder of Shirley Faulkner.

Faulkner, 154 S.W.3d at 52-56.


B. Post-Conviction Evidence

1. Petitioner's Proof

Lead Counsel testified that at the time of the post-conviction hearing, he had been practicing law for almost forty-three years. When he represented the Petitioner, half of his practice was devoted to criminal defense, and the other half was civil in nature. Lead

---

[1] The State also relied on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel in that it involved torture. See Tenn. Code Ann. § 39-13-204(i)(5) (1997). However, the jury did not find that aggravating circumstance.

Counsel had tried multiple capital cases before representing the Petitioner. He was retained to represent the Petitioner and thought he received only $500 for his work. He had represented members of the Petitioner's extended family for some time but was unsure whether he had represented the Petitioner previously. Lead Counsel was contacted by Glenda Williams or Eddie Parker to represent the Petitioner. He said his goal was to negotiate a guilty plea for second degree murder or manslaughter.

Lead Counsel testified that he waived the preliminary hearing in general sessions court. He thought the State only intended to present the testimony of Sergeant William Ashton, the officer who took the Petitioner's statement. Lead Counsel said that in Shelby County, the State would not provide discovery before a preliminary hearing but probably would provide a defendant's statement if the defendant waived the hearing. Lead Counsel assumed the State provided him with the Petitioner's statement as a result of his waiving the preliminary hearing. Lead Counsel later filed a motion for discovery and received discovery from the State. As a general rule, the prosecution only provided defense counsel with the information that the prosecution deemed to be discoverable. Lead Counsel did not recall the prosecutor's giving him a file and telling him to copy whatever he wanted.

Lead Counsel testified that when he signed the court jacket as counsel for the Petitioner, he received a copy of the affidavit of complaint dated January 26, 1999, charging the Petitioner with first degree murder. He never saw an affidavit of complaint dated January 25, 1999, charging the Petitioner with second degree murder. Lead Counsel also never saw a document reflecting a meeting between Assistant Attorney General Ken Roach and Sergeant Ashton. According to the document, General Roach requested to see the Petitioner's criminal record before determining what offense with which to charge him. General Roach reviewed the Petitioner's criminal record and determined the offense with which the Petitioner should be charged. Lead Counsel said he never saw a document reflecting a later meeting between Assistant District Attorney General Jerry Harris and Sergeant Ashton in which General Harris stated he thought the Petitioner should be charged with first degree murder.

Lead Counsel testified that he was unaware before trial that the Petitioner initially was charged with second degree murder. He acknowledged that the general sessions criminal information system report included both the charges for second degree murder and first degree murder. The report also provided that the date for the video arraignment for the second degree murder charge was January 26, 1999, and that the date for the video arraignment for the first degree murder charge was January 27, 1999. Lead Counsel did not think he was present for the arraignments because he had not yet been retained. He said he was retained between February 3 and February 17, 1999.

Lead Counsel testified that he did not know why he did not receive the affidavit of complaint regarding the second degree murder charge. He said that after an attorney signed the court jacket as representing a defendant, the attorney could obtain the affidavit of complaint. Lead Counsel said he may not have signed the court jacket for the second degree murder charge. Regardless, Lead Counsel thought the State should have provided the affidavit of complaint charging second degree murder in discovery.

Lead Counsel testified that he could not determine whether the initial affidavit of complaint charging the Petitioner with second degree murder would have been useful had the State provided it to him. The affidavit charging second degree murder stated that the Petitioner went to the victim's home, that they argued, and that the Petitioner attacked the victim. The affidavit of complaint charging first degree murder did not suggest that an altercation occurred before the attack. Lead Counsel acknowledged that the difference could have been significant in cross-examining Sergeant Ashton. He also acknowledged that the affidavit of complaint for second degree murder tended to support the Petitioner's statement to police that he went to the victim's home to talk with her, that they were involved in an altercation, and that he lost control. Lead Counsel could have used the affidavit of complaint to challenge the prosecutor's closing argument in which he stated that the Petitioner's version of the crime was "phony baloney."

Lead Counsel testified that he did not have any notes of his interviews with the Petitioner. He said he generally did not make notes of any meetings with clients or witnesses. He preferred not to have any notes in case the State requested them at trial as prior statements.

Lead Counsel testified that at some point, the Petitioner told him that the Petitioner had been using drugs and alcohol during and after the offense. Lead Counsel did not attempt to obtain a blood or urine sample from the Petitioner for testing because approximately three weeks had passed between the victim's death and Lead Counsel's being retained to represent the Petitioner. By that time, cocaine and alcohol likely would not have been in the Petitioner's system. Lead Counsel acknowledged that marijuana possibly could have remained in the Petitioner's system if the Petitioner had smoked it just before his arrest. He did not recall the Petitioner's informing him of the drug and alcohol use until some months after the preliminary hearing.

Lead Counsel testified that he did not interview Sergeant Ashton before trial. He generally did not interview police officers. He acknowledged that if he had not waived the preliminary hearing and Sergeant Ashton had testified, he could have learned more information about the charges. Lead Counsel said he may not have learned any additional

information because Sergeant Ashton likely would have testified only about the Petitioner's statement. Lead Counsel stated that in Shelby County, preliminary hearings generally were "cut . . . pretty short." He acknowledged that he would have been able to question Sergeant Ashton about the second degree murder charge if he had been aware of it.

Lead Counsel testified that Judge Joseph Dailey appointed Co-Counsel while he remained as lead counsel. Because the Petitioner was indigent, Lead Counsel secured the services of Clark Chapman and Glori Shettles as investigators by court order. Ms. Shettles worked for Inquisitor, Incorporated, and Mr. Chapman owned his own investigation firm. Lead Counsel identified an order entered on June 28, 2000, approving Ms. Shettles's services. Inquisitor requested $18,000 or $65.00 per hour to perform the mitigation investigation, and the trial court approved initial funds of $5,000. Lead Counsel also retained Dr. Fred Steinberg, a psychologist.

Lead Counsel testified that he filed a motion for Judge Dailey to recuse himself because Judge Dailey had prosecuted the Petitioner previously. Judge Dailey granted the motion, and Judge Chris Craft became the trial judge. Lead Counsel said that he requested funds for the services of Dr. Diane McCoy, a clinical psychologist in Knoxville, Tennessee. Lead Counsel wanted Dr. McCoy to assist in the mitigation aspect of the Petitioner's case. In her affidavit, Dr. McCoy requested up to $30,000 and listed the tasks she believed she needed to develop mitigation effectively. Lead Counsel said her services would have been in addition to the services of Dr. Steinberg. However, Judge Craft denied the request.

Lead Counsel testified that he had known Mr. Chapman for some time and that their offices were located on the same floor. They met "a couple of times" each week to discuss the Petitioner's case. Lead Counsel kept a refrigerator containing sodas in his office, and Mr. Chapman would stop by for a soda and update him on developments in the Petitioner's case. Mr. Chapman regularly updated him on the Petitioner's case in an informal way. Mr. Chapman also prepared memoranda regarding his investigation.

Lead Counsel testified that he did not know whether he, Co-Counsel, Ms. Shettles, and Mr. Chapman ever met together as a group. Lead Counsel and Co-Counsel met with Mr. Chapman. Ms. Shettles was conducting the mitigation investigation, and Lead Counsel knew that she and Mr. Chapman discussed the case. Ms. Shettles gathered background information on the Petitioner and sent reports to Lead Counsel and Dr. Steinberg. Lead Counsel thought Ms. Shettles came to his office for a meeting.

Lead Counsel testified that on November 28, 2000, Ms. Shettles sent trial counsel a letter stating that the funds approved by the trial court had been depleted. Ms. Shettles also

sent trial counsel a letter dated January 30, 2001, stating that she thought they had completed their work because she no longer had any funds. Lead Counsel thought he obtained additional funds for Ms. Shettles beyond the initial $5,000 approved by the trial court but did not recall the additional amount. Lead Counsel acknowledged that a few days after the Petitioner's trial, Ms. Shettles sent a letter to trial counsel in which she stated that she assumed they had requested additional funds for her.

Lead Counsel testified that Dr. Steinberg assisted trial counsel with preparing evidence of diminished capacity and mitigation. Lead Counsel said they were trying to show diminished capacity such that the Petitioner was unable to form the intent to commit murder. In his statement to police, the Petitioner had said he killed the victim. Therefore, his defense was based upon his mental state and whether he was capable of premeditation. Lead Counsel noted that around the time of the offense, the Petitioner had used cocaine and was under stress. Moreover, the Petitioner's best friend had committed suicide, and his grandmother was ill or had just died. The Petitioner had lost his job at the Cook Convention Center, and he had marital problems. Lead Counsel said the combination of the Petitioner's drug use and the stress factors caused him to "snap." Lead Counsel said that in addition to evidence of diminished capacity, an intoxication defense possibly existed. Trial counsel presented testimony from Patricia McNeely, a counselor who was helping the Petitioner at an alcohol/drug center.

Lead Counsel testified that Ms. Shettles recommended Dr. Steinberg to trial counsel. The trial court signed the order approving funds to retain Dr. Steinberg on November 5, 2000, shortly before the trial was to begin. The trial was continued, and Lead Counsel said the continuance could have been the result of his failure to provide Dr. Steinberg's report to the State in a timely fashion. Lead Counsel did not recall when he first met with Dr. Steinberg, but they met in his office. There, they discussed the standard for diminished capacity, and he told Dr. Steinberg what the defense needed in order to present such evidence. Dr. Steinberg had information about the Petitioner before the meeting.

Lead Counsel recalled that Dr. Steinberg testified at trial that he could not conclude the Petitioner had a mental disease or defect. The trial court ruled that Dr. Steinberg's testimony did not meet the standard for admissibility of diminished capacity evidence. Lead Counsel said that he had reviewed Dr. Steinberg's report with him before trial and that he knew Dr. Steinberg did not find a mental disease or defect. Nevertheless, Lead Counsel tried to introduce evidence of diminished capacity despite Dr. Steinberg's findings. He did not recall any discussion about retaining a psychiatrist in an attempt to find a mental disease or defect. Rather, Lead Counsel relied entirely upon Dr. Steinberg, stating that Dr. Steinberg "was my expert. He would have superior knowledge than me." Lead Counsel did not know

whether he was aware at the time of the Petitioner's case that psychological testing might not detect mental diseases or defects.

Lead Counsel testified that he reviewed the social history prepared by Ms. Shettles. He acknowledged that Ms. Shettles discussed the issue of fetal alcohol syndrome in her report. Lead Counsel said that he was aware of fetal alcohol syndrome at the time of the Petitioner's case but that he relied upon Dr. Steinberg's expertise in evaluating the Petitioner. Lead Counsel later testified that he did not know whether he was aware of fetal alcohol syndrome or fetal alcohol spectrum disorder before he represented the Petitioner. He said that, regardless, Dr. Steinberg evaluated the Petitioner and did not mention fetal alcohol spectrum disorder in his report. Lead Counsel did not recall anyone in the Petitioner's family having a serious drinking problem.

Lead Counsel testified that he was certain Dr. Steinberg received a copy of Ms. Shettles's report. Lead Counsel said he spoke to Dr. Steinberg "quite a bit before trial" but did not recall whether they discussed any fetal alcohol issues. Lead Counsel also said, "Apparently he didn't find it or he would have said something to us about it." Lead Counsel did not know whether fetal alcohol syndrome could be diagnosed by a psychologist. He did not recall discussing using a neuropsychologist or Dr. Steinberg suggesting a neuropsychologist. Lead Counsel said he was "roughly" aware that a difference between a clinical psychologist and a neuropsychologist existed. He also was aware of the difference between a psychologist and a psychiatrist.

Lead Counsel testified that Dr. Steinberg's report was dated November 12, 2000, and that Dr. Steinberg visited the Petitioner in jail on November 7, 8, and 10, 2000. Lead Counsel thought Dr. Steinberg began working on the case before the trial court entered an order approving funds. Lead counsel said that although trial counsel discussed Dr. Steinberg's findings with him before he drafted his report, he did not provide trial counsel with the report until shortly before the trial was scheduled to begin in November 2000. Trial counsel did not provide Dr. Steinberg's report to the State until after the jury was selected but before it was sworn. The Petitioner's trial was continued from November 2000 to March 2001.

Lead Counsel testified that he researched case law regarding diminished capacity and filed a defense plea of diminished capacity. He explained that he filed the plea to preserve the issue for appellate review. Lead Counsel said Dr. Steinberg attempted to help trial counsel present evidence of diminished capacity. Lead Counsel did not know how far in advance of the March trial that he knew a mental disease or defect was required but spoke with Dr. Steinberg many times before and during the trial regarding the requirement. He

-12-

thought he gave Dr. Steinberg copies of case law addressing diminished capacity and said Dr. Steinberg tried to find a defect that would qualify.

Lead Counsel testified that he and Co-Counsel spoke often before trial. They also spoke often with Dr. Steinberg. Lead Counsel had Ms. Shettles's reports, and Ms. Shettles provided them with the names of witnesses she thought should testify. Lead Counsel did not know whether he filed a notice of his intent to present psychological testimony during the penalty phase.

Lead Counsel testified that he relied upon diminished capacity in an attempt to obtain a conviction for a lesser offense. He thought that the Petitioner should have been convicted of a lesser offense but that they were "saddled with some bad facts." Lead Counsel did not think that trial counsel "panicked" when the trial court refused to allow them to present Dr. Steinberg's testimony. Rather, he thought the trial court's ruling was wrong. Lead Counsel raised the issue in the motion for new trial as a violation of the Petitioner's right to present a defense.

Lead Counsel testified that after he learned Dr. Steinberg did not find a mental disease or defect, he may have contacted other attorneys involved in capital litigation for any suggestions. He consulted with other criminal defense attorneys regularly. He did not know whether he consulted any attorneys outside of Memphis. Lead Counsel acknowledged that he received a letter from attorney David Keefe on April 27, 2001, approximately six weeks after the Petitioner's trial. However, he did not know if he communicated with Mr. Keefe prior to that date.

Lead Counsel acknowledged that according to Dr. Steinberg's report, the Petitioner received a critically abnormal score on the Luria-Nebraska Screening test. The report noted that the Petitioner's score on the Booklet Category Test showed that he manifested difficulty in abstraction, reasoning, and logical analysis. The report also stated that the Petitioner had difficulty shifting problem-solving strategies when confronted with changing circumstances. Lead Counsel said the Petitioner's statement about the offense could have demonstrated a shift in problem-solving strategy and a change of circumstances. Lead Counsel also said the Petitioner may have demonstrated reasoning and logical difficulties when the Petitioner thought he and the victim were going to reconcile and she told him that she wanted a divorce instead.

Lead Counsel testified that he did not recall seeking any experts to establish that some of the blood found in the victim's house belonged to the Petitioner. He recalled reviewing some documents indicating that the Petitioner was cut during an argument with the victim

a few days before her death. He did not recall searching for an expert to challenge the testimony of Dr. O.C. Smith or Paulette Sutton. Lead Counsel was taken by surprise with Ms. Sutton's testimony regarding the blood spatter. He recalled stating at trial that he had not seen a report from her. He did not know whether the defense interviewed Dr. Smith and Ms. Sutton before trial.

Lead Counsel testified that the victim had been working at a Piggly Wiggly on the day of her death. He did not recall seeing a photograph of the bedroom where the victim was found that depicted her work apron and two receipts from Piggly Wiggly on her bed. Lead Counsel said jurors might have disagreed as to whether the apron had been neatly placed or just thrown on the bed. He noted that the victim was found lying at the foot of the bed and that the attack occurred in the hallway. The State's theory was that the Petitioner was in the house when the victim returned. Lead Counsel said he may not have wanted to dwell upon the evidence found in the bedroom because the crime scene officers also found the skillet handle in the bedroom.

Lead Counsel testified that he did not recall an issue regarding the victim's moving her hands and the time of consciousness. Dr. Smith was questioned regarding whether the victim died immediately or suffered. Lead Counsel thought Dr. Smith's answer was helpful to the defense. He did not know whether he would have wanted to present evidence that someone might have moved the victim's hands while checking her pulse.

Lead Counsel testified that he did not recall the Petitioner's filing a complaint against him with the Board of Professional Responsibility. He identified a response that he sent to the Board addressing the reasons he did not present certain witnesses at trial. Trial counsel subpoenaed a warden who would have testified that the Petitioner won a prison essay award. Lead Counsel said the warden did not want to testify and informed Lead Counsel that he would say the Petitioner was a violent person. Lead Counsel discussed the matter with the Petitioner, and the Petitioner agreed that the warden should not testify. Lead Counsel was unable to locate Ms. Nesbitt of the Tennessee Department of Correction (TDOC) Probation and Parole Division. He did not recall Ms. Shettles's stating that the Petitioner's probation and parole records should be certified so that counsel could introduce them.

Lead Counsel testified that the State erred in its wording of the notice that it was seeking the death penalty against the Petitioner. The State attempted to correct the notice but failed to do so. Lead Counsel said he had wanted to wait until the trial began to argue that the State's notice was improper. However, a few days before trial, Co-Counsel went to the trial court regarding the matter. Judge Craft called the prosecutors and allowed them to amend their notice. Lead Counsel stated he might not have learned about the amended notice

until the day of trial. He did not think that he saw anything from the State indicating that Judge Craft had assisted the State with correcting the notice.

Lead Counsel testified that the Petitioner had been known as "Skillet" since his youth. The Petitioner told the police that he hit the victim with a skillet. Lead Counsel did not file a motion in limine to prevent any reference to the Petitioner as "Skillet." Instead, he challenged the evidence in a motion to suppress and made an oral objection at trial. Lead Counsel testified that he did not recall evidence presented establishing that the Petitioner had assaulted the victim during an argument on January 18, 1999, a few days before her death. He also did not recall whether the trial court offered a limiting instruction pursuant to Rule 404(b), Tennessee Rules of Evidence. Lead Counsel did not recall Mr. Chapman providing him with a recording of a 911 call by the victim on January 18, 1999, reporting that the Petitioner had stabbed himself and needed an ambulance.

Lead Counsel testified that he thought he subpoenaed Glenda Williams, the Petitioner's cousin, and that she attended the trial. Ms. Williams and her son, Eddie Parker, had approached Lead Counsel about representing the Petitioner. Lead Counsel had previously represented Ms. Williams and Mr. Parker in their respective divorces. Lead Counsel did not recall Ms. Williams telling him that the Petitioner called her several times on the day of the victim's death and told her that he was having difficulty thinking. He said Ms. Williams never told him that she was with the Petitioner after he killed the victim but before he turned himself in to the police or that the Petitioner was using drugs and alcohol. Rather, Lead Counsel said Ms. Williams told him that she did not want to testify.

Lead Counsel testified that he attempted to portray the Petitioner in as positive a light as possible. The defense presented evidence that the Petitioner attempted to turn himself in to the police but was turned away and instructed to return the following day. Lead Counsel did not know why he did not obtain a transcript of the suppression hearing before trial.

On cross-examination, Lead Counsel testified that upon receiving completed questionnaires from potential jurors, he read each questionnaire and made index cards for each potential juror, grading the juror as good or bad for the defense. In the Petitioner's complaint to the Board, the Petitioner alleged that Lead Counsel should have presented at trial the testimony of the prison warden. The warden could have been the warden at the facility where the Petitioner served a prior sentence. According to Lead Counsel, the warden did not want to testify and claimed he would have to testify that the Petitioner was violent in the facility. As a result, Lead Counsel did not want to present him as a witness and discussed the matter with the Petitioner. Lead Counsel said he and Co-Counsel made a "trial decision judgment call" against calling the warden as a witness. Lead Counsel could not

locate Ms. Nesbitt to serve her with a subpoena because she was no longer employed by the Department of Probation and Parole.

Lead Counsel testified that the Petitioner also complained to the Board that Dr. Steinberg and Ms. McNeely were not allowed to testify during the guilt phase. Lead Counsel attempted to present their testimony in the guilt phase, but the trial court excluded it. Both witnesses testified during the penalty phase.

Lead Counsel testified that he had retained Mr. Chapman as an investigator in other criminal cases. Mr. Chapman knew how to conduct the investigation, and trial counsel requested that he conduct a follow-up investigation on other matters. Lead Counsel provided Mr. Chapman with a copy of discovery. Mr. Chapman either provided trial counsel with written memoranda or updated them verbally. They had ongoing conversations up to and through the trial. Lead Counsel did not have to direct Ms. Shettles because she knew what to do, and he relied on her to identify experts. Lead Counsel said Ms. Shettles provided him with Dr. Steinberg's name; Lead Counsel did not know Dr. Steinberg before working with him on the Petitioner's case. Lead Counsel provided Dr. Steinberg with all the information he requested and met with him.

Lead Counsel testified that Dr. Steinberg mentioned potential alcohol abuse by the Petitioner's mother in his report. Dr. Steinberg, however, focused on other issues. Lead Counsel was certain that if Dr. Steinberg had thought additional testing was needed, he would have told counsel. Dr. Steinberg never told counsel that additional experts should be retained. Lead Counsel continued to have discussions with Dr. Steinberg after Dr. Steinberg generated his report, and they discussed the issue of mental disease or defect. Dr. Steinberg attempted to establish diminished capacity and was upset that he could not do so.

Lead Counsel testified that he presented Dr. Steinberg's testimony in mitigation. Dr. Steinberg testified about the Petitioner's cocaine abuse and the stressors that he was experiencing, including his failing marriage. The Petitioner's friend had committed suicide, and the Petitioner had employment and financial issues. Lead Counsel recalled that both Dr. Steinberg and Ms. Shettles provided him with those issues to present. Lead Counsel also presented testimony from Ms. McNeely regarding the Petitioner's drug treatment and requested certain jury instructions regarding mitigation. The defense received information from the Petitioner's family members, and the Petitioner cooperated with trial counsel, Dr. Steinberg, and Ms. Shettles.

Lead Counsel testified that the defense strategy at the guilt phase was that the Petitioner's capacity was diminished and that the State should not have charged him with first

degree murder. They also tried to show that the homicide was spontaneous and a crime of passion. The mitigation strategy was that the Petitioner reacted without thinking, had been using cocaine, and had been subject to multiple stress factors.

On redirect examination, Lead Counsel testified that Ms. Shettles interviewed Warden Warren Douglas and provided Lead Counsel with a memorandum summarizing the interview. The memorandum stated that the warden had described the Petitioner as a good inmate who had taken responsibility for his past crimes. The memorandum also stated that the warden had agreed to testify on the Petitioner's behalf. Lead Counsel said the warden's testimony was relevant to the Petitioner's past behavior in prison and his belief that the Petitioner would not pose a threat to anyone in the prison system. Lead Counsel said the warden later called and said it would not be in the defense's best interest to present him as a witness because he would testify that the Petitioner had been a violent person. Lead Counsel said he would have had difficulty impeaching his own witness, particularly in front of a jury. He was certain that he told the warden what he wanted from the warden's testimony. Lead Counsel acknowledged that the jury was going to think that the Petitioner might be a violent person when it learned of his past record, but Lead Counsel "didn't need to add any more fuel to the fire." Lead Counsel thought the essay award would reflect favorably on the Petitioner. Warden Douglas thought the Petitioner's essay no longer existed.

Lead Counsel testified that trial counsel may have attempted to secure additional funds for Ms. Shettles but that the trial judge was not willing to grant additional funds. He said that rather than filing a motion, trial counsel may have approached the judge and asked whether he would grant additional funds.

Lead Counsel testified that if Dr. Steinberg had thought the use of alcohol by the Petitioner's mother was vital evidence, he would have advised trial counsel to consult other experts. Lead Counsel did not recall whether he was aware at the time of the trial that Dr. Smith was going to testify that blood clotted within five to six minutes. He did not retain any experts to challenge that testimony.

On recross examination, Lead Counsel acknowledged that according to Dr. Steinberg's report, the Petitioner yielded a critically abnormal score on the Luria-Nebraska screening testing that "typically [was] marginally indicative of brain damage and [needed] further neuropsychological testing." However, the next sentence in the report stated, "However, upon closer inspection his difficulties noted above in math were largely responsible for this marginal score. Therefore, the results on this test are seen as being

consistent with his above mentioned intellectual functioning." Lead Counsel acknowledged that that sentence meant the abnormal score was not as significant.

Co-Counsel testified that he became licensed to practice law in 1993 and that Judge Dailey appointed him to this case on October 11, 1999. Prior to the appointment, Judge Dailey questioned him regarding his background and experience. Co-Counsel had recently been certified to serve as second chair in capital cases and had represented defendants in ten to fifteen jury trials, including one first degree murder case. However, this was his first capital trial.

Co-Counsel testified that he met with the Petitioner on a number of occasions before trial and took notes of their meetings. Lead Counsel met with the Petitioner's family because he was familiar with them. Co-Counsel said he mentioned to Lead Counsel about filing a motion in limine to exclude evidence of the Petitioner's nickname, but the motion was not filed.

Co-Counsel testified that he and Lead Counsel had informal meetings in which they discussed the case and divided out responsibilities. They discussed ideas about the direction of the case. Lead Counsel ultimately determined what tasks needed to be completed and who should complete them. Co-Counsel was to approach Judge Dailey and request funds for experts.

Co-Counsel testified that he did not draft a motion requesting funds for experts. Rather, he met with Judge Dailey on multiple occasions and requested experts. Judge Dailey denied any funds to retain Inquisitor, Incorporated. Judge Dailey thought Inquisitor overcharged, and Co-Counsel "got the sense he didn't like them." Initially, Judge Dailey only granted funds to retain Mr. Chapman. When the Petitioner's case was transferred to Judge Craft, Co-Counsel went to him and requested the same experts for whom Judge Dailey had denied funds.

Co-Counsel testified that trial counsel were aware of issues regarding the Petitioner's current and past mental state. They wanted to retain a mental health expert and an expert who would determine whether there were any issues as a result of the Petitioner's childhood. The trial court never granted funds to retain such an expert. Co-Counsel did not think he filed a formal motion requesting the funds.

Co-Counsel testified that he prepared a motion requesting funds to retain Dr. Diane McCoy, a psychologist, to address mitigation issues regarding the Petitioner's childhood and mental health issues. Co-Counsel acknowledged that according to Dr. McCoy's affidavit,

her services related to those of a mitigation specialist who would prepare a social history. Co-Counsel explained that Ms. Shettles was not a psychologist and that the defense needed a mental health expert to explain to the jury that the Petitioner's past and present mental health issues may have affected his behavior. Co-Counsel did not request a hearing on the record regarding Dr. McCoy, and the trial court never approved funds to retain her. Co-Counsel said, "We were just shot down by that."

Co-Counsel acknowledged that other than the date on which he was appointed, he did not include any other entries on his fee claim for 1999. He explained that trial counsel did not perform many tasks in 1999 because the holidays were near, and they knew they had some time to complete the tasks before trial. The next court date listed on Co-Counsel's fee claim was April 11, 2000, in which he had a conference with the trial court regarding his request for funds to retain Dr. McCoy. Co-Counsel recalled having several conversations with Judge Craft regarding Dr. McCoy.

Co-Counsel testified that Lead Counsel knew the Petitioner's family and that Lead Counsel told him the family had a history of drug and alcohol abuse existed. Lead Counsel thought the Petitioner's past history of incarceration, family, and current mental health issues needed to be explored. Co-Counsel thought obtaining a social history was "vital." The purpose of the social history was to inform the jury that the events that occurred on the night of the victim's death should not be considered in a vacuum. Co-Counsel said the social history prepared by Ms. Shettles showed that the Petitioner's mother drank alcohol heavily during pregnancy and throughout her life. Ms. Shettles noted the Petitioner's low birth weight and questioned whether it was the result of fetal alcohol syndrome. Ms. Shettles discussed other indicators of fetal alcohol syndrome. Co-Counsel told Lead Counsel that an expert in fetal alcohol syndrome was needed and requested funds from the trial court for such an expert. Co-Counsel could not recall whether he filed a formal motion requesting the funds.

Co-Counsel testified that fetal alcohol syndrome was a new issue being raised in capital defenses. Initially, he requested funds from the trial court for an expert in fetal alcohol-related illness. However, he never made the request in a formal motion. He said that Dr. McCoy would have addressed those areas but that his request for funding was denied. Co-Counsel contacted defense attorneys from Memphis for the names of experts in fetal alcohol-related illness but did not contact any national or state-wide organizations.

Co-Counsel testified that the case was scheduled to go to trial in November 2000. After the jury was selected, the trial was continued before the jury was sworn. The continuance was due in part to trial counsel's providing the State with a copy of Dr.

-19-

Steinberg's report the day after the jury was selected. Co-Counsel said they provided the report to the State shortly after receiving it. The trial was continued until March 5, 2001.

Co-Counsel testified that he did not recall interacting with Ms. Shettles often. He identified three letters from Ms. Shettles dated November 28, 2000; January 30, 2001; and March 14, 2001. In the November and January letters, she said she had run out of funds. In the January letter, she also asked whether trial counsel wanted her to complete any additional tasks. In the March letter, Ms. Shettles requested that trial counsel have her fees approved by the trial court. Co-Counsel noted that the January and March letters were addressed only to Lead Counsel. He could not recall whether he had any interaction with Ms. Shettles between November 2000 and March 2001.

Co-Counsel testified that his fee claim did not include any out-of-court hours between November 14, 2000, and January 31, 2001. The next entry on his fee claim was February 28, 2001, when he interviewed Dr. O.C. Smith for two and one-half hours. Co-Counsel said he was surprised by Ms. Sutton's testimony. He said the information he had obtained from his interviews with Dr. Smith and Ms. Sutton was completely different from their trial testimony. Co-Counsel requested funds from the trial court to retain a forensic expert, but the court denied the request. Co-Counsel did not file a formal motion for funds for a forensic expert.

Co-Counsel testified that he performed the majority of the work regarding the diminished capacity issues. Trial counsel attempted to determine a way to present evidence of diminished capacity despite Dr. Steinberg's report. Co-Counsel acknowledged that the task was difficult. Trial counsel wanted to question the jurors during voir dire regarding diminished capacity, and they discussed the issue at trial. They attempted to present Dr. Steinberg's testimony during the guilt phase, but the trial court did not permit him to testify because he could not find a mental disease or defect.

Co-Counsel testified that he had multiple meetings with Lead Counsel regarding Dr. Steinberg's failure to find a mental disease or defect. Co-Counsel recalled meeting with Dr. Steinberg in Dr. Steinberg's office either before or after receiving his report. Co-Counsel said that diminished capacity was a primary issue and that Dr. Steinberg's report "caught us off guard." Neuropsychological testing was discussed with Dr. Steinberg during the meeting, but Co-Counsel did not recall the outcome of the discussion. He said Lead Counsel was responsible for interacting with Dr. Steinberg. Co-Counsel thought the Petitioner had mental health issues, and Co-Counsel wanted to retain as many mental health experts as possible. Trial counsel discussed presenting an intoxication defense and attempted to argue that the Petitioner's drug and alcohol addictions were mental illnesses. Co-Counsel acknowledged that according to a police department "law incident table," an officer had suspected the

-20-

Petitioner of using alcohol at the time of the offense. Co-Counsel also acknowledged that the table could have been valuable in his cross-examination of the State's witnesses.

Co-Counsel testified that he had contact with Mr. Chapman and was aware that Mr. Chapman had located a woman with whom the Petitioner had reported using drugs before the victim's death. Trial counsel did not issue a subpoena for her. Mr. Chapman informed trial counsel that the woman's drug problems were so serious that she might not be a credible witness. Co-Counsel thought Mr. Chapman may have had problems locating her near the time of trial. Co-Counsel wanted to present the woman as a witness, but Lead Counsel decided not to do so.

Co-Counsel testified that he decided the Petitioner should not testify at trial. Co-Counsel and the Petitioner discussed in detail the possibility of the Petitioner's testifying. Co-Counsel recalled that when the Petitioner testified at the suppression hearing, he was "totally confused" and did not testify well on cross-examination. One of the considerations in Co-Counsel's decision not to present the Petitioner as a witness at trial was that the Petitioner had testified so poorly during the suppression hearing.

Co-Counsel testified that before trial he obtained the affidavit of complaint charging the Petitioner with first degree murder. He never saw the affidavit of complaint charging second degree murder. Co-Counsel said the affidavit of complaint charging second degree murder would have been helpful at trial because the entire focus of the defense was to explain to the jury exactly what had occurred. He said the affidavit also would have been helpful during his cross-examination of Sergeant Ashton. Co-Counsel could not say what he would have done if the affidavit had been provided to him. He said the events listed were essentially his closing argument, which the prosecutor referred to as "a bunch of hocus pocus or whatever words he used."

Post-Conviction Counsel showed Co-Counsel two documents reflecting meetings between an officer and two assistant district attorneys general. Co-Counsel acknowledged that according to one of the documents, General Roach had accepted the Petitioner's claim that the victim's death was the result of a domestic disturbance that got out of control. Co-Counsel noted that according to the document, General Roach had examined the Petitioner's criminal record before authorizing the charge of second degree murder. Co-counsel said that if he had had the document at trial, his cross-examination of Sergeant Ashton would have been "totally different."

Co-Counsel acknowledged that during the pretrial suppression hearing, he conducted Sergeant Ashton's cross-examination and the Petitioner's direct examination. Co-Counsel

also acknowledged that he attempted to impeach Sergeant Ashton's trial testimony with his suppression hearing testimony. However, Co-Counsel had "numerous problems with that" because he did not have the suppression hearing transcript. He did not recall a reason for not obtaining the transcript before trial.

Co-Counsel testified that three days before the trial was set to begin, he approached Judge Craft to determine whether the trial was going forward as a death penalty case because the death notice was improper. Co-Counsel had told Lead Counsel that he planned to approach the trial court about the issue. He said that if Lead Counsel had told him not to approach the trial court, he would not have done so. Co-Counsel said Judge Craft informed the prosecutors about the improper notice and instructed them on how to draft the notice properly. Co-Counsel did not consider filing a motion for Judge Craft to recuse himself.

Co-Counsel testified that trial counsel did not file a motion arguing that the death penalty was unconstitutional under the First Amendment. The motion was filed in a different case, and trial counsel decided to wait for that result before filing the motion in this case. The motion was denied in the previous case, so Lead Counsel decided not to file the motion in the Petitioner's case.

On cross-examination, Co-Counsel testified that he did not know which officer entered the information in the law incident table regarding the suspicion about the Petitioner's using alcohol. He acknowledged that the statement had to be admissible in order for him to question a witness about it. He also acknowledged that if he had discovered that Sergeant Ashton did not make the entry in the table, he could not have used the statement to impeach the officer's testimony.

Co-Counsel testified that he and Lead Counsel made a list of experts they wanted to retain and discussed the list. Co-Counsel said they needed an investigator, a mental health expert to assess the Petitioner's present-day mental health issues, an expert to review his childhood issues resulting from drug and alcohol abuse, a forensic expert, and a jury consultant. He also thought they needed a psychological expert to educate the jury about how a person who had spent the majority of his or her life incarcerated would react to the outside world. Co-Counsel approached Judge Dailey and requested funds for the experts. Judge Dailey denied his request for funds to retain Inquisitor but granted his request for funds to retain Mr. Chapman. When Judge Craft became the trial judge in the case, Co-Counsel approached him with the same list of experts. Judge Craft granted the request for funds to retain Ms. Shettles to conduct the mitigation investigation but denied the request for funds to retain Dr. McCoy, a forensic pathologist, and a jury consultant.

Co-Counsel testified that he thought Lead Counsel suggested Dr. Steinberg. Co-Counsel said they expected Dr. Steinberg to conclude that the Petitioner had a mental health disease and that they were going to use the diagnosis to establish diminished capacity. Dr. Steinberg, however, did not find any mental illness. Co-Counsel did not recall Dr. Steinberg's ever stating that he would change his opinion.

Co-Counsel testified that according to Dr. Steinberg's report, Dr. Steinberg considered the Petitioner's statement, jail records, mental records, school records, juvenile court records, parole records, employment records, drug treatment records, and correction center records. Dr. Steinberg also considered the social history prepared by Ms. Shettles; her interview with Leon Brown, Patti McNeely, Sherry Osby, and the Petitioner's family; an incident report involving Jimmy Osby; Ms. Shettles's summary of the Petitioner's prior convictions; and photographs. Dr. Steinberg focused on the Petitioner's life and the traumatic incidents that had occurred in his life. Dr. Steinberg discussed dysfunctional lifestyles, drug abuse, and a number of stressors that were in the Petitioner's life before the victim's death. The stressors included the Petitioner's disintegrating marriage, his problems with employment, drug and alcohol abuse, failed drug screens, and his relationship with another woman.

Co-Counsel testified that Dr. Steinberg diagnosed the Petitioner with poly-substance abuse under Axis I and personality disorder not otherwise specified under Axis II. Under Axis IV, Dr. Steinberg noted problems related to the Petitioner's primary support group, his interaction with the legal system, his occupation, and his social environment and housing. Dr. Steinberg's global assessment of the Petitioner was 60. Co-Counsel said he, Lead Counsel, and Dr. Steinberg discussed whether another expert should evaluate the Petitioner. According to Co-Counsel, the trial court refused to grant funds to retain any other mental health expert for any other reason. Co-Counsel did not recall Dr. Steinberg's suggesting another expert.

Co-Counsel testified that he met with Dr. Smith and Ms. Sutton at the medical examiner's office. They discussed the autopsy, the cause of the victim's death, the victim's injuries, and the crime scene. They also discussed that a cast iron skillet was used and that the handle of the skillet was broken off. Co-Counsel asked Dr. Smith how the handle could have broken, and Dr. Smith said it could have broken if the skillet was old or worn. Co-Counsel said he was surprised by Dr. Smith's answer because he had expected Dr. Smith to state that the handle was broken because the victim was beaten to the point that she was unrecognizable. Co-Counsel stated that the victim was beaten badly and that the scene was "gruesome." Dr. Smith discussed with Co-Counsel the gravity of the victim's injuries and how she died. Ms. Sutton educated Co-Counsel about blood spatter and what the evidence would mean at trial. Co-Counsel said that at trial, Dr. Smith discussed war injuries and "the

explosive type thing." Dr. Smith described the crime scene as a "two hour torture scene." Co-Counsel said Dr. Smith's testimony took him by "complete surprise."

Co-Counsel testified that the Petitioner told him about the night of the victim's death, his job, his relationship with the victim, and how his prison experience had formed his ability to function in the outside world. Co-Counsel said the Petitioner was unable to explain with clarity what occurred on the night of the victim's death or how the death occurred. The Petitioner was able to answer Co-Counsel's questions regarding the facts, the events, and his background and history. The Petitioner was able to provide emotional detail regarding his family and his past.

Co-Counsel testified that he had a good relationship with Lead Counsel and that Lead Counsel listened to his thoughts and suggestions. Co-Counsel spoke with Mr. Chapman frequently. Co-Counsel said that if he requested additional funds, the money was either for Mr. Chapman or Dr. Steinberg. Co-Counsel thought that he requested additional funds for Mr. Chapman and that the trial judge approved the request. Co-Counsel did not know if he requested additional funds for Dr. Steinberg.

Co-Counsel testified that he received Ms. Shettles's report shortly after the date on the report. He was unsure whether Lead Counsel requested that Ms. Shettles complete any additional tasks. Co-Counsel did not think there were any other tasks she needed to complete.

Co-Counsel testified that he conducted voir dire with the benefit of jury questionnaires. He and Lead Counsel reviewed the questionnaires and ranked the potential jurors. Co-Counsel said Lead Counsel had a unique system in that he wrote information about each juror on index cards. Lead Counsel, Co-Counsel, and the Petitioner decided whether to keep or strike a juror. Co-Counsel said that when considering potential jurors, he considered not only those in the jury box but those who could replace them.

On redirect examination, Co-Counsel testified that he did not request funds for experts in a formal motion or ask for a formal hearing. Instead, Co-Counsel spoke with Judge Dailey and later Judge Craft. The judges always wanted to know how much an expert was going to cost, and Co-Counsel would tell them that he did not know. The judges also wanted to know why Mr. Chapman or Dr. Steinberg could not complete the tasks. Ultimately, the judges always concluded that the expert was not needed. Co-Counsel acknowledged that he could not appeal their rulings if his requests were not in writing.

Clark Chapman, a private investigator, testified that he was hired by trial counsel in March or April 2000. He met with both of them but met more frequently with Lead Counsel because their offices were close. He occasionally spoke with Co-Counsel over the telephone or at Co-Counsel's office. Mr. Chapman's meetings with trial counsel were usually brief. However, he had one meeting with Co-Counsel and the Petitioner that lasted several hours. Mr. Chapman spoke to Ms. Shettles on the telephone and talked with her several times when they met with the Petitioner.

Mr. Chapman testified that he was retained to conduct the guilt/innocence portion of the investigation. The Petitioner was knowledgeable about the people involved in the case and identified witnesses for Mr. Chapman to interview. Mr. Chapman thought the case was more related to mitigation. He explained that based on the Petitioner's statements to him and the police, his job was to determine what took place and what led to the victim's death.

Mr. Chapman testified that the defense was concerned about the Petitioner's mental status at the time of the crime. Mr. Chapman researched the issue and interviewed witnesses the Petitioner identified as possibly being able to develop his actions before the victim's death. Mr. Chapman said that the information was important to both the guilt and penalty phases and that he hoped the jury would convict the Petitioner of a lesser offense.

Mr. Chapman testified that he interviewed Glenda Williams, prepared a memorandum of the interview, and gave the memorandum to trial counsel. Ms. Williams reported that the Petitioner had contacted her and asked her to pick him up on the night of the victim's death. The Petitioner reported problems with his mental state. Ms. Williams refused to pick him up because of a storm that night.

Mr. Chapman testified that he searched for Terri Strickland, who lived close to the home of the Petitioner's grandmother. The Petitioner was alleged to have been with her before the victim's death. Mr. Chapman located Ms. Strickland and spoke with her briefly several times. He said Ms. Strickland was "fidgety" and appeared to be a "street person" or "a person who [was] very visibly on drugs." Mr. Chapman was unable to complete an interview with her because she could not maintain a conversation for more than a few minutes. Ms. Strickland admitted that she was with the Petitioner on the afternoon before the victim's death and that they were "partying." When Mr. Chapman attempted to question Ms. Strickland about the partying, she told him to return later and she would tell him about it. The last time Mr. Chapman spoke with Ms. Strickland, she told him that she would call him at 9:00 p.m. that night. However, she never called. Mr. Chapman did not recall trial counsel's instructing him to subpoena Ms. Strickland for trial.

Mr. Chapman testified that approximately 90% of his work involved criminal defense. During the course of his career, he had spoken to other witnesses and defendants about partying and had observed others that were "fidgety" or "jumpy." Mr. Chapman thought "partying" involved drug use. He submitted a preliminary timeline to trial counsel, stating that on Thursday, January 21, 1999, the Petitioner visited Ms. Strickland at 8:30 p.m. and smoked cocaine. The timeline also included an entry for 4:30 p.m. that same day regarding the Petitioner's smoking cocaine. Mr. Chapman recalled discussions about an intoxication defense.

Mr. Chapman testified that he tried to locate Rosie Puryear or "Bee." He went to her home, left his number there, and spoke to a man who lived at the home. He also telephoned Ms. Puryear. However, Ms. Puryear did not cooperate. He acknowledged that he could have conducted surveillance of her home in an attempt to interview her. He talked with trial counsel numerous times about his attempts to contact Ms. Puryear.

Mr. Chapman testified that he obtained a 911 tape recording regarding an altercation between the Petitioner and the victim that had occurred at the home of the Petitioner's grandmother several days before the victim's death. He prepared a memorandum summarizing the tape recording and provided the recording to counsel. He reviewed the social history prepared by Ms. Shettles. Mr. Chapman did not recall meeting with Dr. Steinberg before trial but spoke with him during the course of trial.

On cross-examination, Mr. Chapman testified that he knew his responsibilities regarding the investigation. He, Co-Counsel, and the Petitioner met in the jail for several hours. The Petitioner identified witnesses and the general vicinity where the witnesses could be located. Mr. Chapman compiled a timeline based upon his interviews with the Petitioner and witnesses and the records that he obtained.

Mr. Chapman testified that the Petitioner did not deny killing the victim. According to his statement to police, the Petitioner beat the victim with a skillet. Mr. Chapman said the only issue was the Petitioner's mental state. As a result, Mr. Chapman's investigation was very limited. He thought the majority of the investigation related to the issues for which Ms. Shettles was responsible.

Mr. Chapman testified that the Petitioner identified Ms. Puryear as a witness but that Ms. Puryear basically "dodged" him. At first, he left messages for her to contact him but did not provide a reason. Later, he left messages stating that he needed to talk with her about the Petitioner's case. Mr. Chapman telephoned her home, spoke to a man, and told him the reason for the call. Ms. Puryear never returned his messages, and Mr. Chapman said it

appeared that she was unwilling to cooperate. Mr. Chapman discussed the matter with the Petitioner. The Petitioner said that he knew the man and that he thought the man had told Ms. Puryear not to get involved.

Mr. Chapman testified that Ms. Strickland appeared to be a drug addict. The Petitioner told him that Ms. Strickland used cocaine and other drugs heavily. Mr. Chapman said Ms. Strickland's appearance and behavior confirmed the Petitioner's statement. Mr. Chapman met with Ms. Strickland twice, but she always "put him off" until later. He said she could not stand still long enough to tell him what he needed to know. He informed trial counsel and the Petitioner about his difficulties with interviewing Ms. Strickland.

On redirect examination, Mr. Chapman testified that he and counsel typically interviewed a defendant and built a task list based upon the witnesses to be interviewed and the documents to be obtained. Counsel determined whether Mr. Chapman should spend a great amount of time investigating certain areas. Counsel usually determined which records and witnesses were to be subpoenaed.

Mr. Chapman testified that he never spoke with Ms. Puryear and just left her messages. He acknowledged that Ms. Puryear never told him directly that she did not want to be involved. He also acknowledged that he could have issued a subpoena for her.

Mr. Chapman testified that the Petitioner described the events of the offense to him. The Petitioner and the victim had separated, but the Petitioner thought they were going to reconcile. The Petitioner claimed that when the victim told him she wanted a divorce, he "snapped."

Glori Shettles, a mitigation investigator with Inquisitor, Incorporated, testified that she conducted the mitigation investigation for the Petitioner's case and prepared a social history for the Petitioner. The purpose of the social history was to develop case strategy and identify which witnesses to present during the guilt and penalty phases. An expert could use the social history as an overall assessment of the defendant's life. The social history included the places, people, and records from which the information was obtained.

Ms. Shettles testified that she never received any feedback from trial counsel regarding the information she provided, that they never asked her to follow up on any information, and that she attempted to contact them many times about the information. Trial counsel did not ask her to provide any insight into the appropriate experts that might be needed.

Ms. Shettles testified that she did not recommend Dr. Steinberg to trial counsel and did not recall ever working with him before the Petitioner's case. Dr. Steinberg requested Ms. Shettles's assistance in obtaining documentation. Ms. Shettles wrote a letter to Lead Counsel dated October 17, 2000, regarding Dr. Steinberg's request. At that time, the Petitioner's trial was scheduled for November 2000. Ms. Shettles provided the Petitioner's social history to Dr. Steinberg on November 2, 2000, and to trial counsel the following day. Ms. Shettles referred to the possibility of fetal alcohol damage in the social history. She talked with the Petitioner's family members about their personal knowledge of his mother's drinking alcohol during her pregnancy. Ms. Shettles said the Petitioner's birth records reflected problems with the birth and the Petitioner's low birth weight, indicators of fetal alcohol syndrome. Ms. Shettles said she learned of fetal alcohol syndrome during training and through research. She was aware of the possibility of cognitive impairments, developmental problems, and neurological or brain damage in people with fetal alcohol syndrome.

Ms. Shettles testified that if she been asked to recommend an expert, she would have suggested a neuropsychologist. A neuropsychologist had areas of expertise and training on cognitive issues and in administering tests that were indicators of neuropsychological problems. She said the areas would have related to mental defects rather than mental diseases. Ms. Shettles assumed that Dr. Steinberg would have been alerted to possible issues or problems and would have made the recommendation.

Ms. Shettles testified that she was unaware trial counsel intended to present evidence of diminished capacity. She knew diminished capacity required a showing of a mental disease or defect such that the person's capacity to form intent was diminished. Ms. Shettles said that because Dr. Steinberg did not find a mental disease or defect, trial counsel should have used another expert to address fetal alcohol syndrome as a defect.

Ms. Shettles testified about difficulties she had in communicating with trial counsel. Trial counsel did not return her telephone calls or respond to her letters. On August 22, 2000, shortly after meeting with the Petitioner and obtaining initial information about the case, Ms. Shettles wrote Lead Counsel and requested information that could have been helpful for obtaining records. Lead Counsel did not respond. Ms. Shettles met with Lead Counsel within two or three weeks of the original November trial date. According to Ms. Shettles's memorandum about the meeting, the trial date was scheduled for November 13, and the meeting occurred on November 9. Co-Counsel did not attend the meeting, even though Ms. Shettles had requested that he do so. During the meeting, Lead Counsel informed Ms. Shettles that he intended to call Dr. Steinberg and the Petitioner as witnesses. Lead Counsel did not ask Ms. Shettles to complete any additional tasks.

-28-

Ms. Shettles testified that the Petitioner sent a letter to her and Mr. Chapman, stating that he was concerned because he did not know what evidence would be presented. The Petitioner said he was unaware of the trial strategy and did not have any contact with Lead Counsel. When Ms. Shettles met with Lead Counsel, he informed her that he planned to meet with the Petitioner that upcoming Saturday. Ms. Shettles and Mr. Chapman visited the Petitioner on Sunday and learned that Lead Counsel had not met with him.

Ms. Shettles testified that she never met with Co-Counsel and that Mr. Chapman had a better relationship and rapport with Co-Counsel. Mr. Chapman told Ms. Shettles that he communicated with Co-Counsel because Lead Counsel would not return his calls. Ms. Shettles later learned from Mr. Chapman that the Petitioner's trial had been continued to March 2001.

Ms. Shettles testified that she interviewed several family members and was the primary contact for the family. Through her interviews, she learned that the Petitioner's mother drank alcohol during her pregnancy. The primary source of that information was the Petitioner's first cousin, Willie Mae Avery, who was at least twenty years older than the Petitioner. Ms. Shettles met with Ms. Avery on one occasion and may have spoken with her briefly on the telephone. Ms. Avery passed away in 2006. Ms. Shettles described the Petitioner's family as extremely cooperative. She informed family members that they may be called to testify, and no one objected. Ms. Shettles learned that the Petitioner's father was a heroin addict. She said a history of drug and alcohol abuse on both sides of a family made a person more likely to have substance abuse problems.

Ms. Shettles testified that she interviewed Warden Wayne Douglas, whom she had known for many years. Warden Douglas had worked at Fort Pillow Prison, and Ms. Shettles questioned him regarding the Petitioner's issues in prison. The Petitioner respected Warden Douglas both personally and professionally and thought he would be a very credible witness. Ms. Shettles did not recall the warden's suggesting that his testimony would negatively impact the Petitioner. The warden planned to testify about an award the Petitioner had won in a contest during Black History Month, and Ms. Shettles recommended that trial counsel present Warden Douglas as a witness. Ms. Shettles said Warden Douglas had no reservations about testifying and that he "would not gloss over" any negative aspects in the Petitioner's disciplinary record. Ms. Shettles thought Warden Douglas could have explained the issues that existed in prison and prisoners' experiences, especially for the length of time the Petitioner had been incarcerated.

Ms. Shettles testified that she contacted Leon Brown, the Petitioner's former employer, who described the Petitioner as an excellent employee. Mr. Brown had a contract

with the City of Memphis to clean the Cook Convention Center. The contract changed to require criminal background checks. When Mr. Brown told the Petitioner about the new requirement, the Petitioner said he would not be able to pass a criminal background check and informed Mr. Brown about his criminal history. Mr. Brown was "shocked" when he learned that the Petitioner had been charged with killing the victim. On January 17, 1999, the Petitioner had been involved in an incident with the victim. Ms. Shettles learned about the incident from the Petitioner and the police incident report.

Ms. Shettles testified that one of her roles in capital cases was to prepare witnesses to testify. However, trial counsel did not ask Ms. Shettles to prepare witnesses to testify in this case. Ms. Shettles said she made it clear that she was willing to help trial counsel in any way, but she did not think she specifically told trial counsel that she could prepare witnesses for trial.

Ms. Shettles testified that she never discussed the Petitioner's social history or her concerns about fetal alcohol syndrome with Dr. Steinberg. Dr. Steinberg requested the records and the discovery materials from Ms. Shettles. Ms. Shettles said that Dr. Steinberg wanted to know whether the Petitioner had given a statement to the police and that she was not provided with any statement. Ms. Shettles never received a copy of Dr. Steinberg's report. She said that when she first began working on a case, she determined what counsel considered her role to be. Some attorneys welcomed her input, and some attorneys rarely communicated with her. Ms. Shettles said that she had no communication with Lead Counsel and that she assumed he did not want her input or help. Ms. Shettles was unaware of the theory of defense in this case and said that trial counsel did not discuss with her any theory related to either phase of the trial.

Ms. Shettles testified that following her meetings with Lead Counsel and the Petitioner, her only other task was to deliver a subpoena to Glenda Williams. Once the trial was continued, trial counsel never contacted her again. Ms. Shettles sent a letter to trial counsel asking them whether they wanted her to complete any other tasks, but she did not receive a response.

Ms. Shettles testified that the mitigation investigation of the Petitioner's case was not adequately funded. She originally requested $18,000 at $65 per hour. She based her request upon her investigation in other cases and from the standard recommended at training. The total amount the trial court originally approved was $5,000. Ms. Shettles's investigation exceeded that amount.

Ms. Shettles testified that on November 28, 2000, she wrote trial counsel a letter

-30-

regarding information that the Petitioner had requested she provide to them. Ms. Shettles informed trial counsel that Angela Chillis, who had been the Petitioner's parole officer, was no longer in the office but that Susan Shettlesworth could be used as a witness if they needed her. Ms. Shettles also asked trial counsel whether they wanted her to complete any other tasks and informed them that the funds granted by the trial court had been depleted. Ms. Shettles never received a response from trial counsel. She said she also told Lead Counsel that he would be required to subpoena the probation and parole records in order to obtain them.

Ms. Shettles testified that on January 30, 2001, she wrote trial counsel a letter and enclosed an affidavit requesting payment for monies that had exceeded the original $5,000 granted by the trial court. She noted in the letter that she had not spoken with trial counsel since the trial had been continued and that she assumed they did not need her to complete any additional tasks because she had not heard from them. In March 2001, Ms. Shettles wrote a letter to Lead Counsel informing him that she had learned of the outcome of the trial in the newspaper. She reiterated in the letter that her funds had been exhausted and that she assumed Lead Counsel had not requested any additional funds for her. She asked for payment for services in excess of the original $5,000 and attached an invoice for the time after the money had been depleted, which began on October 27, 2000.

On cross-examination, Ms. Shettles testified that the Administrative Office of the Courts (AOC) ultimately decided the amount of money she should receive. The AOC could limit the amount and may have done so. Ms. Shettles said the AOC had limited amounts in other cases when it did not consider all of the funds necessary. She said it was unusual, though, for no effort to be made to obtain additional funds after the initial funds were expended.

Ms. Shettles testified that she did not remember whether she had any other conversations with Dr. Steinberg after November 2000. She did not recall them discussing the substance of her work or the records. Dr. Steinberg had the benefit of the social history she prepared.

Ms. Shettles testified that the Petitioner discussed his drug abuse with her. She said she knew he was abusing cocaine and thought he was abusing alcohol and marijuana. Ms. Shettles thought the Petitioner had access to many drugs around the time of the offense. The victim had suspected that the Petitioner used cocaine during a prior altercation.

Ms. Shettles testified that she did not recall discussing the offense at length with the

Petitioner. The Petitioner did not deny killing the victim. Rather, the issue involved the factors and events that led up to the killing.

Ms. Shettles testified that the Petitioner's family members were cooperative. They informed her of the Petitioner's background and his family's background. She obtained the Petitioner's prison and school records. Ms. Shettles had information about family members who were deceased. She reviewed information regarding the alcohol and addiction history of other family members. She submitted the information to trial counsel and Dr. Steinberg.

Ms. Shettles testified that although her meeting with Lead Counsel lasted for approximately one hour, the time was not devoted entirely to the case because another client walked in during the meeting. Ms. Shettles attempted to determine trial counsel's strategy and wanted to suggest family members who would testify. Lead Counsel told her that he had not allowed sufficient time for Dr. Steinberg to testify in the guilt phase. As a result, he planned to present both Dr. Steinberg and the Petitioner as witnesses during the penalty phase.

Ms. Shettles testified that she spoke with Co-Counsel over the telephone two days before her meeting with Lead Counsel. She told him that she would like to meet, and he agreed. She said that Co-Counsel was "running for judge" at the time and that she never heard from him.

On redirect examination, Ms. Shettles testified that the Petitioner told her that he never used cocaine before his release from prison. Ms. Shettles did not know what trial counsel did with the records and the information that she provided. She received no communication, instructions, or direction from trial counsel.

Ms. Shettles testified that John Black was a well-known gangster and drug dealer in Memphis. Mr. Black and the Petitioner's father had grown up together and were very good friends. Ms. Shettles said Mr. Black was present in the Petitioner's life.

Sergeant William Ashton of the Memphis Police Department testified that he was the case coordinator and prepared a supplemental report on January 24, 1999. According to the report, the Petitioner came to the police department to turn himself in. After the Petitioner gave a written statement, he was taken to jail and booked. The Petitioner requested that he be placed on suicide watch. Sergeant Ashton said it was possible the Petitioner attempted to turn himself in to police the day before but was turned away and told to return the following day because no one was there. After taking the Petitioner's statement, Sergeant Ashton began the process of charging the Petitioner.

Sergeant Ashton testified that he prepared a supplemental report dated January 25, 1999, reflecting a meeting he had with Assistant Attorney General Ken Roach. According to the report, General Roach requested that Sergeant Ashton obtain the Petitioner's criminal record before General Roach decided how to the charge the Petitioner. After Sergeant Ashton provided General Roach with the Petitioner's criminal history, General Roach signed the Attorney General's Authorization to Charge form, charging the Petitioner with second degree murder. Sergeant Ashton said General Roach's request for the Petitioner's criminal record was not unusual. Sergeant Ashton then prepared an affidavit of complaint charging the Petitioner with second degree murder. The information in the affidavit was based on the Petitioner's statement and the information obtained from the ongoing investigation.

Sergeant Ashton testified that Assistant District Attorney General Jerry Harris spoke with him about changing the charge to first degree murder and determined that a charge of first degree murder was more appropriate. Assistant District Attorney General Jennifer Nichols instructed Sergeant Ashton on how to complete the new arrest ticket, and the charge was changed to first degree murder on January 26, 1999. Sergeant Ashton did not recall whether it was the first time that he had changed a charge in a case and completed a new arrest ticket and a new affidavit of complaint. He said the information in both affidavits of complaint was true.

Sergeant Ashton testified that he was unaware of the Petitioner's medical history. He understood that the Petitioner previously had been charged with second degree murder after he killed a drug dealer from whom he was trying to purchase drugs. Sergeant Ashton did not know when that offense occurred. Sergeant Ashton identified the law incident table in which an officer had suspected the Petitioner of using alcohol. Sergeant Ashton denied entering the notation but said another officer may have done so. Sergeant Ashton did not recall speaking with trial counsel before trial.

Dr. Gregory James Davis, the Director of the Forensic Consultation Services for the Department of Pathology and Laboratory Medicine at the University of Kentucky College of Medicine, testified as an expert in forensic pathology that he was asked to assess the case from the perspective of the injuries sustained by the victim, examine the testimony regarding the period of time that those injuries may have been sustained, and determine whether he agreed with the opinions of Ms. Sutton and Dr. Smith. Dr. Davis reviewed Dr. Smith's autopsy report, color photographs of the crime scene, crime scene diagrams, the Petitioner's statement to police, and the transcript of the testimony of Dr. Smith and Ms. Sutton.

Dr. Davis testified that the amount of time the Petitioner attacked the victim could not be determined. Testimony at trial had suggested that the attack lasted a minimum of six minutes due to a conclusion that some of the blood spatter was clotted blood. However, Dr. Davis found no scientific basis to state that the attack lasted six minutes or more. While he acknowledged that the attack could have occurred for more than six minutes, he said it was equally possible that the attack occurred for a much shorter period of time, such as thirty seconds to one minute. He did not think any scientific method existed to discern one way or the other.

Dr. Davis testified that he did not understand testimony at trial that a blood clot had spattered onto a wooden surface. From the photographs, he saw blood spatters that would have been liquid blood that subsequently clotted. Although Ms. Sutton testified that blood required six minutes to clot in a clinical scenario, the crime scene was not a clinical scenario. Dr. Davis explained that blood could coagulate rapidly when it hit a surface. He noted that the victim sustained severe head trauma that would have released thromboplastin into her system, causing the blood to clot extremely quickly.

Dr. Davis testified that based upon his review of the photographs of the blood, he did not know the time span over which the assault occurred and did not think the time span could be determined. He said that while the attack could have occurred over a period of minutes, it easily could have occurred for one-half of a minute. Dr. Davis did not think there was any way to conclude that the blood clotted before it was "cast off" and landed on a different surface. He said it was equally plausible that large droplets of liquid blood landed on the surface and coagulated.

Dr. Davis testified that thromboplastin was a tissue factor that was extremely concentrated in the brain and interacted with blood following a head injury, causing the blood to clot more rapidly. Dr. Davis said that due to the extent of the victim's head trauma, it was highly likely that the thromboplastin mixed with the projected blood. He also said that regardless of the existence of thromboplastin, he found no evidence that the blood was clotted before it was cast off and struck the surfaces.

Dr. Davis testified that he had never encountered an attempt to determine the minimum length of time of an assault based upon the amount of time that blood clotted in a clinical setting. He said that a six-minute determination was not a reasonable medical conclusion and that "I don't know" would have been a more reasonable assertion in this case. Dr. Davis said, "I'm not saying it's out of the bounds of possibility, I'm just saying I've never seen it or heard of it." He had never read peer-reviewed or non-peer-reviewed literature addressing the subject.

-34-

Dr. Davis testified that expiratory blood, or blood upon exhaling, was common in people who experienced trauma. The victim had basilar skull fractures that caused blood to aspirate into her windpipe. Dr. Davis said blood could come out of the mouth and/or nose even after the person lost consciousness but continued to breathe for a period of time. He did not think that the presence of blood in the victim's windpipe was relevant to the case and stated that it only meant she breathed for a period of time after sustaining the injuries. The evidence of blood did not relate to her state of consciousness during that time.

Dr. Davis testified that he disagreed with Dr. Smith's testimony that the victim swallowed thirty-six to thirty-seven times. Dr. Davis saw no evidence supporting Dr. Smith's conclusion. He explained that in head trauma cases, he often saw up to 400 millimeters of blood in the stomach or windpipe. In any case with basilar skull fractures, blood began escaping into the windpipe immediately. Physical swallowing or breathing of the blood in the nature of thirty-six to thirty-seven swallows was not required. Dr. Davis said an estimate of fifteen millimeters per swallow as provided by Dr. Smith was more precise than science allowed.

Dr. Davis noted that Ms. Sutton testified that the victim sustained a minimum of five blows, while Dr. Smith testified that the victim sustained a conservative estimate of thirteen blows. Dr. Davis said the discrepancy in their testimony was understandable because one blow to the head could appear as multiple blows due to the irregular surface of the head. Dr. Davis said that either the testimony of Dr. Sutton or Dr. Smith regarding the number of blows was plausible. The multiple blows could have occurred quickly.

Dr. Davis testified that based upon the extent of the victim's skull and brain injuries, he agreed with Dr. Smith's conclusion that the victim was unconscious when she fell to the floor. The non-specific pattern of blood spatter on her hands did not reveal any information to Dr. Davis. Rather, the blood spatter showed that the surfaces of the victim's hands were exposed to blood when the victim was struck. The positions of the victim's hands and head did not reveal any information to Dr. Davis regarding her consciousness or unconsciousness.

Dr. Davis testified that the evidence did not support the claim that the Petitioner had to straddle the victim to prevent her from moving her arms. Dr. Davis said that while the Petitioner could have had his knees on the victim's arms to restrain their movement, there was no evidence he did so. Dr. Davis did not think such information could be obtained by forensic science.

Dr. Davis testified that he did not review any evidence suggesting that the victim was conscious throughout the attack. He said that while the victim was conscious before the attack, there was no way to determine whether she was rendered unconscious following the first or second blow. He said that while her basilar skull fractures and other injuries indicated that she lost consciousness rapidly, Dr. Davis could not provide an "exact second to second time."

On cross-examination, Dr. Davis testified that he visited crime scenes on "rare occasions." He acknowledged that visiting a crime scene allowed the forensic expert to view the body, the circumstances, and the surroundings before reaching a conclusion. While Dr. Davis was perplexed by some of Dr. Smith's conclusions, he did not speak with Dr. Smith about the case or go to the medical examiner's office to review the file. Instead, he only reviewed the materials that were sent to him. He acknowledged that the autopsy report was not the entire autopsy file. The autopsy would have included a number of photographs of tissue injuries and possibly samples that had been retained.

Denise Oher, the Petitioner's sister, testified that she was two years younger than the Petitioner and three years older than her other brother, Albert Riley. Ms. Oher did not have a close relationship with her mother, Ilene Riley. When Ms. Oher was a child, she lived with her grandmother, along with her two brothers, her mother, an aunt, and her aunt's children. Seven to nine people lived in a house with a living room, one bedroom, a kitchen, and one bathroom. Ms. Oher said her grandmother cared for her and ensured that she had enough to eat. Ms. Oher did recall her mother being present during that time.

Ms. Oher testified that when she was eight or nine years old, her grandmother died and that her family "broke up" as a result. Ms. Oher, her mother, and her two brothers moved down the street to a "rooming house" with different apartments. Their living area consisted of one large room, a kitchen, and a bathroom. Ms. Oher, her mother, and her brothers all slept on a "laid out couch." After some time, Ms. Oher's stepfather, Walter Turner, moved in with them.

Ms. Oher testified that Mr. Turner was a "mean man." Both he and Ms. Riley were intoxicated most of the time and fought often in front of Ms. Oher and her brothers. Ms. Oher said that when Mr. Turner became intoxicated, he would wake her and her brothers and beat them. She said the beatings seemed to occur on a nightly basis. Ms. Oher recalled that Mr. Turner appeared to be harder on the Petitioner and beat him with an electrical cord on one occasion. On other occasions, Mr. Turner beat them with a belt or his hand. At the time, Ms. Oher was eight or nine years old, and the Petitioner was ten or eleven years old. The Petitioner was small for his age, and Ms. Oher may have been taller than him.

Ms. Oher testified that she did not recall food being available when she lived with her mother and Mr. Turner. Ms. Oher and her brothers would escape to a shed in the back of their home and hide and sleep. Her mother and Mr. Turner never missed them when they hid. Ms. Oher recalled that Mr. Turner attempted to sexually assault her on one occasion while he was intoxicated but that she managed to escape from him.

Ms. Oher testified that at age ten or eleven, she and the Petitioner were placed in Goodwill Home for Children and remained there for two years. While at the foster home, Ms. Oher and the Petitioner attended school daily and lived in a more stable environment. Ms. Oher could not recall attending school when she lived with her mother. Anna Clark, a social worker, ensured that the children had everything they needed. Ms. Oher said she also had a good relationship with Delores Rose, a secretary, and continued to see her regularly after Ms. Oher left Goodwill Home.

Ms. Oher testified that after she left Goodwill Home, she returned to live with her mother, while the Petitioner lived with his father. The Petitioner's father had a girlfriend, who had twelve or thirteen children. When Ms. Oher visited the home of the Petitioner's father, she also visited those children. Ms. Oher was unaware of the Petitioner's getting into trouble during that time period because she was not with him often. The Petitioner associated with a different group of people. Ms. Oher recalled that the Petitioner's nickname was "Skillet" and that he got the nickname when was thirteen years old or younger.

Ms. Oher testified that she knew the victim and thought the Petitioner and the victim were in a relationship for seven or eight years. They were in a relationship before the Petitioner was incarcerated for other offenses, and the Petitioner moved in with the victim following his release from prison. Ms. Oher visited the victim's home and attended a family gathering in the victim's backyard. The victim had one daughter and two sons, and the victim's sons did not appear to like the Petitioner.

Ms. Oher testified that she had thirteen children, two of whom were deceased. She had a history of alcohol and drug problems and received treatment and counseling. Ms. Oher said no one from the Petitioner's defense team contacted her before trial and that she would have testified if she they had asked her to do so.

Anna Clark, a case worker at Goodwill Home, testified that the Petitioner and Ms. Oher were sent to Goodwill Home by court order due to lack of supervision by a parent. Thelma Bush, a case worker from juvenile court, assisted in placing the Petitioner and Ms.

-37-

Oher at Goodwill Home. Ms. Clark said Goodwill Home only accepted African-American children. At that time, other institutions in the city did not accept African-American children.

Ms. Clark testified that the staff at Goodwill Home was primarily female. The employees were very supportive of the children and cared for them as if the children were their own. The children received breakfast every day and were transported to school and field trips. The staff attempted to provide the children with everything they did not receive from their natural parents.

Ms. Clark testified that the Petitioner's and Ms. Oher's mother neglected them. The children did not have proper clothing, adequate food, or proper supervision. No emotional support or love was in their home. Ms. Clark described the Petitioner's mother as "selfish" and an alcoholic who was unable to care for her children properly. She remained with her "drinking buddies" rather than supervising her children. She took care of her needs first, which included drinking alcohol, and never visited the children while they were at Goodwill Home.

Ms. Clark testified that the Petitioner was a "normal" child in that he did not engage in any outstanding negative behavior. He got along well with the other children and was more of a follower than a leader. The Petitioner was more passive in his interactions with other children. The children called the Petitioner "Skillet." At some point, the Petitioner and Ms. Oher returned to their mother. Ms. Clark did not think that was wise or that their mother had changed. Ms. Clark was living in Memphis in 2001, but the Petitioner's defense team did not contact her. She said she would have testified if had she been requested to do so.

Dolores Rose testified that she had been employed at Goodwill Home since 1962 and recalled the Petitioner and Ms. Oher. At that time, twenty to thirty children were housed in one building. After the Petitioner and Ms. Oher left Goodwill Home, the facility was expanded to house approximately forty children. The home was a family-like setting, and the staff treated the children as family.

Ms. Rose testified that the Petitioner and Ms. Oher had been removed from their home due to neglect. She thought their mother associated with people who primarily partied and drank alcohol. Ms. Rose described the Petitioner's mother as a good person who abused alcohol. She recalled occasions in which the Petitioner and Ms. Oher were unable to attend weekend visits with their mother because no one was home. Thelma Bush, who worked in the juvenile court system, placed the Petitioner and Ms. Oher in Goodwill Home. Ms. Rose said Ms. Bush was alive in 2001 and would have been available for trial counsel to interview.

Ms. Rose testified that the Petitioner was a "normal" boy who did "normal boy pranks and things like that." He was not a troublemaker but a follower. Ms. Rose said the Petitioner's records from Goodwill Home were destroyed in a flood but would have been available at the time of trial in 2001.

Ms. Rose testified that she had contact with the Petitioner and Ms. Oher as adults. She was aware of Ms. Oher's drug problem and saw her under the influence on occasion. She was unaware of the Petitioner's problems. Ms. Rose said that when she saw the Petitioner after she had not seen him for some time, he told her that he had been incarcerated. Ms. Rose saw the Petitioner and the victim at a grocery store shortly after they were married, and they seemed happy. Ms. Rose stated that no one from the Petitioner's defense team contacted her and that she would have been willing to testify.

Glenda Williams, the Petitioner's cousin, testified that she was three years older than the Petitioner and had known him all of his life. Her mother was Willie Mae Avery. When Ms. Williams and the Petitioner were children, they lived with the Petitioner's grandmother, Clara Riley, and the Petitioner's mother, Ilene Riley. Ms. Oher was born two years later. Ilene Riley and Ms. Avery were close in age and drank alcohol together. The Petitioner weighed approximately three pounds when he was born. He seemed small for his age, and Ms. Williams looked out for him. Ms. Williams described the Petitioner as a follower rather than a leader. Following Clara Riley's death, Ms. Williams and her mother moved in with Ms. Williams's grandmother. The Petitioner and his family remained in Clara Riley's home for approximately one month. Ms. Williams lived about fifteen to twenty minutes away but continued to see the Petitioner daily. Ilene Riley then moved and took her children with her.

Ms. Williams testified that Ilene Riley lacked "motherly instincts." She told her children to "shut up" and did not know how to "cuddle." Ms. Williams said Ms. Riley was more interested in herself than her children, drank alcohol, and did not spend time with the children or help them with their homework. Ms. Williams stated that when she was thirteen years old, Ms. Riley gave her a jar of corn liquor and told her to drink it. Ms. Williams drank the liquor and choked.

Ms. Williams testified that the Petitioner and his siblings visited her at her grandmother's home and that her grandmother fed them. Her grandmother then sent the children home. On occasion, the Petitioner and his siblings returned because no one was at their home and they could not get into the house. Ms. Williams's grandmother allowed them to spend the night and sent them home the following morning.

Ms. Williams testified that the Petitioner and his siblings told her that their mother threw shoes at them, hit one of them with a broom, and injured one of their arms. Walter Turner, the Petitioner's stepfather, beat the children. The Petitioner and Ms. Oher were removed from the home and lived at Goodwill Home. After they left Goodwill Home, the Petitioner lived with his father, and Ms. Oher lived with Ms. Williams.

Ms. Williams testified that following the Petitioner's release from prison in 1997, he lived with her. The Petitioner had been dating the victim before he was incarcerated. The Petitioner moved out of Ms. Williams's home and moved in with the victim in a home located in North Memphis. Ms. Williams said she did not want the Petitioner to live with the victim. She explained that the Petitioner was raised in North Memphis and had gotten into trouble there. Ms. Williams lived in East Memphis and thought the Petitioner needed something different in his life.

Ms. Williams testified that the North Memphis neighborhood in which she and the Petitioner were raised was "terrible." When they were children, they witnessed violence in the neighborhood. Before age eleven, Ms. Williams saw people cut and shot. One time, she saw a man in the neighborhood lying in a gutter with his intestines exposed.

Ms. Williams testified that the Petitioner and the victim separated in December 1998 or January 1999. The Petitioner moved in with his paternal grandmother in North Memphis. Ms. Williams visited the Petitioner at his grandmother's house on occasion. She said that although they were separated, the victim also visited the Petitioner at the home, did his laundry, and brought him dinner.

Ms. Williams testified that on the day of the victim's death, the Petitioner called her and asked her to pick him up and drive him to her home. The Petitioner told Ms. Williams that he did not "feel right" and needed to get away. The Petitioner said he was not sick but felt "bad." The Petitioner sounded depressed. A storm was coming, so Ms. Williams told the Petitioner to wait and see about the weather. Ms. Williams explained that she did not want to drive in a storm and that her car was not operating well at that time. The Petitioner telephoned Ms. Williams several times that day. During his last call, the Petitioner told Ms. Williams not to come. The Petitioner said the victim had called him and asked him to come to her house after she returned from work so they could talk. Ms. Williams said the Petitioner was happy because he thought the victim wanted to reconcile.

Ms. Williams testified that the Petitioner was very intelligent and loved his family. She stated that the Petitioner should have known right from wrong but that he began following the wrong crowd. Ms. Williams said that although she attended the Petitioner's

trial, she was not allowed to remain in the courtroom because she was supposed to testify. She did not testify but said she would have done so if asked. Her mother, Ms. Avery, also attended the trial and was allowed to remain in the courtroom. Ms. Avery died on February 6, 2006.

Rosie Puryear Loyde testified that she and her family moved to North Memphis when she was seventeen years old and met the Petitioner and Ms. Oher. Ms. Loyde said she and the Petitioner lived in a "ghetto" neighborhood with gangs, drug activity, prostitution, and gambling. Ms. Loyde and the Petitioner were approximately the same age and were like siblings. They went to cafes where there was drinking, gambling, alcohol, cursing, fighting, and prostitution. They also used crack cocaine together.

Ms. Loyde testified that Ms. Oher was approximately fifteen years old at that time and that Ilene Riley did not supervise Ms. Oher. Ms. Loyde met the Petitioner's mother and often saw her and his stepfather going to the liquor store. They would be intoxicated and argued with each other often. The Petitioner's father was employed but gambled and drank alcohol on the weekends. The Petitioner's father lived like a bachelor, and Ms. Loyde never saw the Petitioner and his father have a father/son relationship. The Petitioner never opened up to Ms. Loyde about his background. One time, he mentioned that his stepfather had "jumped on" his mother.

Ms. Loyde testified that during the time she knew the Petitioner, he never maintained a home of his own. He often lived with Benita Taylor, whom he viewed as a mother. Ms. Taylor had a house full of children, including grandchildren. On occasion, the Petitioner stayed at Ms. Loyde's home. Ms. Loyde acknowledged that the Petitioner was in prison in the mid-1990s.

Ms. Loyde testified that she never met the victim and did not become aware of her until after the Petitioner and the victim were married. Ms. Loyde learned about the marriage after seeing the Petitioner one day on his way to work at the Cook Convention Center. The Petitioner was happy about his marriage and his job. One week before the victim's death, Ms. Loyde saw the Petitioner, and he told her that he was no longer living with the victim. Ms. Loyde said that she knew the Petitioner was using crack cocaine again but that he was not on drugs when she talked to him a week before the victim's death.

Ms. Loyde testified that the Petitioner came to her home on the morning after the victim's death and told her what had happened. She described him as sad, nervous, and depressed. The Petitioner said he had walked all night. A gash was on his hand, and Ms. Loyde bandaged it. Ms. Loyde said she was unable to determine whether the Petitioner was

on drugs at that time. It had rained the previous night, and the Petitioner's clothes were dirty and "shabby." Ms. Loyde gave the Petitioner pants and a clean shirt. She could not recall whether his clothes were wet. She acknowledged that her perception that morning was not good because she had been "up all night drinking[,] drugging[,] and gambling."

Ms. Loyde testified that the Petitioner stayed at her home for the remainder of the day. The next day, they went to the police station and approached two officers. The Petitioner told the officers that he wanted to speak to someone from the homicide office. One of the officers said that the homicide office was closed and that they needed to return the following day.

Ms. Loyde testified that she and the Petitioner returned home. The Petitioner was depressed and kept his head down. The following morning, they returned to the police station. Ms. Loyde accompanied the Petitioner inside the police station, waved to him, and returned home. Ms. Loyde thought the Petitioner was anxious to turn himself in to the police because he was depressed and wanted it to be over. The Petitioner also was concerned about what would happen to Ms. Loyde if he remained at her home.

Ms. Loyde testified that while the Petitioner was at her home, he consumed drugs. He was nervous and fidgeting, and a drug dealer in the neighborhood gave him a "hit" of crack cocaine. Ms. Loyde said the Petitioner did not take any other drugs while at her home. She said that no one from the Petitioner's defense team contacted her and that she would have been willing to testify.

On cross-examination, Ms. Loyde testified that the Petitioner admitted killing the victim. He said he loved the victim and did not mean to kill her. He also said that his marriage was sacred to him and that things "got out of hand." The Petitioner told Ms. Loyde that the victim had told him she wanted a divorce.

Sherry Phillips testified that during the penalty phase of the Petitioner's trial, she testified that her husband, Jimmy Osby, had committed suicide the day before the victim's death. She also testified at the trial that the Petitioner and Mr. Osby were very close and were like brothers. Ms. Phillips said the Petitioner was aware of Mr. Osby's suicide and had visited him on the day of the suicide. The Petitioner was upset about Mr. Osby's suicide.

Ms. Phillips testified that she occasionally socialized with the Petitioner and the victim. The only drug use that Ms. Phillips recalled by the Petitioner was marijuana. Ms. Phillips said she met with trial counsel for a few seconds outside the courtroom before she testified. When Post-Conviction Counsel asked her whether she felt comfortable with the

questions that trial counsel planned to ask, Ms. Phillips replied, "It was fine. It wasn't anything terrible." On cross-examination, Ms. Phillips testified that she did not recall whether she spoke with Ms. Shettles about her husband's suicide.

Richard Douglas, the unit manager at West Tennessee State Penitentiary, testified that at some point, he was employed at Fort Pillow Prison where the Petitioner used to be an inmate. Mr. Douglas described him as "laid back and courteous, easy to get along with." He said that the Petitioner may have gotten into a fight on occasion but that fighting was not unusual in prison. Mr. Douglas explained that larger inmates frequently targeted inmates of a smaller stature, such as the Petitioner. As a result, the Petitioner likely was forced to defend himself. Mr. Douglas noted that inmates tended to calm with age. He thought the Petitioner would perform well in a controlled, non-threatening environment.

Mr. Douglas testified that he was familiar with the Black History Month essay contest at Fort Pillow Prison. Mr. Douglas was never involved in grading the essays. He said the essays probably were graded based upon basic content and effort by the inmate. Mr. Douglas described the functioning of most of the population at the prison as borderline at best and said he would not have been surprised if the winning essay included misspellings and grammatical or structural errors. Mr. Douglas did not speak with trial counsel about testifying and was not called to testify at the Petitioner's trial. Ms. Shettles interviewed him.

On cross-examination, Mr. Douglas testified that he did not know the number of fights in which the Petitioner was involved. He also did not know when or how long the Petitioner was incarcerated at Fort Pillow.

Patti McNeely, who served as the Director and a counselor at the Alcohol and Chemical Abuse Rehab (ACAR) Center in 1998 and 1999, testified as an expert in forensic substance abuse that the Petitioner was one of her patients at the ACAR Center and that she was a witness for him at trial. Shortly before Ms. McNeely testified at trial, she met with the Petitioner's counsel outside the courtroom. She thought she told them she was not a medical doctor but a forensic substance abuse counselor.

Ms. McNeely testified that as part of her job, she assessed an offender's drug use, alcohol use, and criminal history. She then determined the type of treatment the offender needed and the location of the treatment. In 1998, new patients were referred to her through either drug court or the federal probation and pretrial program. Ms. McNeely stated that it was difficult for cocaine addicts to stop using cocaine and that the relapse rate was 75% to 80%. She said cocaine, particularly crack cocaine, was an insidious drug in that most people became addicted the first time they used it. She said that as the person continued to use the

drug, the person attempted to "chas[e] the high" or obtain the "initial feeling." Ms. McNeely stated that in order to stop the addiction, patients needed long-term in-patient treatment such as in a halfway house. She said that some in-patient treatment programs were funded by the State and that those not funded by the State cost $15,000 to $20,000 for a thirty-day program.

Ms. McNeely testified that she assessed the Petitioner, determined that he was chemically dependent, and recommended that he try to enroll in an in-patient treatment program. However, in-patient programs funded by the State had few openings at that time because the Petitioner was assessed during the winter when people came off the street, entered a program, and remained in the program.

Ms. McNeely testified that the ACAR Center was an out-patient program and that the out-patient treatment programs cost $20 to $30 per session. The Petitioner entered the program at the ACAR Center and was supposed to pay for it. However, at that time, Ms. McNeely treated anyone regardless of the person's ability to pay. The Petitioner was subject to drug screens as part of the program. On January 13, 1999, he took a drug screen, which revealed that he had attempted to "flush" drugs from his system by consuming liquids. Ms. McNeely said that a patient needed a drug-free environment in order to be successful in the program and that the Petitioner could not remain drug-free in his home environment. Therefore, he needed to be in an in-patient program. The Petitioner told Ms. McNeely that he was having marital problems and that someone he knew had committed suicide. The Petitioner contacted Ms. McNeely on January 20 or 21, but she could not remember what he told her. She thought she would have told him to seek in-patient treatment.

Dr. Fred Steinberg, a psychologist who evaluated the Petitioner and testified at his trial, testified that he did not think he had any interaction with Co-Counsel. He interacted with Ms. Shettles briefly when she brought materials to his office. He did not think he and Ms. Shettles ever sat down and discussed the case together.

Dr. Steinberg testified that according to his statements for services in this case, on November 4, 5, and 6, 2000, he reviewed the materials he received from Ms. Shettles. On November 7, 8, and 10, 2000, he conducted a forensic evaluation of the Petitioner. During the evaluation, Dr. Steinberg conducted a competency interview, a historical interview, and a mental status examination. He became acquainted with the Petitioner, took a social history from him, and administered psychological testing. Dr. Steinberg spent a total of nine hours with the Petitioner before writing his report.

Dr. Steinberg testified that he was careful to ensure that all the time he spent on a case was billed and that he would not have met with trial counsel without billing for the time. He

generally did not bill for telephone calls unless they lasted fifteen minutes or more. Dr. Steinberg did not have any substantive discussions with trial counsel between November 12, 2000, and February 7, 2001. On February 7, 2001, he administered memory tests to the Petitioner for two hours. On March 5, 2001, he spent one hour reviewing documents. The next day, he met with trial counsel for two hours, and they prepared him to testify at trial.

Dr. Steinberg testified that he not think trial counsel ever requested that he conduct a full battery of neuropsychological testing. He said he was not an expert in fetal alcohol syndrome and that his knowledge about the syndrome in 2000 and 2001 would have been that of a general psychologist.

Dr. Steinberg testified that he concluded in his report that diminished capacity could be supported. He said he based his conclusion on case law that a person could have a condition that rendered the person incapable of forming intent. Dr. Steinberg was under the impression that diminished capacity could be established without a showing of a mental disease or defect. He noted that one of the premiere texts on forensic psychology written in 1991 stated that substance abuse could be a basis for diminished capacity. Dr. Steinberg said Lead Counsel told him that the Petitioner's use of drugs and alcohol, his addiction, and his mental stressors at the time of the offense were sufficient to establish diminished capacity.

On cross-examination, Dr. Steinberg testified that he diagnosed the Petitioner with poly-substance abuse under Axis I, personality disorder not otherwise specified under Axis II, and problems in his primary support group and his social history under Axis IV. Dr. Steinberg assessed the Petitioner's global assessment functioning under Axis V as 60. In reaching his conclusions, Dr. Steinberg considered the materials that Ms. Shettles had provided. Dr. Steinberg did not diagnose the Petitioner with a cognitive disability and did not find him to have a cognitive defect. He found the Petitioner to have low average intelligence. Dr. Steinberg said that he reviewed psychological tests that had been administered to the Petitioner previously and that the results of the previous testing were consistent with the results of his testing.

Dr. Steinberg testified that in his report, he noted that the Petitioner was raised in a violent and chaotic world. The Petitioner was incarcerated for seventeen years in a violent environment, and his marriage required that he attempt a lifestyle to which he was unaccustomed. The Petitioner withdrew and began using marijuana and lacked the emotional tools to adjust to his new lifestyle. Dr. Steinberg said the Petitioner coped by isolating himself, using drugs, and reverting back to the prison world where he had lived in a small space by himself. The Petitioner left his wife and lost his job; his grandmother was hospitalized; and a close friend committed suicide. Dr. Steinberg thought the Petitioner was

overwhelmed by the events and was unable to handle the situation.

Dr. Steinberg testified that the Petitioner's drug use lessened his ability to cope and that he dealt with the stressors by acting out. Dr. Steinberg said that the Petitioner's actions in killing the victim were impulsive and that the Petitioner's drug use reduced his ability to examine and control his behavior in a rational way. Dr. Steinberg testified about his conclusions at trial. He said his conclusions were within the best of his professional ability and within a reasonable degree of psychological certainty.

On redirect examination, Dr. Steinberg testified that he noted in his report that the Petitioner was born two and one-half months premature to an alcoholic mother. He did not mention the Petitioner's low birth weight or continued low weight.

Dr. Pamela Auble, a psychologist and neuropsychologist, testified as an expert in neuropsychology and forensic psychology that Post-Conviction Counsel contacted her in April 2006 to evaluate the Petitioner and that she evaluated him in May 2006. Dr. Auble was asked to determine whether the Petitioner had diminished capacity at the time of the offense and whether he had mental impairments due to fetal alcohol syndrome.

Dr. Auble testified that she diagnosed the Petitioner with cognitive disorder not otherwise specified due to fetal alcohol exposure; major depressive disorder, single episode, severe, without psychotic features; and poly-substance dependence. Dr. Auble said that cognitive disorder not otherwise specified had been present since the Petitioner's birth but that the other two diagnoses had not. Dr. Auble believed that at the time of the offense, the Petitioner was unable to engage in reflection and judgment due to the mental disease of major depressive disorder and the mental defect of cognitive disorder.

Dr. Auble testified that the Petitioner had cognitive deficits. She concluded that he had deficits consistent with fetal alcohol syndrome or partial fetal alcohol syndrome and referred him to Dr. Richard Adler and Dr. Natalie Brown, who were experts in the area. Dr. Adler diagnosed him with partial fetal alcohol syndrome. Dr. Auble prepared an affidavit detailing her findings of cognitive impairments.

Dr. Auble testified that she reviewed the Petitioner's birth and childhood hospital records from the City of Memphis, his hospital records from the Regional Medical Center, his school records, his statement to police, his social history prepared by Ms. Shettles, a psychological summary from the TDOC, Dr. Steinberg's report, a summary of the Petitioner's juvenile records, his juvenile records, records from the ACAR Center, his records from the Shelby County Jail, his records from the Shelby County Jail Correctional

Medical Service, a transcript of the testimony of Dr. Steinberg and Ms. McNeely during the penalty phase, Dr. Brown's test results, a summary of an interview with Glenda Williams, and the reports of Drs. Brown, Adler, Fred Bookstein, and Murray Smith. Dr. Auble stated she had not reviewed the reports of Drs. Brown, Adler, Bookstein, and Smith when she drafted her report. Since drafting her report, Dr. Auble had reviewed the affidavit of complaint dated January 25, 1999, a summary of a 911 call, and the January 18, 1999 police report prepared by Officer Elenor Worthy. Dr. Auble stated that with the exception of the reports of Drs. Brown, Adler, Bookstein, and Smith, the materials that she reviewed were available to trial counsel at the time of the Petitioner's trial.

Dr. Auble testified that she found information in the Petitioner's social history materials suggesting that he suffered from mental impairments. The records indicated that a strong family history of substance abuse and neglect existed and that the Petitioner's mother drank alcohol while pregnant, which placed him at risk for fetal alcohol syndrome. The Petitioner's school records revealed that he had difficulty in school from an early age and was using substances at an early age.

Dr. Auble testified that she was aware that trial counsel wanted to present evidence of diminished capacity. She described diminished capacity as a legal construct and said it was not a psychological diagnosis. As a result, psychologists had to rely on attorneys to inform them of the legal standards for diminished capacity and what evidence was necessary to meet those legal standards. Dr. Auble understood that diminished capacity was not a defense but was evidence that a defendant was guilty of a lesser offense. Dr. Auble said that a defendant had to have a mental disease or defect and that the psychologist had to discuss the particular circumstances of the offense with the defendant in order to determine whether the mental disease or defect rendered the defendant unable to form the requisite culpable mental state. A conclusion that the defendant had some general tendencies or a certain personality type was not sufficient to establish diminished capacity. Rather, the conclusion had to be linked to the time and circumstances of the offense. A conclusion that a defendant was in an emotional state also was not sufficient.

Dr. Auble testified that neuropsychological testing was necessary based on information in the materials she reviewed. She stated that the consumption of alcohol by the Petitioner's mother during pregnancy could have affected the development of the Petitioner's brain. According to the Petitioner's school records, he performed poorly in school, suggesting that he had some difficulties with cognition. Dr. Auble identified the Petitioner's family history of drug and alcohol abuse as another sign that neuropsychological testing was necessary. Dr. Auble noted that Dr. Steinberg did not diagnose the Petitioner with a mental disease or defect. Dr. Auble stated that because Dr. Steinberg was not a neuropsychologist, he would not have "done the mental defect part of it."

Dr. Auble testified that she conducted a clinical interview of the Petitioner during which he explained to her what had occurred on the night of the victim's death. Dr. Auble said Sergeant Ashton's version of the offense as stated in the affidavit of complaint dated January 25, 1999, corroborated the Petitioner's explanation. Dr. Auble also administered testing to the Petitioner. She saw him on May 15, 23, and 30, 2006, and May 17, 2010. She spent a total of thirteen hours with him.

Dr. Auble testified that the Petitioner had experienced problems in functioning since childhood. As a result, she expected his test scores to be consistent from childhood to adulthood. Dr. Auble noted that the Petitioner's I.Q. scores were similar throughout his life. In 1964, when the Petitioner was nine years old, his I.Q. was 85. His I.Q. was 89 at age eleven and 84 at age thirteen. In 1995, when the Petitioner was in the prison system and forty years old, he was administered an I.Q. test and received a score of 82. Dr. Steinberg administered an I.Q. test to the Petitioner in 2000, and his score was 82. Dr. Auble administered the Wechsler Adult Intelligence Scale, third edition (WAIS-III) to the Petitioner in 2006, and he received an I.Q. score of 84. Dr. Auble said the Petitioner's score of 84 fell within the below average range. She said his scores over his lifetime had been stable and were reliable.

Dr. Auble testified that the consistency of the Petitioner's scores over time suggested that his effort on the tests was adequate. Moreover, the fact that his scores remained the same over many years indicated that his scores likely were a valid and accurate measure. Dr. Auble administered specific tests for malingering. The Petitioner received a perfect score on the Test of Memory Malingering and an "excellent" score on the Long-Delay Force Choice Recognition from the California Verbal Learning Test. Dr. Auble said the scores indicated that the Petitioner was putting forth adequate effort, and she believed the results were an accurate representation of how he could perform.

Dr. Auble testified that she administered tests to the Petitioner to measure his mental flexibility. According to the Petitioner's I.Q. tests scores, he performed best when he was required to complete simple repetitive tasks. The Petitioner performed well on tests that required him to copy symbols or complete tasks that were "very cut and dried." The Petitioner's score on tests requiring him to copy symbols was within the 50th percentile. He performed worse on open-ended reasoning tests where he was required to have ideas and engage in reasoning. His scores on such tests were within the second and ninth percentile. Dr. Auble said open-ended tests were not direct measures of mental flexibility but had some relation to mental flexibility.

Dr. Auble testified that executive functioning was defined as the ability to address ambiguity, adapt and change behavior, cope with changing situations, plan, and make sense out of things in life. The tests she administered that directly related to executive functioning and mental flexibility were Trailmaking, the Wisconsin Card Sort, Word Context, Twenty Questions, Proverbs, Tower Test, Controlled and Word Association, the Strut Test, and Ruff Figural Fluency. Dr. Steinberg administered the Booklet Category Test, another test for executive functioning. The Petitioner's performance on the tests varied to some degree based upon how structured they were. The Petitioner performed better on the more structured tests. The Petitioner failed to develop a strategy in the open-ended tests. His scores fell within the normal range on all but one of the high-structured executive functioning tests. His scores fell within the abnormal range on all of the low-structured executive functioning tests.

Dr. Auble administered memory testing and concluded that while the Petitioner's memory was not universally impaired, it was affected by the difficulties he experienced in complexity and organization. The Petitioner performed relatively worse on complex tests in which he was required to organize, remember, and sort information. When compared to those of his own age, the Petitioner's performance was worse on the more complex tests and better on the simpler tasks.

Dr. Auble testified that she administered the Rey-Osterrieth Complex Figure where the Petitioner was given a model and asked to draw it as accurately as possible. The Petitioner first was instructed to copy the figure. His copy was relatively accurate and included all of the details. Rather than drawing an outline of the model and filling in the details, he drew the model piece by piece. He also experienced difficulty in his organization. He took more than seven minutes to complete his model, which Dr. Auble said was an excessively long time. The Petitioner's time to copy the model fell below the first percentile. After the Petitioner drew the figure with the model in front of him, the model and his drawing were taken away, and he was instructed to draw the model from memory. Dr. Auble stated that the Petitioner's memory of the figure was very poor and that he failed to include almost all of the details. The Petitioner's memory fell below the first percentile in relation to those of his age. After thirty minutes, the Petitioner was asked to draw the same figure again. The Petitioner recalled very little about the model, and his memory fell below the first percentile in relation to those of his age. Dr. Auble said that because the Petitioner took seven minutes to draw the initial drawing, his exposure to the model was greater than most people who took the test. His memory, however, was quite poor.

Dr. Auble testified that the results of the tests suggested that the Petitioner did not cope well in open-ended situations when feeling overwhelmed. When something unexpected occurred, he tended to lose control, was unable to make sense of the situation, and acted in maladaptive ways. It affected the Petitioner's ability to tolerate stress and deal with

situations that were not structured where he was required to determine the next step to take. Dr. Auble stated that when the Petitioner was in a situation in which he felt overwhelmed and unexpected things occurred, he did not know how to cope with the situation, and his capacity to engage in reflection and judgment was affected.

Dr. Auble testified that she reviewed Dr. Steinberg's report and noted that he did not conduct a complete neuropsychological evaluation because he was not a neuropsychologist. Dr. Steinberg administered the Luria-Nebraska and the Booklet Category Test, both of which tested for cognitive impairment. The Luria-Nebraska was a screening test which indicated whether a full neuropsychological battery should be conducted. A score of eight or above indicated the need for full neuropsychological testing. Dr. Auble noted that Petitioner received a score of eight or above. She also noted that he received an abnormal result on the Booklet Category Test, which was a low structured test of executive functioning and mental flexibility.

Dr. Auble testified that Dr. Steinberg did not rule out depression as a diagnosis. Dr. Auble explained that in order to rule out a diagnosis, the expert had to consider the diagnosis and the symptoms. Dr. Auble stated that while Dr. Steinberg administered personality testing, he diagnosed the Petitioner based upon the Petitioner's status at the time of the evaluation.

Dr. Auble testified that trial counsel apparently did not inform Dr. Steinberg about the legal requirements for diminished capacity. Dr. Steinberg based his conclusion of diminished capacity on the Petitioner's excessive accumulation of stressors at the time of the offense. Dr. Auble said Dr. Steinberg did not discuss a particular mental state that existed at the time of the offense. Dr. Auble further said Dr. Steinberg made a "personality type kind of statement" in that the Petitioner was prone to episodes of impulsivity and acting out under conditions of strong emotions. Dr. Auble stated that based upon her understanding of the requirements for diminished capacity, Dr. Steinberg did not properly conclude that the requirements for diminished capacity were met. He did not examine the Petitioner for whether the Petitioner could have met the criteria for a mental disease at the time of the offense, and he could not offer an opinion on whether the Petitioner had a mental defect because he was not a neuropsychologist. Dr. Auble said that if a psychologist knew that a mental disease or defect was a requisite part of a legal claim and administered two tests indicating that a mental defect likely was present, she could not think of a valid reason for not proceeding with more testing.

Dr. Auble testified that the Petitioner had difficulty in coping with open-ended situations where he had to choose the means of solving a problem and then use that

information from his environment to develop his own strategies to devise a plan that was adaptive and effective. The Petitioner performed poorly on tests such as the Wisconsin Card Sort and Twenty Questions where he was required to use feedback, determine a strategy, and change his behavior. The Petitioner had trouble interpreting proverbs, which required him to determine and apply inferences. He experienced difficulties with completing mental arithmetic problems, which involved mental manipulation of information, in recalling information where he was required to organize that information, in making sense and categorizing a word list, and in examining groups of people and complex pictures of people. He experienced problems with high level processing and conceptual thinking, which Dr. Auble said were common problems for people who had been exposed to alcohol prenatally.

Dr. Auble testified that the Petitioner experienced problems with the testing of his motor speed, strength, and dexterity. His left hand was stronger and faster than his right hand. Dr. Auble explained that the right hand was controlled by the left hemisphere of the brain and that the Petitioner's issues raised the possibility of some left hemisphere damage.

Dr. Auble testified that she diagnosed the Petitioner with cognitive disorder, not otherwise specified, a mental defect. Dr. Auble said the mental defect had been present for the Petitioner's entire life. According to his school records, the Petitioner had had difficulties in school since early childhood, and his estimate of intelligence had been stable since he was a child. Dr. Auble concluded that due to the mental defect, the Petitioner was unable to manage his emotional reactions and was more likely to respond impulsively, make threats, and engage in violence. The Petitioner's argument with the victim was a highly emotional situation. Dr. Auble concluded that due to the Petitioner's mental defect and other disorders, he was unable to engage in reflection and judgment during the argument.

Dr. Auble testified that she also diagnosed the Petitioner with major depressive disorder, single episode, severe without psychotic features, which was a mental disease. She said the Petitioner was suffering from a major depressive episode at the time of the offense which developed in the two and one-half week period before the offense. The Petitioner lost his job. On January 3, the victim asked him to leave her home. The Petitioner's grandmother, with whom he was living, was diagnosed with Alzheimer's Disease and was hospitalized. The Petitioner had on-going conflicts with the victim. The victim allegedly found the Petitioner with another woman, and a close friend committed suicide. Dr. Auble concluded that due to the mental defect of cognitive disorder, not otherwise specified, and the mental disease of major depressive disorder, the Petitioner was unable to form the requisite level of intent necessary for premeditation. Dr. Auble stated that the Petitioner was unable to engage in reflection and judgment and that the offense was more a product of excitement and passion.

Dr. Auble testified that the Petitioner's diagnosis supported the following statutory mitigating factors: (1) the murder was committed while the Petitioner was under the influence of extreme mental or emotional disturbance, and (2) the Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense for the crime but substantially affected his judgment.

Dr. Auble testified that the Petitioner's behavior was affected by his long-standing cognitive impairments that related to his capacity to take in information, use judgment, reflect on different options, and respond in adaptive ways. The Petitioner also was reportedly intoxicated on the night of the offense and was overwhelmed by his recent losses. He went to the victim's home and wanted to discuss his friend's death and the funeral. The Petitioner said the victim wanted to discuss divorce, and he was unable to cope with the new subject. Dr. Auble concluded that based upon the Petitioner's mental disease, mental defect, and intoxication, he was unable to conform his conduct to the requirements of the law, lost control of his anger, and began striking the victim, resulting in her death.

Dr. Auble testified that Dr. Steinberg did not discuss statutory mitigating factors in his report. He mentioned some of the Petitioner's life history but did not really explain how the Petitioner's life history affected him at the time of the offense. Dr. Auble stated that although Dr. Steinberg testified that the Petitioner was impulsive and had some stress at the time of the offense, he did not link it to extreme mental or emotional disturbance. Dr. Auble thought trial counsel were responsible for ensuring that the expert knew what the statutory mitigating factors were.

Dr. Auble testified that she found evidence of non-statutory mitigating factors. She first noted that the Petitioner's mother was an alcoholic who consumed alcohol during her pregnancy. Dr. Auble testified that excessive alcohol consumption during pregnancy affected the unborn child and caused cognitive impairments in intelligence, executive functioning, and attention. Dr. Auble also found as non-statutory mitigating factors in that the Petitioner's childhood involved repeated abandonment and neglect by his caregivers and he was exposed to violence and physical abuse during his childhood that would have modeled violence as a way to cope with problems.

Dr. Auble testified that the Petitioner spent the first month of his life in the hospital and was unable to bond with a caregiver. During the first five years of his life in which he was raised by his grandmother and her friends, the Petitioner was in a reasonably nurturing environment. According to his medical records, the Petitioner was not well nourished during

that time. However, it was still a relatively good time in his life. When the Petitioner was five years old, his grandmother passed away, and he was placed in his parents' care. Dr. Auble described the Petitioner's mother as an alcoholic prostitute and his father as a heroin-addicted pimp. The Petitioner stayed with his parents only on weekends. During the week, the Petitioner stayed with an aunt who forced him and his siblings to sleep on the couch and did not feed the Petitioner adequately.

Dr. Auble testified that when the Petitioner was six or seven years old, he lived with his mother and her alcoholic boyfriend, who was reported to have physically abused the Petitioner. The Petitioner's mother was unfaithful to her boyfriend with the Petitioner's father. When that occurred, her boyfriend would beat the Petitioner. One night, the Petitioner woke up as he was being beaten with an iron cord and escaped from the home in his underwear. Dr. Auble said that following the incident, the Petitioner did not have a permanent home or any reliable caregivers. He occasionally stayed with his father or his father's girlfriend, who had thirteen children. In 1995, while in prison, the Petitioner described his father's girlfriend as his primary parental figure during his childhood.

Dr. Auble testified that the Petitioner was introduced by his family to a lifestyle of "pimping, gambling, picking pockets, drugs, [and] alcohol." The Petitioner subsequently was placed in foster care. Dr. Auble said that while Dr. Steinberg mentioned the foster care, he did not elaborate on it. The Petitioner was placed in an orphanage. Dr. Auble stated that while such placement generally was considered traumatic for children, it was one of the most positive experiences of the Petitioner's childhood. The Petitioner and his sister remained in the orphanage for two years until the Petitioner was thirteen years old. The Petitioner then was returned to his parents' custody. Within one year, the Petitioner was placed in the Taft Youth Center for two and one-half years for burglary, purse snatching, and arson.

Dr. Auble testified that the Petitioner likely was genetically predisposed to addiction. Both of the Petitioner's parents were chemically dependent. Dr. Auble said that according to the Diagnostic Manual for Psychiatric Disorders, forty to sixty percent of those at risk of developing alcohol dependence had genetic influences. By the time the Petitioner was twelve years old, he was able to drink pints of whiskey at a time. He smoked marijuana and began abusing cocaine when he was an adult. Dr. Auble said that when the Petitioner was intoxicated, his behavioral controls were lowered due to his mental defects. As a result, he had a short temper and was involved in many fights.

Dr. Auble testified that due to the Petitioner's experiences of abandonment, neglect, and abuse, his impaired cognitive functioning, and his drug and alcohol dependency, he was not prepared to function as a responsible adult in society. The Petitioner was angry,

mistrustful, and often intoxicated. He had a long history of criminal activity. His relationship with the victim was volatile and marred by his addictions.

Dr. Auble testified that although the Petitioner attempted to turn his life around, she thought it was a "flawed effort." Following his release from prison in 1997, the Petitioner married the victim. He attempted to work and make a living, which he had never done previously. The Petitioner lapsed back into addiction between October and December 1998.

Dr. Auble testified that the Petitioner had performed reasonably well since returning to prison after killing the victim. She believed both the structured prison environment and the Petitioner's aging had been beneficial. He expressed remorse for killing the victim and stopped smoking cigarettes and drinking caffeine. Religion became important to him. Dr. Auble said the Petitioner attempted to live an "upright" life within the structure of prison, which he failed to do when he was younger. Dr. Auble also said her findings were consistent with those of Drs. Brown, Adler, and Murray Smith.

On cross-examination, Dr. Auble testified that she and the Petitioner discussed the circumstances of the victim's death. She said that the Petitioner was able to recall the circumstances and that his recollection was reasonably consistent from what she had learned of the events from the trial and the documentation she reviewed. Dr. Auble never spoke with Dr. Steinberg or Lead Counsel.

Dr. Auble testified that the Petitioner was abusing alcohol, cocaine, and marijuana during the time of the victim's death. Dr. Auble did not recall whether she asked the Petitioner about the exact quantities he consumed. She understood that the Petitioner ingested as much as he could get for a few days straight. She said the Petitioner was ingesting cocaine more than any other drug. He ingested cocaine with his friend who later committed suicide. The friend left the Petitioner a substantial amount of cocaine. Dr. Auble understood that the Petitioner was heavily intoxicated at the time of the offense.

Dr. Auble testified that the Petitioner told her that he went to the victim's house thinking that they could reconcile and attend his friend's funeral together. When he arrived, he and the victim argued, and the victim said she wanted a divorce. The victim asked the Petitioner to move his car. The Petitioner told Dr. Auble that he "exploded." Dr. Auble said the Petitioner expressed remorse for his actions. Immediately after killing the victim, he used more cocaine. He attempted to turn himself in to police but was turned away because the detectives had left for the day. The Petitioner admitted everything to the police. He then attempted to commit suicide and was placed on suicide watch at the jail.

Dr. Richard Adler, a medical doctor and a child and adult psychiatrist who specialized in fetal alcohol spectrum disorder, testified as an expert in forensic psychiatry and fetal alcohol spectrum disorders. Dr. Adler was contacted by the Petitioner's counsel on September 19, 2008. He was requested to perform the medical component of an evaluation that was performed by his group in order to determine whether the Petitioner had fetal alcohol spectrum disorder. Dr. Adler reviewed the social history prepared by Ms. Shettles on August 23, 2000, Dr. Auble's report, Dr. Brown's report, and the Petitioner's MRI.

Dr. Adler testified that he diagnosed the Petitioner with partial fetal alcohol syndrome. He explained that fetal alcohol spectrum disorder was a medical diagnosis that related to the negative and harmful effects of alcohol ingested by a mother on a fetus during gestation. He further explained that alcohol moved from the mother to the baby with the baby receiving approximately the same concentration of alcohol that the mother received. Because the baby did not have a working liver, the alcohol remained in the baby for a longer period of time. Dr. Adler said the issue often occurred before the mother knew she was pregnant.

Dr. Adler testified that the Centers for Disease Control (CDC) provided the diagnostic criteria for fetal alcohol syndrome in 2004 and that partial fetal alcohol syndrome was described in a 1996 report from the Institute of Medicine (IOM). Dr. Adler said his group used more stringent criteria for diagnosing fetal alcohol spectrum disorder and "borrow[ed]" from the 2004 CDC criteria. Dr. Adler's group first produced the model standard for diagnosing fetal alcohol spectrum disorder on their website in 2008. In 2009, the group presented the model publically at an international meeting for those who practiced in the fetal alcohol area.

Dr. Adler testified that fetal alcohol spectrum disorder involved a multi-disciplinary assessment. The CDC required a physical diagnosis, which psychologists could perform. However, a medical doctor had to review MRIs, brain wave tests, and a facial photographic analysis. Neuro-developmental data, which included results from psychological testing and school records, also had to be reviewed.

Dr. Adler testified that fetal alcohol spectrum disorder was a diagnosis of exclusion requiring that all data be considered to ensure that no other condition more accurately explained the person's symptoms. He said that eighty to ninety percent of people with fetal alcohol spectrum disorder had "a picture that looks like attention deficit disorder" and had a greater chance of suffering from neurological problems. The categories of fetal alcohol spectrum disorder included fetal alcohol spectrum disorder with confirmed maternal exposure, fetal alcohol spectrum disorder without confirmed maternal exposure, partial fetal

alcohol syndrome with confirmed maternal exposure, alcohol-related birth defects, and alcohol-related nerve developmental disorder.

Dr. Adler testified that fetal alcohol spectrum disorders were primary deficits. Primary deficits related to the direct effect of the alcohol on the baby and the way in which the baby was born. Secondary deficits were those difficulties that occurred later in the exposed person's life such as difficulties with substance abuse, independent living, and employment. Dr. Adler said fetal alcohol spectrum disorder was not the equivalent of intellectual disability. Only about nine percent of those with partial fetal alcohol syndrome had an I.Q. below 70. Those with partial fetal alcohol syndrome had an average I.Q. of 90, and those with fetal alcohol syndrome had an average I.Q. of 79.

Dr. Adler testified that people with fetal alcohol syndrome experienced difficulties with daily functioning. They did not function at levels that were consistent with their I.Q. scores. The achievement scores of those with fetal alcohol syndrome or partial fetal alcohol syndrome generally were less than what would be expected based upon their I.Q. scores. They experienced particular difficulty in arithmetic. While the adaptive functioning level of those with intellectual disability generally corresponded with their I.Q. scores, the adaptive functioning levels of those with fetal alcohol syndrome or partial fetal alcohol syndrome generally were lower than what their I.Q. scores suggested they should be. Dr. Adler said people with fetal alcohol spectrum disorder tended to have a "patchy" or "irregular" series of issues as opposed to global issues or a single issue. They experienced problems with executive functioning, which included planning, delaying gratification, solving problems, and making decisions under stress. Dr. Adler noted that caretakers of those with fetal alcohol spectrum disorders reported good and bad days, resulting in variability in performance.

Dr. Adler testified that fetal alcohol spectrum disorder fell within the learning disorder section of the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV). Those with fetal alcohol spectrum disorders were diagnosed under Axis I with cognitive disorder not otherwise specified. Dr. Adler explained that the diagnosis meant there were issues with the brain that were likely related to a medical condition, which was identified on Axis III, the medical axis. Those with partial fetal alcohol syndrome typically had abnormalities with thinking in the mental mechanisms, which was known as cognitive thinking. This resulted in a diagnosis of cognitive disorder not otherwise specified, which was a mental defect.

Dr. Adler testified that a diagnosis of partial fetal alcohol syndrome required confirmed maternal exposure to alcohol and characteristic facial abnormalities. The

diagnosis also required either evidence of growth retardation, central nervous system abnormalities, or cognitive abnormalities.

Dr. Adler testified that according to Ms. Shettles's summary, she interviewed Willie Mae Avery, who reported that the Petitioner's mother drank alcohol heavily throughout her pregnancy. Ms. Avery implied that the Petitioner's mother continued to drink alcohol even after she discovered she was pregnant with the Petitioner. Dr. Adler said that based upon that information, he confirmed internal alcohol exposure, thus meeting the first criteria for diagnosing partial fetal alcohol syndrome.

Dr. Adler testified that when fetal alcohol spectrum disorders were first appreciated in 1973, children with the disorder were known to have facial abnormalities. Over time, efforts were made to identify the emblematic features and develop a system to assess those features. Dr. Adler said three emblematic features had been identified. One was a palpebral fissure opening, which was a black line between the margins of the eye opening. The second feature was a flattened ridge below the bottom of the nose to the upper part of the lip. The third feature was a thinned upper lip. In 2000 or 2001, technology was developed that allowed practitioners to identify facial abnormalities by using a computer.

Dr. Adler testified that the facial abnormalities did not necessarily remain with the person throughout his or her life. Many of the emblematic features could diminish or disappear as the person aged. Dr. Adler determined that the Petitioner had facial abnormalities by using a photograph of the Petitioner that Dr. Adler had uploaded in a computer program. Dr. Adler said the IOM required evidence of some components of the pattern of facial abnormalities. Dr. Adler, however, used the fetal alcohol syndrome facial photographic program, which was more stringent. The program referred to the Petitioner's facial abnormalities as "FAS features, mild." Based upon the report, Dr. Adler concluded that the Petitioner met the second criteria for partial fetal alcohol syndrome. While Dr. Adler said the Petitioner's facial abnormalities may have been more pronounced as a child, he could not make that conclusion with any degree of reasonable medical certainty.

Dr. Adler testified that he was unable to determine whether any evidence of growth retardation existed. He noted that because the Petitioner's mother did not have prenatal care, he did not have a reasonable idea of how premature the Petitioner was at birth. When the Petitioner was born, he weighed four pounds, five ounces and remained in the neonatal intensive care unit for approximately one month. Dr. Adler noted data suggesting that the Petitioner fell within a higher percentile for gestation at birth and fell within the lower percentile at age one year, eight months. Dr. Adler stated that while one of the diagnostic

criteria for growth retardation was decelerating weight over time, some inconsistencies existed in the records regarding whether the Petitioner received adequate nutrition.

Dr. Adler testified that an MRI of the Petitioner's brain was performed in Nashville in April 2008. Dr. Fred Bookstein conducted a subsequent MRI study on the Petitioner in 2009 at the University of Washington. Dr. Adler testified that based upon the analysis, the Petitioner had several aspects of brain abnormalities. The Petitioner's corpus callosum was abnormal and included an abnormality that appeared as a notch. Dr. Adler explained that the corpus callosum was a structure of the brain that included white fibers that connected the right and left sides of the brain and were believed to be important in the area of mathematics. Dr. Bookstein's analysis of the corpus callosum involved a specialized study during which he compared the Petitioner's corpus callosum to those of people known to have fetal alcohol spectrum disorders. Dr. Bookstein's paper regarding the specialized study was published in 2001 or 2002.

Dr. Adler testified that he consulted Dr. Bookstein regarding the notch or focal abnormality in the Petitioner's brain. According to Dr. Bookstein, such focal abnormalities tended to occur later in prenatal development, specifically after the end of the second month of gestation. Dr. Adler characterized their conversation as "corroboration" that the Petitioner's mother continued to drink alcohol later in her pregnancy. Dr. Bookstein concluded that "this colossal-shaped abnormality [was] a direct effect of the prenatal environment; that is [the Petitioner's] brain was permanently damaged before birth by the prenatal alcohol exposure."

Dr. Adler testified that in addition to the findings from the MRI analysis, the Petitioner had generalized atrophy, or shrinking of the brain tissue, throughout his brain. According to Dr. Adler, the shrinking of the brain was characteristic of people with fetal alcohol spectrum disorders. As a result, Dr. Adler concluded that the requirement of central nervous system abnormalities was "amply" met. He said the images of the atrophy were readily available and could have been read by radiologists in 2000.

Dr. Adler testified that the radiologist in Nashville referred to the Petitioner's brain atrophy as mild, while the radiologist in Washington referred to it as moderate. Dr. Adler said that while atrophy generally suggested shrinkage of the brain, it also could result from the failure of the brain tissue to form. The actual mental defect was referred to as cerebral atrophy. Dr. Adler had never observed the extent of the Petitioner's atrophy in any other case. He did not think the Petitioner's brain appeared in that manner at birth. Rather, he consulted with Dr. Cohen, a senior neuroradiologist at the University of Washington, who said that the appearance was the result of a combination of prenatal and post-natal damage.

Dr. Adler testified that in determining whether the Petitioner had neurodevelopmental abnormalities, he performed a neurological examination and found that the Petitioner had "soft sides," which did not relate to a focal abnormality but to more generalized neurological problems. The Petitioner experienced issues in his ability to follow Dr. Adler's finger fluidly and smoothly move his eyes. He was unable to maintain lateral gaze in that his eyes essentially returned to the midline rather than the side on which Dr. Adler moved his finger. The Petitioner's grip on his right side was not as strong as his grip on his left side even though he was right-handed, and his fluidity of movement on his right side was not as good as on his left side. Dr. Adler concluded that the Petitioner met the criteria for neurodevelopmental abnormalities. Dr. Adler said he assigned a "plus/minus" to the category in his report because he did not find anything that he categorized as "pathognomonic."

Dr. Adler testified that the Petitioner satisfied the criteria for deficits in functional domains. He said the Petitioner specifically satisfied the criteria established by both the IOM and the CDC, which was more stringent. The IOM required a complex pattern of behavior or cognitive abnormalities but did not provide direction regarding the quantity of abnormalities required. The CDC required three abnormalities, and the deficits had to be of a certain magnitude based upon generally accepted, frequently used standardized testing. In the Petitioner's case, Dr. Brown identified eight abnormalities. Dr. Adler noted the Petitioner's poor performance in testing of adaptive functions, which Dr. Adler said was characteristic of those with fetal alcohol spectrum disorders and those who ran afoul of the law.

Dr. Adler testified that in terms of adaptive functioning and secondary disabilities, people with partial fetal alcohol syndrome had a worse prognosis than those with fetal alcohol syndrome. He explained that people with partial fetal alcohol syndrome were less likely to be diagnosed as such and less likely to obtain necessary services. People with partial fetal alcohol syndrome experienced problems in legal, employment, and domestic areas.

Dr. Adler testified that he diagnosed the Petitioner with cognitive disorder not otherwise specified under Axis I, partial fetal alcohol syndrome under Axis III, and stressors based upon extreme incarceration on death row under Axis IV. Under the global assessment of functioning under Axis V, Dr. Adler assigned the Petitioner a score of 70 as both his current and prior functioning. Dr. Adler also found evidence of substance abuse. He understood that the Petitioner had a history of poly-substance dependence that was in remission at the time of his examination. Dr. Adler said poly-substance abuse would have been a diagnosis under Axis I.

Dr. Adler testified that in 1991, the surgeon general had warned about the effect of prenatal alcohol exposure. The diagnosis of partial fetal alcohol syndrome and the criteria established by the IOM had existed since 1996. Dr. Adler said that other than the MRI image taken in 2008, the data supporting his conclusions had existed since 2001. MRI testing was available in 2000.

On cross-examination, Dr. Adler testified that major mental disorders fell within Axis I, that personality disorders fell within Axis II, that medical disorders fell within Axis III, and that stressors fell within Axis IV. Dr. Adler said Axis V was known as the global assessment of functioning and was not the most reliable scale. The global assessment measured how a person was functioning at a particular time in the world around him. Dr. Adler measured the Petitioner's functioning under Axis V according to his world in prison.

Dr. Adler testified that at the time of the offense, the Petitioner had an extensive history of drug abuse. He had relapsed and was using cocaine again. The Petitioner may have been using cocaine about the time of the offense. Dr. Adler said that when Dr. Steinberg evaluated the Petitioner, he had to consider that factor because it existed around the time of the offense. Dr. Steinberg diagnosed the Petitioner under Axis I with poly-substance abuse.

Dr. Adler testified that fetal alcohol spectrum disorder was an "overlooked" disorder. He explained that the disorder did not receive a great amount of exposure at medical schools or during training for psychologists. In diagnosing the Petitioner, he reviewed summaries of prior assessments conducted while the Petitioner was incarcerated and while the Petitioner was in school. He interviewed the Petitioner and administered a neurological examination. Dr. Adler also examined an MRI that was taken of the Petitioner in 2008. To his knowledge, no other imaging of the Petitioner was taken before 2008. Dr. Adler did not interview members of the Petitioner's family but relied upon summaries of interviews conducted by Ms. Shettles. He also did not interview Dr. Steinberg.

Dr. Adler testified that alcoholism caused some shrinking of the brain. Cocaine use resulted in some subtle differential effect in terms of white matter atrophy. Dr. Adler said that according to an article he had read, an average of thirteen years of heavy alcohol usage could result in a loss of five percent of brain tissue. He acknowledged that use of cocaine and alcohol had to be considered when examining brain shrinkage.

Dr. Adler testified that he questioned the Petitioner about a head injury the Petitioner had received at age fifteen and which supposedly had rendered him unconscious for a protracted period of time. The Petitioner reported that he suffered a concussion and was not

"quite right for about a day." Dr. Adler found no evidence of trauma from the Petitioner's MRI or any evidence that the Petitioner had suffered a head injury.

On recross-examination, Dr. Adler testified that the Petitioner's partial fetal alcohol syndrome, along with his cognitive abnormalities, warranted a diagnosis of cognitive disorder not otherwise specified, which was a mental disease or defect. Dr. Adler said the Petitioner's mild or moderate atrophy was a mental defect. He also said evidence confirming maternal alcohol consumption during pregnancy existed in 2000. The Petitioner fell within less than the fifth percentile in height. Dr. Adler presumed the Petitioner had facial abnormalities in 2001 and neurological deficits in 2000. He noted that the results of Dr. Steinberg's testing revealed neurological deficits. Dr. Adler thought partial fetal alcohol syndrome could have been diagnosed in 2000.

In response to questions from the post-conviction court, Dr. Adler testified that the type of alcohol consumed by the mother did not impact a diagnosis of fetal alcohol spectrum disorder. He noted a correlation between the diagnosis and the amount of alcohol and the frequency in which it was used. Ms. Avery had told Ms. Shettles that the Petitioner's mother had consumed alcohol heavily and consistently throughout the pregnancy.

Dr. Adler testified that people with fetal alcohol syndrome could function under low-level circumstances. They could "parrot" or repeat things and function in situations involving over-learned material. They could review legal points with a "jail-house lawyer" while in jail and then repeat those points in court. Dr. Adler said that according to neuropsychological test results, people with fetal alcohol syndrome experienced difficulties with more complex cognitive functions. Dr. Adler noted that crimes committed by people with fetal alcohol syndrome typically were planned poorly.

Dr. Natalie Novick Brown, a psychologist in Seattle, Washington, testified as an expert in clinical and forensic psychology with a particular expertise in the field of fetal alcohol spectrum disorders. She said fetal alcohol spectrum disorder was an "umbrella" term for several conditions that related to prenatal exposure to alcohol during pregnancy. Brain damage generally resulted from alcohol exposure.

Dr. Brown testified that alcohol created a unique pattern of deficits or damage to a fetus. Fetal alcohol syndrome created physical malformations, including external and internal malformations. External malformations included facial dysmorphology, facial abnormalities, and growth deficits. Internal malformations related to the effects of alcohol on the organs and systems within the body. Dr. Brown said that the brain developed throughout the nine-month gestational period and that the face developed between the eighth

and twelfth week. The amount of alcohol that a woman consumed at a particular moment was not the issue in determining the damage to the fetus. Rather, the relevant factors were the frequency and pattern of alcohol use, the woman's metabolism and genetics, the genetic makeup of the fetus, the resiliency of that genetic composition, stress, and the environment.

Dr. Brown testified that fetal alcohol syndrome was first identified in the United States in an article published by two doctors at the University of Washington in 1973. In 1983, the surgeon general first warned American women against consuming alcohol during pregnancy. By 1989, a congressionally mandated warning label appeared on all alcoholic beverage containers. Dr. Brown said fetal alcohol spectrum disorders were well-known in the medical and scientific community at the time of the Petitioner's trial.

Dr. Brown testified that the Office of the Post-Conviction Defender contacted her to conduct a functional assessment of the Petitioner. Before contacting Dr. Brown, trial counsel had contacted Dr. Fred Bookstein to conduct a more thorough analysis of the Petitioner's corpus callosum as it appeared on an MRI image. Thus, when Dr. Brown evaluated the Petitioner, tangible evidence of brain damage existed. Dr. Brown noted information in the record that the Petitioner's mother had consumed alcohol when she was pregnant with the Petitioner and that the Petitioner had experienced growth and functional deficits. Dr. Brown further noted a pattern that initially appeared consistent with fetal alcohol spectrum disorder.

Dr. Brown testified that in evaluating a person for fetal alcohol spectrum disorder, her group typically had the person undergo neuropsychological testing first. If the testing revealed damage in multiple domains consistent with fetal alcohol spectrum disorder, Dr. Brown then conducted her evaluation. In the present case, Dr. Brown was provided with testing conducted by Dr. Auble. If neuropsychological deficits were established and those deficits were found to be lifelong, the functional criterion for fetal alcohol spectrum disorder had been satisfied. A doctor experienced in the field then conducted a physical examination and made a differential diagnosis. Dr. Brown explained that the diagnosis of fetal alcohol spectrum disorder was a medical condition and a medical diagnosis that fell under Axis III.

Dr. Brown testified that even if she did not consider Dr. Bookstein's research from 2003, she had sufficient information from Dr. Auble's testing of the Petitioner and the Petitioner's social history to lead her to presume fetal alcohol damage. Dr. Brown said the protocol for diagnosing fetal alcohol damage did not require evidence of morphological damage. If no such evidence was available, she may consider whether any central nervous system dysfunction on the functional deficits existed. Such information may be obtained through neuropsychological testing and a lifelong functional assessment, which Dr. Brown

conducted regarding the Petitioner. Dr. Brown noted, however, that Dr. Bookstein had been conducting morphological assessments since the 1990s.

Dr. Brown testified that individuals with varying specialties had to be utilized in diagnosing fetal alcohol spectrum disorder because the diagnosis required various physical and psychological aspects. The facial characteristics, external characteristics, growth deficit, and differential diagnosis had to be assessed by a medical doctor, and the functional aspects had to be assessed by a psychologist. Dr. Brown noted that one type of specialist could find brain damage that another type of specialist did not find.

Dr. Brown testified that even if a clinical psychologist evaluated someone and did not find a mental disease or defect, that lack of a finding did not necessarily rule out the existence of a mental disease or defect. Rather, the issue was what the psychologist was searching for in conducting the evaluation. According to Dr. Brown, a psychological assessment was essentially a screening process to determine the most likely cause or source of the problem. The assessment required a broad spectrum of testing to determine whether deficits existed. Dr. Brown said she focused on the functional manifestation of any brain damage discovered and the lifelong manifestation of that brain damage.

Dr. Brown testified that a diagnosis of fetal alcohol syndrome required a finding of three primary facial characteristics: small palpebral fissures, relatively flat eye openings, and an abnormal philtrum. A diagnosis of partial fetal alcohol syndrome required two or fewer of the facial features. A growth deficit may not exist in people with partial fetal alcohol syndrome. Both syndromes involved central nervous dysfunction. Dr. Brown stated that an assessment of a person's facial features could be affected by the pattern and timing of the alcohol exposure and the age of the assessment. The facial features were most visible in middle childhood. By puberty, the face coarsened and lost the "babyish fullness" and the abnormalities. Dr. Brown said that adults with fetal alcohol syndrome often showed either no or very few facial abnormalities because they were lost in the process of puberty.

Dr. Brown testified that she was asked to determine whether the Petitioner's history produced evidence of functional deficits consistent with the functional criterion for fetal alcohol spectrum disorder. If such evidence existed, Dr. Brown was asked to determine whether the Petitioner displayed suggestibility consistent with fetal alcohol spectrum disorder that would have affected his statement to police. Finally, she was asked to determine the effect of the mental defect produced by fetal alcohol spectrum disorder upon the Petitioner's mental state at the time of the offense. Dr. Brown explained that if a person had brain damage that impacted his or her functioning, that impact would be present throughout the

person's life, including prior to, during, and following a criminal offense.  The impact could be relevant to the person's behavior in committing the offense.

Dr. Brown testified that in conducting an assessment, she reviewed the person's social history in order to obtain an overall sense of the case and the person's functioning  The social history also assisted her with determining the likelihood of prenatal exposure to alcohol.  She examined information about the mother and the mother's lifestyle and whether "adverse life course outcomes or secondary disabilities" existed.

Dr. Brown testified that she reviewed the social history prepared by Ms. Shettles at the time of the Petitioner's trial.  Dr. Brown noted that Ms. Shettles addressed the possibility that the Petitioner had fetal alcohol damage.   Ms. Shettles discussed the Petitioner's premature birth, his low birth weight, and reports from family members that his mother had consumed alcohol during her pregnancy.  Dr. Brown stated that in the thirty-five to forty capital-case defendants she had assessed, the social history prepared by Ms. Shettles was the best she had seen in alerting counsel of the possibility of fetal alcohol spectrum disorder.

Dr. Brown testified that if the Petitioner had fetal alcohol spectrum disorder, his history would have included standardized test results that illustrated a global deficit in I.Q. and/or deficits of one or more standard deviations below the mean in at least three functional domains or categories.  Anecdotal evidence of that dysfunction would have been included in the records.  The records also would have established that the dysfunction existed during the Petitioner's childhood, teen, and adult years in the form of secondary disabilities in his adaptive functioning.

Dr. Brown testified that according to the diagnostic criteria, fetal alcohol spectrum disorder may cause intellectual disability, which was an I.Q. less than 70.  According to the CDC and IOM guidelines, if the person was intellectually disabled, neuropsychological testing to determine deficits and multiple separate domains was not necessary.  Dr. Brown stated that only approximately twenty percent of those with fetal alcohol spectrum disorders were intellectually disabled.

Dr. Brown testified that the diagnostic criteria for fetal alcohol spectrum disorders listed ten or twelve functional domains where deficits may exist.  Those functional domains included cognitive or intellectual functioning, learning, memory, motor skills, executive functioning, and adaptive functioning.   Adaptive functioning included areas of communication skills, daily living and social skills, social functioning, and sensory integration.  Dr. Brown noted the importance of examining a person's family history to determine functional deficits.  The worse the family environment, the more likely adverse

outcomes or secondary disabilities would exist. Dr. Brown said the Petitioner's family system was important in her understanding of the environmental and social factors that impacted him when he was a child.

Dr. Brown testified that executive functioning was the area most impacted by fetal alcohol spectrum disorder. Executive functioning included the ability to plan, organize, sequence goal-directed behavior, be self-aware, and foresee consequences before acting. It involved "high order" thinking, decision making, and impulse control. Dr. Brown said impulse control was likely the most prevalent finding in all research regarding fetal alcohol spectrum disorders. Lack of impulse control resulted in illogical crimes and excessive aggression. Dr. Brown stated that when people with fetal alcohol spectrum disorder were arrested, they quickly waived their rights and stated that they understood them even when they did not. They then made confessions that most people would not have made. Dr. Brown said she typically observed bravado in the confession in that the person falsely or overly confessed. She acknowledged that such bravado was not present in the Petitioner's case.

Dr. Brown testified that she examined evidence of the Petitioner's developmental progress in the records. She searched for risk factors that would have led to secondary disabilities in fetal alcohol spectrum disorder, including abuse, neglect, domestic violence, substance abuse by the Petitioner's parents, and exposure to crime and poverty. Dr. Brown also noted the importance of the examination into a person's history as an adult. A person who did not have fetal alcohol spectrum disorder may have been able to overcome some of the adverse events that occurred during childhood and lead relatively productive pro-social lives. Those with fetal alcohol spectrum disorder did not have the initiative or cognitive ability to overcome the negative exposure and change their lives. Dr. Brown said she was searching for evidence in the record of the Petitioner's successes that would have refuted the suggestion that he had fetal alcohol spectrum disorder as an adult.

Dr. Brown testified that the Petitioner's I.Q. scores consistently fell within the borderline range of intellectual functioning beginning at age nine until 2009, when Dr. Auble tested him. Dr. Brown said a global deficit in I.Q. required an I.Q. of 70 or below, which the Petitioner did not have. The average I.Q. of a people with fetal alcohol syndrome was 79, and the average I.Q. of people with partial fetal alcohol syndrome was 90. Brown said the Petitioner's I.Q. fell within the middle of the average I.Q. score for those with fetal alcohol syndrome and for those with partial fetal alcohol syndrome. Dr. Brown said the Petitioner's history of drug and alcohol abuse since the age of twelve did not explain his I.Q. scores because he had the same I.Q. at ages nine and fifty. Whatever damage existed when the Petitioner was a child remained the same in terms of his intellectual functioning at age fifty.

Dr. Brown testified that she searched for evidence in other functioning domains to determine whether the Petitioner was capable of performing better or worse than his I.Q. predicted. She said that if the Petitioner had fetal alcohol spectrum disorder, his performance level would have been worse. Dr. Steinberg administered the Wide Range Achievement Test, third edition, and Dr. Auble administered the fourth edition to the Petitioner. Dr. Brown looked for low average academic performance on the achievement tests but found that the Petitioner's performance was below that level. She said the Petitioner's scores were significantly below what she expected based upon his I.Q. His scores were two grade levels below the mean, which fell within the special education category.

Dr. Brown testified that she had someone from her group administer the Vineland Adaptive Behavior Scales, second edition, (Vineland-II) which was one of several standardized measures of adaptive functioning and was used in almost all research into fetal alcohol spectrum disorder. The Vineland-II was an hour-long questionnaire that was administered to Denise Oher, the Petitioner's sister, and Glenda Williams, the Petitioner's cousin, over the telephone. Dr. Brown said the standard procedure was to administer the Vineland-II to at least two different people and compare the results. Similar results gave more credence or reliability to the accuracy of the perceptions of those tested. Dr. Brown considered the consistency between the results of the tests administered to Ms. Oher and Ms. Williams to be "excellent." Ms. Oher rated the Petitioner's overall adaptive functioning as falling within the ninth percentile, and Ms. Williams rated his overall adaptive functioning as falling within the fifth percentile, which was close to two standard deviations below the mean.

Dr. Brown testified that adaptive functioning was based upon executive functioning in that a person with deficiencies in executive functioning also would have deficiencies in adaptive functioning. Dr. Brown said the Petitioner's adaptive functioning was extremely low in terms of his ability to cope with adverse stressful events. His ability to cope was similar to that of a thirteen-year-old. Dr. Brown said that as a result, his executive functioning during adverse stressful events would have been very low.

Dr. Brown testified that the Petitioner had a "declining triad" in his scores. His I.Q. score fell within the fourteenth percentile and was approximately one standard deviation below the mean. His achievement test scores were lower than predicted based upon his I.Q. His adaptive functioning was lower than his achievement test scores and was close to two standard deviations below the mean.

Dr. Brown testified that adaptive behavior was directly relevant to offense conduct and that a person with fetal alcohol spectrum disorder would have maladaptive responses to

unfamiliar, non-routine, and stressful events. The Petitioner's score in this area was very low, indicating poor behavior. Dr. Brown stated that people who simply did not want to follow the rules did not have scores from standardized testing indicating the incapacity to adaptively function. She also said the Petitioner had standardized test scores across his life indicating a biological incapacity to function adequately.

Dr. Brown testified that she relied heavily on neuropsychological testing because it illustrated how brain damage manifested in terms of a person's ability to function across multiple domains. In people with fetal alcohol spectrum disorder, Dr. Brown typically expected to see evidence of brain damage across multiple domains with some strengths and weaknesses. She said the Petitioner had a significant amount of functional damage across multiple domains. She found him to be extremely deficient in terms of tests involving less structure and unexpected and unfamiliar situations.

Dr. Brown testified that she searched for evidence of poor grades that were consistent with the Petitioner's low level of academic achievement and his poor learning ability. She noted that the Petitioner's grades were poor throughout his elementary school years. Dr. Brown also searched for evidence of poor decision-making and executive functioning. She found evidence in the Petitioner's file of events during which he acted out and did not control his anger.

Dr. Brown testified that the Petitioner met the functional criteria for fetal alcohol spectrum disorder. She found that he had deficiencies in eight functional domains and that his memory was impaired in his executive functioning.

Dr. Brown testified that secondary disabilities were the adverse life outcomes that occurred to people with fetal alcohol spectrum disorder if they were exposed to risk factors throughout their childhood without appropriate interventions. A large number of people with fetal alcohol spectrum disorder were arrested and convicted of criminal offenses. Dr. Brown said the best scenario for people with fetal alcohol spectrum disorder was a stable, nurturing home throughout childhood. The time between ages eight and twelve was the most critical time when stability and nurturing needed to be present in the home in order to protect against secondary disabilities. During that time period, the Petitioner was living with his mother and Walter Turner, who physically abused him. The Petitioner was exposed to domestic violence, drug use, and poverty.

Dr. Brown testified that people with fetal alcohol spectrum disorder and an I.Q. greater than 70 were at risk for secondary disabilities. A child who was intellectually disabled was able to obtain more services, which were important in reducing secondary

disabilities. A child with an I.Q. in the low average or borderline range typically did not receive such services. Dr. Brown stated that early diagnosis of fetal alcohol spectrum disorder also was a protective factor because the early diagnosis provided a greater opportunity for interventions to be applied consistently throughout childhood.

Dr. Brown testified that the Petitioner did not receive any services to reduce the likelihood of secondary disabilities. She found that throughout his adult years, the Petitioner had seven of the nine secondary disabilities that those with fetal alcohol spectrum disorder were prone to have. Dr. Brown noted that the Petitioner's brain damage had been described as severe and that she expected to find many secondary disabilities as a result. Dr. Brown said that because fetal alcohol spectrum disorder resulted in cognitive disorder not otherwise specified, the Petitioner had a mental defect.

Dr. Brown testified that she administered the Gudjonsson Suggestibility Scale to the Petitioner to assess his interrogative suggestibility. People with partial fetal alcohol spectrum disorder were very suggestible and performed worse on the test than those who were intellectually disabled. Dr. Brown explained that the scale assessed two kinds of suggestibility: (1) the tendency to acquiesce to leading questions; and (2) the tendency to change responses in response to negative feedback. Dr. Brown read a short story, which included forty pieces of data, to the Petitioner, and the Petitioner was required to report the elements of the story that he could recall. Dr. Brown said the Petitioner's score was very low and consistent with the result of Dr. Auble's neuropsychological testing which revealed significant impairments in short-term memory. She said that the Petitioner's score in acquiescing to leading questions was much higher than the "normative" populations and that he changed his answers "right and left" in response to negative feedback. Dr. Brown concluded that the Petitioner's overall suggestibility score was very high and that he demonstrated a high degree of suggestibility. She identified a record from the TDOC from 1995 in which a psychologist characterized the Petitioner as suggestible.

Dr. Brown testified that Dr. Steinberg had concluded that the Petitioner was competent to waive his Miranda rights. She explained that Dr. Steinberg administered a competency test to assess the Petitioner's competency to stand trial and based his opinion on a test that did not measure competency to waive Miranda rights. Dr. Brown also reviewed a basic evaluation of the Petitioner's intellectual ability that was included in his juvenile court records. At age sixteen, the Petitioner was in the ninth grade and had been retained in the second and eighth grades. The Petitioner was failing all of his subjects, and his I.Q. and achievement scores were listed as below average.

Dr. Brown testified that she administered the Grisso Miranda Test to the Petitioner. The first portion of the test required the Petitioner to report back in his own words the meaning of each of the phrases in the Miranda warnings. The Petitioner received a perfect score on that portion of the test. Dr. Brown tested the Petitioner's ability to determine whether a word was similar or different than one of the Miranda terms. The Petitioner's performance was one and one-half standard deviations below the mean. In the Miranda vocabulary section of the test, the Petitioner was asked to define the concept of some of the words used in the Miranda warnings, such as "consult," "attorney," "interrogation" or "questioning," "appoint," "entitled," and "right." The Petitioner's score was one and one-half standard deviations below the mean.

Dr. Brown testified that the "function of rights and interrogation" test assessed the Petitioner's understanding of the significance of the rights as they applied to his situation. The Petitioner was shown cartoons that depicted different court proceedings, was asked what was occurring, and was asked what the defendant in the cartoon should or should not do. Dr. Brown said the Petitioner demonstrated very poor ability to interpret what was occurring in the courtroom scenes. His score was one standard deviation below the mean.

Dr. Brown testified that the Petitioner did not understand the meaning of the word "right" and said that "right" meant that the person wanted to talk. Dr. Brown said the Petitioner had a poor understanding of the words "consult," "appoint," and "entitled" and was unable to provide accurate meanings for those words. The Petitioner said that during an interrogation, the suspect had to talk if the police had evidence. According to the Petitioner, the evidence trumped the suspect's right to remain silent and have an attorney present during questioning. Dr. Brown said that based on the standardized test, the Petitioner had significant deficiencies in three out of four subtests that assessed a person's understanding of Miranda. Dr. Brown also said that according to the test, the Petitioner was not competent to waive his rights.

Dr. Brown testified that the Petitioner's expressive language skills were directly relevant to his ability to communicate his thoughts accurately. According to both informants on the Vineland-II, the Petitioner functioned like an eight-year-old with regard to his ability to put his thoughts and memories into words. Dr. Brown testified that in 2000, information was available to counsel regarding the relevance of fetal alcohol spectrum disorder to waiving Miranda rights. In 2000, information also was available to counsel regarding the relevance of fetal alcohol spectrum disorder to a person's mental state and to criminal penalties.

Dr. Brown testified that the Petitioner's behavior during the offense was consistent with having fetal alcohol spectrum disorder. She characterized his behavior as an "over reaction" and an excessive reaction. Dr. Brown found no evidence that the Petitioner's conduct was planned. She said the victim's death appeared to be the result of impulsive, spontaneous, and emotion-provoked rage. She also said the Petitioner made a poor attempt to conceal the offense because he left the handle of the skillet on the bed and drove the victim's car following the offense. Dr. Brown said the Petitioner was unable to consider the consequences of his conduct and other ways of behaving. The Petitioner turned himself in to police, immediately waived his rights, and gave a confession that "suspects don't typically give."

Dr. Brown testified that the federal government recognized that those with fetal alcohol spectrum disorder were very impulsive and could not determine the consequences of their actions. The federal government also recognized that fetal alcohol spectrum disorder was relevant throughout the judicial process. Dr. Brown concluded that due to his mental defect, the Petitioner lacked the biological capacity to premeditate and form the intent to kill. She also concluded that the Petitioner did not have the biological cognitive capacity to reflect and use his judgment. Dr. Brown explained that the abilities to reflect, exercise judgment, and self-regulate were related to executive functioning and that the Petitioner was substantially impaired in executive functioning.

Dr. Brown testified that acute intoxication at the time of the offense would have made the Petitioner's deficiencies more profound and that substance abuse worsened the functioning level. Dr. Brown noted multiple events that had occurred in the Petitioner's life in the month before the homicide. She said the events had a cumulative impact on him and increased his emotional distress.

On cross-examination, Dr. Brown testified that she met with the Petitioner at Riverbend on January 31, 2009, during which time she interviewed him and administered several tests. Of the six and one-half hours she spent with him, approximately one-half of that time was spent administering tests. The Petitioner informed her about the facts and circumstances of the case. She asked him questions about the offense, and he answered them. Dr. Brown did not suggest to him what to say. She said that while she directed him with questions, the answers to her questions were the Petitioner's answers. Dr. Brown compared the Petitioner's version of the facts with his statement to the police and found that they were generally consistent.

Dr. Brown testified that the Petitioner told her, "This is not about me trying to say I'm innocent. I committed murder. It was manslaughter, not premeditated. I had no thoughts

about hurting that woman. If I had planned to kill her why [would] I need a frying pan. . . I had a gun." Dr. Brown said the Petitioner consistently maintained that the homicide was not premeditated but was a crime of passion.

Dr. Brown acknowledged that the Petitioner disposed of all of the weapons but the handle of the frying pan, which he left on the bed. He disposed of the frying pan and the horseshoe in a flooded ditch. He also disposed of his bloody clothes. He drove the victim's car to an apartment complex and abandoned it. The Petitioner then went to an abandoned house and did not return to the house where he had been staying and where people would be looking for him.

Dr. Brown testified that the Petitioner regretted killing the victim and that remorse about the offense was inconsistent with antisocial personality disorder. The Petitioner went to the fugitive squad at the police station where he reported that he had killed his wife and wanted to turn himself in to the police. However, the police sent him home. He returned the following day. Dr. Brown said the Petitioner wanted to turn himself in to the police because he thought he did something wrong.

Dr. Brown testified that she did not find anything in his statement to police that was inconsistent with fetal alcohol spectrum disorder even though he stated that he had consumed drugs, "blew up," and killed the victim. Dr. Brown explained, "Substance abuse or temporary short-term intoxication doesn't fully explain everything about who this man is and how he functions." She acknowledged that the Petitioner told police officers that his best friend had died, that he had lost his job, and that the victim wanted to leave him. The Petitioner said that they were talking, that the victim rejected him, that he "lost it," and that he picked up the "closest thing that [he] could find and beat her to death." Dr. Brown said there was evidence that the Petitioner had consumed drugs before the offense. In his statement, the Petitioner discussed using drugs almost continuously for several days up until the time of the offense and following the offense.

Dr. Brown acknowledged that when suspects confessed to the police, they often attempted to explain their actions in a more positive light. Dr. Brown said the Petitioner's description of the events and his inaccurate appreciation of his Miranda rights were consistent with fetal alcohol syndrome disorder. She acknowledged that the Petitioner had prior experience with the police and knew "how the game [was] played." The police officers asked open but limited questions, and the Petitioner did not provide a great amount of information as a result.

-71-

Dr. Brown testified that her group's website described fetal alcohol syndrome disorder as an "overlooked disorder." The website stated the need to examine the disorder using an interdisciplinary approach which often was not utilized. Dr. Brown said that in the past, one person tended to make the diagnosis.

Dr. Brown testified that the records of the Petitioner's early years and his mother's pregnancy were sparse. She said the Petitioner's mother apparently did not have any prenatal care. Dr. Brown did not conduct any personal interviews with the Petitioner's family members. She did not assess Ms. Oher for fetal alcohol syndrome but said Ms. Oher possibly had the syndrome. Dr. Brown understood that Ms. Oher's children were taken away from her because she could not care for them.

Dr. Brown testified that the questions in Vineland-II were geared toward the Petitioner's functional levels during the time in which the person interviewed had the most exposure to the Petitioner. Ms. Oher had not had any contact with the Petitioner for many years, and her responses were based on a time period when she and the Petitioner were quite young. Before trial, Ms. Oher had her own deficits, and Dr. Brown found Ms. Williams to be "far more reliable" than Ms. Oher. Ms. Williams had had more exposure to the Petitioner during his teen and adult years, and the Petitioner had lived with her during the periods in which he was first released from prison.

Dr. Brown testified that Ms. Oher ranked the Petitioner within the twelfth percentile on communication skills, while Ms. Williams ranked him within the thirteenth percentile. On daily living skills, Ms. Oher ranked the Petitioner within the tenth percentile, and Ms. Williams ranked him within the second percentile. On socialization, Ms. Oher ranked the Petitioner within the twenty-first percentile, and Ms. Williams ranked him within the ninth percentile. Dr. Brown placed more weight on Ms. Williams's responses because she had had long-term contact with the Petitioner and had led a relatively successful life. Ms. Oher had had limited exposure to the Petitioner and significant problems. Dr. Brown said that as a result, Ms. Oher's perceptions likely were not as accurate as Ms. Williams's perceptions.

Dr. Brown testified that the IOM established its criteria for fetal alcohol spectrum disorder in 1996 and that the CDC published its criteria in 2004. On redirect examination, Dr. Brown said the IOM guidelines included the same guidelines established by the CDC. The CDC instructed diagnosticians on how to measure certain aspects such as facial features and growth. Dr. Brown said the diagnostic process would have been the same if the Petitioner had been tested for fetal alcohol spectrum disorder in 2000.

Dr. Brown testified that the Petitioner told her that he left the victim's car parked where it could be found. Dr. Brown considered that act to be foolish and consistent with fetal alcohol spectrum disorder.

Dr. Murray Smith, a licensed physician in Tennessee, testified as an expert in addictionology. Dr. Smith said he was asked to evaluate the Petitioner's records and interview him in order to determine the effect of alcohol and drugs on the crime. Dr. Smith reviewed the Petitioner's medical records from his birth and infancy, his statement to police, his school records from 1961 to 1971, his records from the ACAR Center from November 1998 to January 1999, a Department of Correction psychological evaluation dated January 19, 1995, testimony from Ms. McNeely and Dr. Steinberg, Dr. Kessler's reports of diagnostic imaging, Dr. Adler's forensic psychiatric evaluation, Dr. Bookstein's brain MRI analysis, reports from Drs. Auble and Brown, and two affidavits of complaint filed by Sergeant Ashton. Dr. Smith interviewed the Petitioner at Riverbend in July 2008 and May 2010.

Dr. Smith testified that he concluded that the Petitioner had fetal alcohol syndrome and that the Petitioner was a poly-substance, drug-addicted person who was under the influence and intoxicated at the time of the offense. Dr. Smith said that on January 18, 1999, the Petitioner began a persistent binge of alcohol, cocaine, and marijuana. About the time of the offense, the Petitioner was sleep-deprived, which was an effect of the cocaine. Dr. Smith said the Petitioner was basically using drugs around the clock without any sleep from January 17 or 18 to January 23.

Dr. Smith testified that fetal alcohol syndrome caused brain damage so that less brain tissue was available to perform normal brain functioning. The effect of alcohol and cocaine was more severe on a brain that already was damaged due to fetal alcohol syndrome. Dr. Smith said that due to the Petitioner's intoxication and brain damage from fetal alcohol syndrome, he was unable to exercise judgment, understand the wrongfulness of his actions, reflect upon his actions, and control his behavior. Dr. Smith concluded that the Petitioner was not able to develop any specific mental state for first degree murder at the time of the offense.

Dr. Smith testified that drug addiction was diagnosed with three specific behaviors: (1) a preoccupation with obtaining and using the chemical; (2) repeatedly losing control of using the chemical; and (3) using the chemical even though it caused problems, adverse consequences, and trouble in the person's life. The drug addiction was progressive and persistent. Dr. Smith said relapse was an expected behavior as part of the addictive disease. Since 1956, the American Medical Association (AMA), the American Psychological Association (APA), and the National Institute of Health (NIA) had stated that addiction was

a primary medical illness based upon brain chemistry. Dr. Smith said addiction was a medical disease and could be treated like other medical illness with appropriate research, medications, behavior changes, and instruction. According to Dr. Smith, the disease changed the brain chemistry, resulting in aberrant behaviors. The behavior was not typical of someone in reasonable control of his or her circumstances.

Dr. Smith testified that craving was an irresistible urge to use the chemical. Craving was present in addiction and triggered by different things in the environment. The trigger was dependent on the person and generally something that the person associated with using the drug. Dr. Smith noted that while on parole, the Petitioner continued to use cocaine and fail drug tests. As a result, he was sent back to prison and had to undergo out-patient treatment with Ms. McNeely.

Dr. Smith testified that the NIH recognized risk factors for addiction, including ineffective parenting, a chaotic home environment, a lack of feeling that the person was close to someone, poor social coping skills, affiliations with peers who were using drugs or acting out, and approval of drug use in the environment. Inappropriate behavior in the classroom also was a risk factor because a person who acted out in the classroom would act out in other places. Poor school performance was a risk factor because the person felt shame about his or her failures in school and began searching for ways not to feel bad. Other risk factors included genetics, exposure to violence, and early exposure to drugs. Dr. Smith said the Petitioner had all of the risk factors and none of the support factors.

Dr. Smith testified that support factors included strong family bonds. The Petitioner lived with his maternal grandmother until age eleven. When she died, the Petitioner basically had to care for himself. His parents did not look after him, and he was not required to abide by any rules. Dr. Smith said the Petitioner's school performance was poor, in part, due to his fetal alcohol syndrome. The Petitioner did not have any religious or school connections he could depend on. Dr. Smith was unaware of the Petitioner participating in any organized school activities as a child. At age seven, the Petitioner was in an environment of alcohol and drug use. Dr. Smith said the Petitioner had many reasons to use drugs and alcohol and did not have anything to protect him from not using drugs and alcohol.

The Petitioner reported to Dr. Smith that he began using alcohol and marijuana at age eleven. By age fifteen, he was using alcohol and marijuana almost daily. The Petitioner also was smoking cigarettes, and Dr. Smith noted that nicotine was another highly addictive chemical. The Petitioner reported that he began using cocaine in 1985 by smoking it. He was exposed to it while he was incarcerated from 1983 to 1990. When the Petitioner was

released on parole in 1990, he continued to have positive drug screens for marijuana and cocaine. In 1994, the Petitioner's parole was revoked, and he returned to prison until 1997.

Dr. Smith testified that the Petitioner had all of the craving factors that lead to his continued use of drugs. The Petitioner was in an environment where people were using drugs, and he had no other coping skills. Dr. Smith said the Petitioner was triggered into craving the drugs so that he could not resist them. Dr. Smith also said the Petitioner had an irresistible urge to use drugs even though there were adverse consequences. In 1997, after the Petitioner was released on parole, he continued to have positive drug screens and was referred to Ms. McNeely's treatment program in November 1998. The Petitioner told Dr. Smith that he continued to use alcohol, marijuana, and cocaine while undergoing treatment. He used a cleansing agent to pass drug screens, and the drug screen results stated that the sample was diluted. Dr. Smith said the treatment the Petitioner received was not adequate for his addiction. According to Dr. Smith, the Petitioner required a more "concentrated, safe type treatment" due to the severity of his addiction.

Dr. Smith testified that when the Petitioner was evaluated by the TDOC in 1995, he was diagnosed with chemical dependency, poly-substance. He also was diagnosed by Ms. McNeely, Dr. Steinberg, Dr. Auble, and Dr. Brown. Dr. Smith said a diagnosis of poly-substance abuse meant the person was addicted to more than one chemical. Some forms of addiction were more powerful than others. Dr. Smith ranked the most addictive substance as nicotine, followed by methamphetamine and then cocaine. He stated that prolonged use of cocaine resulted in internal cellular changes in the brain, making it more difficult for the person to abstain from using the drug.

Dr. Smith testified that addiction was a chronic, persistent condition. The disease was not curable but could be sent into remission. Dr. Smith said remission was difficult to obtain when long-term use of cocaine was involved. He also said that although the incarcerated Petitioner currently was not using cocaine and was protected from the triggers, the Petitioner continued to be an addict. If the Petitioner returned to the triggers, he did not have the coping skills to handle them. Dr. Smith stated that the chances of an African-American adult male on crack cocaine entering remission were less than ten percent and likely were in the six percent range. According to Dr. Smith, remission required the very best treatment over a prolonged period of time. He noted that crack cocaine was a stimulant that caused the user to become hyperactive, irritable, and unable to sleep. The drug also caused the user possibly to have reactive violent episodes, be paranoid, be suspicious of others, and lose weight due to loss of appetite. The compulsion to use crack cocaine was such that the person would do whatever was necessary to obtain the drug.

Dr. Smith testified that in concluding that the Petitioner was intoxicated at the time of the offense, he considered the Petitioner's life-long pattern of drug use. Dr. Smith expected the Petitioner to use the drug if available. He said the Petitioner's emotionally upset state at the time also made him more likely to use it. The Petitioner reported using drugs with a woman named "Strickland." Dr. Smith said that although Ms. Strickland was deceased, there was an investigative report in which she stated that the Petitioner was using drugs at the time. On January 18, 1999, the victim reported to the police that she and the Petitioner had been involved in an altercation and that she suspected the Petitioner was using crack cocaine. Dr. Smith said that based on the victim's experience with the Petitioner, she was able to recognize when he was using crack cocaine. An officer had stated in a police report that he thought the Petitioner was using drugs. Ms. Puryear, with whom the Petitioner had stayed after disposing of his clothes and the weapon, said the Petitioner began using drugs immediately when he came to her home following the victim's death. The Petitioner had notified his parole officer on January 21 that he was using drugs. That same day, he contacted Ms. Williams, told her that "his brain was messed up," and asked for help.

Dr. Smith testified that he concluded the Petitioner's behavior at the time of the offense was consistent with intoxication. The Petitioner was sleep-deprived, irritable, and hyperactive. His judgment was impaired, and his understanding was defective. The Petitioner had overreacted to what had occurred. He thought the victim called him for support and acted on that perception as if it were real. His judgment, therefore, was inaccurate. He continued to use cocaine because it was his only coping skill. Dr. Smith noted that according to an affidavit of complaint from Sergeant Ashton dated January 25, 1999, the interaction between the victim and the Petitioner began as a conversation and then escalated into an explosive rage by the Petitioner, resulting in the victim's death. Dr. Smith said the Petitioner was unable to reason due to his intoxication.

Dr. Smith testified that the effects of sleep deprivation were similar to those of cocaine and included irritability, poor judgment, occasional hallucinations, the inability to appreciate the real from the unreal, and the inability to adequately understand and judge behavior. Dr. Smith thought intoxication and sleep deprivation were more marked in the Petitioner's brain due to fetal alcohol syndrome. Dr. Smith reviewed the MRI images of the Petitioner's brain and was shocked by the degree of loss of the white cortical matter, which was used for judgment, planning, understanding, and learning new things.

Dr. Smith testified that he concluded that at the time of the offense, the Petitioner's mental state was "severely abnormal." His mental state was affected in terms of his ability to make good judgments, understand the nature and wrongfulness of his behavior, and control his behavior. Impulsivity was one of the effects of cocaine. Dr. Smith said the Petitioner acted without planning, making a judgment, or anticipating the consequences. Dr.

Smith thought the Petitioner was intoxicated on January 17 and 18, 1999, and said he would have reached the same conclusion if the Petitioner had not had fetal alcohol syndrome.

Dr. Smith testified that the following statutory mitigation circumstances applied: (1) the capacity of the Petitioner to appreciate the wrongfulness of his conduct and to conform his conduct to the law was substantially impaired due to intoxication, which was insufficient to establish a defense to the crime but substantially affected the Petitioner's judgment, and (2) the murder was committed while the Petitioner was under the influence of extreme mental or emotional disturbance. Dr. Smith noted that the Petitioner was born with brain damage from fetal alcohol syndrome and had severe genetics in terms of brain chemistry for addiction in that his mother was an alcoholic and his father was a heroin addict. The Petitioner lived in a home of chaos, violence, and drug use. Dr. Smith said the Petitioner did not have any resources other than drug and alcohol use. Dr. Smith said that he did not find anything that would have protected the Petitioner from those circumstances and that the Petitioner was guaranteed to develop an addiction. Dr. Smith stated that at the time of the offense, the Petitioner was not thinking rationally and that fetal alcohol syndrome made it more likely the Petitioner would relapse into drug use.

On cross-examination, Dr. Smith testified that the Petitioner discussed with him what he was taking and doing on the days leading up to the victim's death. The Petitioner began using drugs when the victim told him to leave and when he lost his job. On January 18, 1999, the Petitioner began using drugs continuously. The Petitioner told Dr. Smith that he was using as much and as often as he could. After he killed the victim, the Petitioner disposed of his clothes and the weapon and cleaned himself. He went to Ms. Puryear's home and continued to use drugs. He attempted to turn himself in to police but was turned away. He returned the following day and gave a statement to the police.

Dr. Smith acknowledged that the Petitioner was accustomed to being in a highly intoxicated state. The Petitioner told Dr. Smith that he met Mr. Osby while in prison. Before committing suicide, Mr. Osby brought a large supply of crack cocaine to the Petitioner.

On redirect examination, Dr. Smith testified that the cocaine would have affected the Petitioner mentally and physically. It would have raised his blood pressure and pulse rate and made him sweaty and shaky. His brain would have been stimulated with irritability, hyperactivity, over-reactivity, impulsivity, and paranoia. The cocaine would have affected the Petitioner's manual dexterity only in terms of increased shakiness but not in terms of large physical behavior. Dr. Smith said the cocaine would not have affected the Petitioner's ability to lift or move something. Dr. Smith acknowledged that part of his evaluation was to corroborate the Petitioner's reports to him.

Regarding the Petitioner's claim that the jury foreperson demonstrated bias and violated his right to an impartial and fair jury, Ms. Coke, the jury foreperson at the Petitioner's trial, testified that the Petitioner's case involved domestic violence. She acknowledged that she previously had been a victim of domestic violence, which had included both verbal and physical abuse. She was hit in the head with a fist and a blunt object. She sought treatment for her injuries and received counseling. Ms. Coke said she also had been convicted of a crime.

Ms. Coke identified the jury questionnaire she filled out for this case and testified that she checked "no" as her answer to the following question: "'Have you or anyone you know ever been a victim of violence such as a physical assault, a shooting, a stabbing, domestic violence or any other violence?'" Post-Conviction Counsel asked, "Were you asked if you had been the victim of domestic violence during the jury selection?" Ms. Coke answered, "No." However, she then said she did not recall answering that question. Post-Conviction Counsel asked, "So the question was asked but you never gave an answer?" Ms. Coke answered, "Right." Ms. Coke said she also checked "no" when the questionnaire asked if she had ever been charged with or convicted of a crime.

On cross-examination, Ms. Coke testified that she "[v]aguely" remembered filling out the questionnaire, that answering "no" to the violence question "was a mistake on [her] part," and that she "must have rushed through" the questionnaire. She acknowledged that answering the questions on the questionnaire accurately was important. Ms. Coke said that in 1989, she was convicted of driving under the influence and placed on probation. She said she later was charged with violating her probation, and counsel for the State noted that she had two probation violation warrants in the record. Ms. Coke said she also was arrested for theft but never charged. Counsel for the State asked Ms. Coke if she had based her decision at trial on the law as the judge had instructed and the evidence presented. Ms. Coke answered, "Yes."

David Keefe testified that he was the Chief Counsel of the Capital Division of the Tennessee Public Defender's Conference from 1996 to 2002. The purpose of the Capital Division was to advise attorneys in capital cases. Mr. Keefe identified a letter he sent to trial counsel dated April 27, 2001. He was unsure whether the letter was sent after the Petitioner's trial. He said it was the same letter that his office sent to every defense attorney representing a defendant in a capital case.

Mr. Keefe testified that he also sent a checklist to attorneys representing defendants in capital cases. The checklist mentioned fetal alcohol syndrome. Mr. Keefe said he helped present capital defense seminars in which fetal alcohol spectrum disorders were addressed.

He noted that a mitigation workbook reproduced by the Tennessee Association of Capital Defense Lawyers (TACDL) included a section addressing fetal alcohol syndrome.

Mr. Keefe testified that the Capital Division produced a newsletter and that one edition of the newsletter discussed a conceptual framework for the use of mental health experts in capital cases. Mr. Keefe explained that a psychologist should not be retained to provide therapeutic services, obtain general information about the defendant, or generate harmful information. Rather, the decision to retain a mental health expert had to be driven by specific litigation purposes. The mitigation specialist had to understand the themes and mitigating facts that might be present. A mental health expert had to be chosen with those themes and mitigating facts in mind.

Mr. Keefe testified that locating an expert witnesses was a "process" that generally was led by the mitigation specialist. Meetings with the defense team were to be held, and the issues emerging from the investigation were to be discussed in the meetings. Either the mitigation specialist or trial counsel would then generate the names of specific experts who might be able to address the specific concerns of the case. Mr. Keefe said counsel had to choose an expert who would identify and narrowly focus on information supporting the defense and the purposes of the defense. Mr. Keefe explained that any negative information generated undermined the purpose behind explaining to the jury why a sentence of less than death was just. The mitigation specialist was expected to recognize the factors and themes, and defense team meetings were to aim at identifying those kinds of experts who supported those themes. After the expert was identified, trial counsel was to limit the scope of the evaluation to a specific issue. Mr. Keefe said trial counsel was not to request a full spectrum evaluation of the defendant because they did not know what would result from such an evaluation. Mr. Keefe noted that Ms. Shettles identified fetal alcohol spectrum disorder, which was at least a cognitive impairment to the brain, as an issue.

2. State's Proof

Dr. O.C. Smith testified as an expert in forensic pathology and blood spatter interpretation that he performed the victim's autopsy and concluded that the cause of death was blunt trauma to the head. He visited the crime scene with Paulette Sutton, Steven Sims, and Dr. Chantal Ferraro. Ms. Sutton was a medical technician experienced in blood stain pattern interpretation. Mr. Sims was a forensic anthropologist with a focus on instrumentality and wound assessment, especially in bones and fractures of bones.

Dr. Smith testified that at trial, he had said the assault lasted about six minutes. He noted the importance of knowing the time period in which blood coagulated. Dr. Smith said

that according to most literature, blood coagulated in three to fifteen minutes. He had never spoken with anyone who had seen blood coagulate in three minutes. Dr. Smith thought blood might coagulate in three minutes in Arizona due to the environment. However, blood coagulated within five to six minutes in the Memphis area. He based his conclusion on the template bleeding times when a clot formed in a capillary tube. The experiment required a person to prick his or her finger with a lancet and put the blood into a capillary tube. Then the blood was checked for clotting every thirty seconds. Dr. Smith said the average time for clotting was five or six minutes.

Dr. Smith testified that he observed projected clots at the crime scene. He explained that if liquid blood hit a wall, it left a flat mark on the wall. The mark would be a certain length and width, and because the blood was a liquid, it would be pulled down by gravity and stain the surface. When blood clotted somewhere else and was projected against a surface, it was three dimensional, rather than two dimensional, in appearance. The blood clot also was sticky and tended to maintain its shape when it hit the surface.

Dr. Smith testified that he reviewed Dr. Davis's report but did not speak with Dr. Davis about Dr. Smith's conclusions and reasoning. Dr. Smith noted the importance of going to the crime scene and observing the body and the details of the scene. He said that when interpreting blood spatter, the person looked at photographs taken by others and that viewing photographs made it more difficult to ascertain what had occurred.

Dr. Smith testified that approximately 550 millimeters of blood was found in the victim's stomach. The victim's lungs also showed areas of aspiration in the alveoli. Dr. Smith had testified at trial that the victim swallowed thirty-six to thirty-seven times. The average swallow was approximately fifteen millimeters. Dr. Smith said it would have taken approximately thirty-six to thirty-seven swallows for that amount of blood to have been in the victim's stomach. He used that amount as a guide in explaining the volume to the jury.

On cross-examination, Dr. Smith testified that he took photographs of the crime scene to preserve his observations and for quality control. Part of the reason for quality control was to allow others to review his work.

Dr. Smith testified that the number of blows delivered was difficult to assess, and he had testified at trial that the period of time it took to deliver the blows also was difficult to assess. He explained that there were some indicators based upon blood spatter patterns that could be useful in determining the length of the assault. The blood clotting could provide some time line. A minimum length of time could be determined, but the maximum time could not be determined. Dr. Smith acknowledged that blood spatter analysis was open to

interpretation. The length of time of the assault related more to blood spatter interpretation than observation of the victim's wounds.

Dr. Smith testified that he determined at the crime scene that the blood had clotted before it was cast off. He did not know how much time had elapsed from the crime to his arrival at the scene. Dr. Smith recalled seeing liquid blood and dried blood that had been cast off onto a surface. He saw liquid blood patterns that were flat or two dimensional.

Dr. Smith testified that while at a crime scene where a great amount of blood had been spilled and projected, a direct examination of the body would show blood clots in the disputed tissues. Those blood clots on the body were very similar to the blood clots that had been projected onto surfaces. When another blow was struck, a portion of the blood clot in the wound would break away and be projected onto a surface whether the clot still had its three dimensional characteristics. The blood clots in the wound would have interacted with the tissue in the body, such as brain tissue.

Dr. Smith testified that the brain had the highest combination of tissue with thromboplastin and that the victim's injuries were to her head. He had testified at the trial that the blows caused bruising of the victim's brain and dislodged fragments that actually tore into the base of her brain. Dr. Smith said he would have expected thromboplastin to be mixed in with the blood. He said the thromboplastin, however, was only one-half of the equation. He explained that even with the thromboplastin, he concluded that the blood clotted in six minutes because that was the average clotting time in Memphis. Dr. Smith did not know how much thromboplastin was mixed in with the victim's blood. He said any experiments with the blood would have been performed by Ms. Sutton, and he did not recall Ms. Sutton's performing any experiments in this case. Dr. Smith said his finding of six minutes for blood to clot was made in collaboration with Ms. Sutton.

On redirect examination, Dr. Smith testified that when blood was spilled in brain tissue, the body had a remedy to maintain balance. Once clotting began, fibrinolysis, or the breaking down of the clots, also began.

On recross examination, Dr. Smith testified that fibrinolysis could occur in a living or deceased person. The enzymatic breakdown could continue for some time because it was in contact with the ruptured blood vessels where the fibrinolysis was released.

3. Petitioner's Rebuttal Proof

Dr. Davis testified that peer review and testing was part of scientific method and spoke to reliability and reproducibility of results. Dr. Davis said that in his experience on peer review boards, he had never encountered the use of blood spatter analysis to determine the time in which an assault occurred. Dr. Davis stated that thromboplastin caused blood to clot. When blood was exposed to thromboplastin, especially in brain tissue, it could cause blood to coagulate in a matter of seconds. The prothrombin test often was used in clinical medicine to determine if clotting factors were working properly. Blood essentially began to clot within twelve to fifteen seconds after exposure to that material.

Dr. Davis testified that he thought Dr. Smith performed an "excellent" autopsy. Dr. Davis, however, did not think any way existed to determine the amount of time the assault occurred. Dr. Smith's autopsy helped Dr. Davis reach his conclusions. Dr. Davis said his opinion differed from Dr. Smith's regarding the interpretation of the results of the autopsy. Dr. Davis said that even if the blood clotted before it was cast off, he did not think a forensic expert could say that the attack occurred over a period of six minutes. Dr. Davis was unaware of any literature supporting Dr. Smith's conclusion.

On cross-examination, Dr. Davis testified that while he had addressed blood spatter analysis in court, he did not know whether he ever officially had been qualified as an expert in the area. On redirect examination, Dr. Davis testified that all forensic pathologists who completed an accredited fellowship in forensic pathology learned about blood spatter.

C. Post-Conviction Court's Findings

At the conclusion of Dr. Davis's testimony, the Petitioner rested his case. On January 31, 2012, the post-conviction court entered a 209-page order denying the petition for post-conviction relief.

1. Ineffective Assistance of Counsel

With regard to the Petitioner's claims of ineffective assistance of counsel, the post-conviction court found that trial counsel established a proper attorney/client relationship. The post-conviction court accredited the testimony of trial counsel and Mr. Chapman and found that trial counsel developed an adequate working relationship with the Petitioner such that the Petitioner provided them with information about the case and his background and assisted with his defense. The court further found that trial counsel consulted the Petitioner regarding the decisions made at trial.

The post-conviction court concluded that trial counsel conducted an appropriate investigation. The court rejected the Petitioner's claim that trial counsel were ineffective in failing to obtain and review Officer Worthy's formal report regarding the victim's complaint against the Petitioner on January 18, 1999. The court found that the report substantially comported with Officer Worthy's testimony at trial. As a result, the court found that even if counsel were deficient, the Petitioner failed to demonstrate that he was denied a fair trial due to inaction by counsel.

The court concluded that trial counsel were not ineffective in failing to speak with all of the witnesses listed in the indictment before trial. The court noted that according to trial counsel, the defense was based on the Petitioner's lack of capacity to formulate the requisite mental state required for first degree premeditated murder. The court found that based on the Petitioner's confession and despite Dr. Steinberg's failure to diagnose the Petitioner with a mental disease or defect, trial counsel made a strategic decision to "front load" their mitigation during the guilt phase of the trial in an attempt to obtain a conviction for a lesser-included offense. The court did not find that tactical choices by counsel were unreasonable or based upon inadequate investigation or preparation.

The court concluded that trial counsel were not ineffective in waiving the preliminary hearing. The court found that Lead Counsel made a reasonable tactical decision to waive the hearing in order to obtain discovery materials and that Lead Counsel's decision was based upon his years of experience practicing in the Shelby County criminal courts. The court further found that even if Lead Counsel was deficient, such deficiency did not result in prejudice.

The post-conviction court rejected the Petitioner's claim that trial counsel were ineffective in failing to follow up on information regarding the Petitioner's family and social history. The court found that trial counsel properly investigated the Petitioner's background and that Ms. Shettles prepared a thorough social history. Based upon her work, trial counsel retained Dr. Steinberg to conduct a forensic psychological evaluation of the Petitioner. Trial counsel also consulted with Ms. McNeely regarding the Petitioner's chronic drug abuse.

The court found that the Petitioner failed to present sufficient proof to support his allegation that trial counsel failed to maintain their workload at the level acceptable for attorneys handling a capital murder case. The court concluded that the Petitioner also failed to present sufficient evidence to support his claim that trial counsel were ineffective in failing to obtain the knowledge and skill required to render effective assistance in a capital case.

The post-conviction court concluded that trial counsel were not ineffective in failing to seek the services of a neuropsychologist or any other expert to examine the Petitioner regarding his capacity to waive his Miranda rights. The court noted that although Dr. Brown testified that the Petitioner was not competent to waive his Miranda rights, the officers who interviewed the Petitioner found that he was competent to waive his rights, and the trial court agreed with their assessment. The post-conviction court also noted the Petitioner's long history with the criminal justice system and said the Petitioner had some exposure to Miranda rights before he gave his statement in this case and likely had been interrogated by police in the past. Dr. Steinberg noted in his report that the Petitioner "was able to describe the details and sequencing of the events leading to the murder" and "also described thinking and concealing some of the evidence of the crime he had committed." Dr. Brown acknowledged that the Petitioner disposed of the weapon and his bloody clothes, abandoned the victim's car, hid in an abandoned house, and attempted to turn himself in to police. Dr. Brown also acknowledged that the Petitioner described the circumstances of the offense and that his description was consistent with his statement to police. The court noted that Dr. Steinberg found that the Petitioner was competent to understand and waive his Miranda rights, to enter a plea of guilty or stand trial, and to testify on his own behalf. The court also noted that the Petitioner's statement did not consist of short, rote responses to lengthy and detailed questions but consisted of detailed responses to open-ended questions by the police. The court concluded that the Petitioner's statement did not comport with Dr. Brown's testimony. The court found that the statement was not rife with "leading" or "suggestive" questions or "negative responses" by the officers and that the context of the Petitioner's responses did not appear to be aimed at telling the police "what they want[ed] to hear."

The post-conviction court rejected the Petitioner's claim that trial counsel were ineffective in securing expert assistance to conduct an independent analysis of the physical evidence. The court stated that Dr. Davis did not dispute that Dr. Smith's conclusions were plausible. Rather, Dr. Davis only stated that Dr. Smith could not determine with scientific certainty how long the attack lasted. The court found that based on Dr. Smith's unique training in the area of blood spatter analysis, it was scientifically possible for him to make reasonable estimates regarding the length of the attack. The court also noted Co-Counsel's testimony that he spoke with Judge Craft regarding funding for a forensic pathologist but that Judge Craft said he would not grant such a request.

The post-conviction court found that trial counsel were not ineffective in failing to retain an addictionologist. The court noted that simply asserting that the Petitioner was an addict who routinely abused alcohol and cocaine would have been insufficient to establish that due to the Petitioner's intoxication at the time of the offense, he was unable to form the culpable mental state for first degree murder. Rather, trial counsel would have been required to present evidence that the Petitioner was in fact intoxicated when he killed the victim. The

-84-

court also noted that trial counsel consulted with Dr. Steinberg and Ms. McNeely regarding the Petitioner's addiction to cocaine. The court stated that one of the "stumbling blocks" to presenting an intoxication defense was that only the Petitioner could establish that he used drugs before the offense and was intoxicated at the time of the offense. Co-Counsel testified that he chose not to present the Petitioner as a witness at the trial because when the Petitioner testified at the suppression hearing, he "became totally confused and lost" and was unable to "go through cross-examination successfully." While Ms. Strickland allegedly used drugs with the Petitioner shortly before the victim's death, trial counsel decided not to present her as a witness based upon her extensive drug history and their difficulty in locating her before trial. The court concluded that "[g]iven the lack of specific information relating to the time of the petitioner's drug use and the amount of drugs ingested by petitioner in the hours leading up to the murder and given the lack of proof available to trial counsel which could corroborate petitioner's claims," the trial court may not have allowed expert testimony relating to intoxication. The court further concluded that even if the trial court had permitted such expert testimony, the jury likely would have rejected the Petitioner's claims absent additional proof.

The court found that trial counsel were not ineffective in failing to request additional funding for Ms. Shettles. The court stated that extensive work was done in preparation for mitigation. In addition to memoranda summarizing interviews with witnesses, Ms. Shettles provided trial counsel with almost 300 pages of records and social history background. The post-conviction court found that given that the trial court had denied funding for Dr. McCoy, it was unlikely that the trial court would have granted additional funding for Ms. Shettles.

The court concluded that trial counsel properly directed Dr. Steinberg's evaluation of the Petitioner. Trial counsel had multiple discussions with Dr. Steinberg regarding their desire to present evidence of diminished capacity. Dr. Steinberg was provided with all of the materials prepared by Ms. Shettles, including information regarding fetal alcohol spectrum disorder. Lead Counsel said he thought he provided Dr. Steinberg with a copy of case law regarding diminished capacity. The court found that it appeared that Dr. Steinberg was aware that a diagnosis of a mental disease or defect was needed to support a theory of diminished capacity but that he was unable, based upon his evaluation, to make such a diagnosis. The court noted that Dr. Steinberg testified during the penalty phase that the Petitioner suffered neglect and abuse as a child; that he developed into a chronic user of alcohol, crack cocaine, and marijuana; that at the time of the offense, the Petitioner was under considerable stress that impacted his behavior; that due to the Petitioner's "predisposition to impulsive behavior" and the stress he was under, the Petitioner was not capable of acting like a reasonable person; and that "under the circumstances of the stress and the intoxication of the cocaine, his ability to suppress these impulses was greatly compromised."

The post-conviction court rejected the Petitioner's claim that trial counsel did not have a proper understanding of the law regarding diminished capacity. The court noted that Dr. Steinberg had an unclear understanding of the parameters for the admission of expert testimony relating to a defendant's diminished capability to form the requisite culpable mental state due to a mental disease or defect. The court further noted that trial counsel were clear on the standards for admissibility of diminished capacity proof. The court found that after Dr. Steinberg was unable to conclude that the Petitioner had a mental disease or defect, trial counsel attempted to obtain another expert, but their request was denied. The court did not find that trial counsel's actions in arguing for admission of Dr. Steinberg's testimony, despite his inability to diagnose the Petitioner with a mental disease or defect, indicated a misapprehension of the state of the law. Rather, the court stated that trial counsel were attempting to persuade the trial court to expand the boundaries of diminished capacity evidence. The court found that trial counsel's failure to introduce evidence of the Petitioner's diminished capacity was not based on their lack of knowledge of the standards for admissibility of such proof but was the result of Dr. Steinberg's failure to find evidence supporting such a theory.

The court also rejected the Petitioner's claim that trial counsel failed to demonstrate a lack of understanding of the capital sentencing process. The court noted Lead Counsel's testimony that he did not present Warden Douglas as a witness because Warden Douglas planned to testify that the Petitioner had been a violent person while incarcerated. The court also noted that trial counsel admitted the "extreme mental or emotional distress" statutory mitigating circumstance based, in part, upon Dr. Steinberg's testimony.

The post-conviction court concluded that trial counsel were not ineffective in failing to develop evidence of diminished capacity based upon fetal alcohol spectrum disorder. The court found that at the time of the Petitioner's trial, the diagnostic criteria and field of study for fetal alcohol spectrum disorder was in its infancy. Even if the broad contours of the disorder were being formed in the scientific community by late 1999 or early 2000, the more detailed analysis performed by Drs. Adler, Auble, and Brown and the more complete diagnostic criteria set out by the CDC were not available to trial counsel. The court noted the incredible difficulty in diagnosing fetal alcohol spectrum disorder even for professionals who practiced in the field full time, particularly when the diagnosis did not occur until adulthood. The court found that the diagnostic criteria for fetal alcohol spectrum disorder was first developed in 1996 by the IOM and three years before trial counsel's investigation of the Petitioner's case. Even with the IOM's establishment of diagnostic criteria, the disorder was not recognized in the DSM-IV. The more stringent diagnostic criteria of the CDC, which apparently led to the disorder being included in the DSM-IV, was not published until 2004. The court found that even in present day, fetal alcohol spectrum disorder was listed as a medical disorder, not a mental disease or defect, and linked to the mental defect

known as cognitive disorder, not otherwise specified. Drs. Adler and Brown did not develop the multi-discipline approach to fetal alcohol spectrum disorder evaluations until 2008, and the approach was not presented to the public until 2009. Some of the imaging and testing performed by the group and commonly utilized currently in the field was not available in 2000. The court found that while attorneys handling capital cases were discussing the possibility of raising fetal alcohol spectrum disorder at trial, as evidenced by Mr. Keefe's testimony and Ms. Shettles's identification of it as a possible issue in the social history, much of the discussion surrounding the disorder in the legal context related to the presentation of mitigation. The court said it did not appear that fetal alcohol spectrum disorder was being discussed widely as a possible avenue for pursuing a theory of diminished capacity. The court found that because the IOM criteria was not released until 1996, it was unclear whether the field would have been sufficiently developed by 2000 to have been admissible through expert testimony in the guilt phase as part of a theory of diminished capacity.

The post-conviction court noted that trial counsel did not completely neglect to investigate the Petitioner's mental health but had him evaluated in an attempt to establish evidence supporting a theory of diminished capacity. The court found that trial counsel were not required to question Dr. Steinberg's diagnosis. Dr. Steinberg was provided with Ms. Shettles's social history in which she mentioned the possibility of fetal alcohol spectrum disorder. Dr. Steinberg, however, did not diagnose the Petitioner with fetal alcohol spectrum disorder or any related cognitive disorder. The court "suspect[ed]" that even if trial counsel had obtained a diagnosis of fetal alcohol spectrum disorder, it was unclear that the evidence would have been admitted at trial given the state of the law and the state of the medical and psychological study of fetal alcohol spectrum disorder at the time. A diagnosis of fetal alcohol spectrum disorder would not have qualified as a mental defect, and an expert would have been required to reach an additional conclusion that the Petitioner suffered from cognitive disorder, not otherwise specified. The court also found that due to the Petitioner's confession and the other evidence presented by the State at trial, the jury could have rejected any assertion that, due to fetal alcohol spectrum disorder or cognitive disorder, not otherwise specified, it was "improbable" that the Petitioner was acting with reflection and judgment at the time of the offense.

The post-conviction court rejected the Petitioner's contention that trial counsel were ineffective in failing to file a motion in limine to prevent the State from referring to him by his nickname, "Skillet." The court found that trial counsel appeared to argue to exclude such references. The court further found that given the limited reference to the Petitioner's nickname and the strength of the State's proof, the Petitioner failed to demonstrate that he was prejudice by any inadequate argument by trial counsel.

The post-conviction court concluded that trial counsel were deficient in failing to have references of the Petitioner's prior convictions redacted from his statement to police. However, the court concluded that the Petitioner was not prejudiced by trial counsel's inaction due to the strength of the State's case and the fact that the Petitioner's statement made only passing reference to his incarceration.

The court found that trial counsel were not ineffective in failing to file pretrial motions seeking the resources necessary for competent representation in a capital case. The court noted that trial counsel sought and received funding for investigators for both phases of the trial and for Dr. Steinberg. Trial counsel sought and was denied funding for a psychiatrist, a forensic pathologist, and a jury consultant.

The court found that based upon Dr. Davis' testimony, trial counsel were deficient in failing to challenge adequately the conclusions of Ms. Sutton and Dr. Smith at trial. The court noted that Dr. Davis's testimony illustrated that conflicting opinions existed regarding the conclusions reached by Dr. Smith and Ms. Sutton which would have provided relevant cross-examination. The court found that deficiencies by counsel did not result in prejudice given the strength of Dr. Smith's testimony at the post-conviction hearing regarding his conclusions.

The court concluded that trial counsel were deficient in failing to cross-examine Officer Worthy regarding the victim's statements in the 911 call two days before the murder that the Petitioner had stabbed himself and needed an ambulance. The court found that trial counsel's deficiencies did not result in prejudice given Officer Worthy's testimony regarding the Petitioner's threats against the victim and the strength of the State's case. The court also found that even if trial counsel were deficient in failing to utilize Sergeant Ashton's affidavit of complaint during the cross-examination of Sergeant Ashton, the deficiency did not result in prejudice because the jury heard evidence of the information that was included in the complaint in the form of the Petitioner's statements to the police.

The post-conviction court found that trial counsel should have objected to the trial court's finding that there was no evidence of the Petitioner's intoxication and the trial court's failure to instruct the statutory mitigating circumstance encompassing his intoxication. The trial court, however, charged the jury that "the capacity of the defendant to control his anger was impaired by the use of cocaine." The post-conviction court concluded that due to the instruction and the strength of the prior violent felony aggravating circumstance, the deficiency by counsel did not result in prejudice.

The post-conviction court concluded that the Petitioner failed to provide proof of his allegations that trial counsel were ineffective in failing to present Ms. Strickland's testimony or additional testimony from Sherri Osby regarding his intoxication. The court found that while Ms. Puryear's testimony could have marginally benefitted the Petitioner, trial counsel's failure to present Ms. Puryear as a witness did not result in prejudice in light of other testimony presented at the Petitioner's trial. The court accredited Lead Counsel's testimony that Glenda Williams refused to testify and also found that her testimony would not have aided the Petitioner in presenting evidence of intoxication. The court concluded that Ms. Strickland would not have been a reliable witness and that trial counsel were unable to locate her.

Regarding trial counsel's failure to remove biased jurors from the panel during voir dire, the trial court noted that Ms. Coke was the only juror to testify at the post-conviction hearing. The post-conviction court found that "[a]lthough Coke's failure to divulge the past abuse might call into question her impartiality, her assertion that she based her decision on the law and the facts, alone, indicates she was not 'actually' biased against petitioner." Thus, the court concluded that even if trial counsel were ineffective in failing to remove Coke from the panel, the Petitioner was not entitled to relief.

The post-conviction court found that trial counsel were deficient in failing to present a full social history to the jury and that they should have presented testimony regarding the Petitioner's "deplorable" childhood and family history. The court noted that the information could have been presented through witnesses such as Delores Rose. With regard to Denise Oher, the court noted that at the time of trial, it was unclear whether Ms. Oher was using drugs. There was some question as to whether Ms. Oher would have been available at the time of trial and whether her credibility was such that she would not have made an effective witness. The court noted that Dr. Steinberg was aware of the details of the Petitioner's childhood and could have testified about his background. The court stated that while this information would have enhanced the Petitioner's mitigation case, evidence of the Petitioner's substantial prior criminal history likely would not have been overcome by the introduction of this evidence. The court also noted the significant mitigation evidence presented at the Petitioner's trial.

2. Trial Court Error

The post-conviction court rejected the Petitioner's claim that the trial court committed constitutional error in interjecting itself into the proceedings in favor of the prosecution and in failing to recuse itself. The post-conviction court did not find that the trial court acted improperly in informing the prosecution that the notice of intent to seek enhanced

punishment listed outdated statutory language in relation to one or more aggravating circumstances. The court concluded that the trial court's actions did not demonstrate actual bias against the Petitioner or establish that the trial court had an interest in the outcome of the Petitioner's case. As a result, the court found that the trial judge was not required to recuse himself.

3. Brady Violation

The post-conviction court rejected the Petitioner's claim that the prosecution violated Brady by failing to disclose Sergeant Ashton's reports and the initial affidavit of complaint. The court found that even if the prosecution had a duty to disclose the documents, the Petitioner failed to demonstrate that the evidence was material. The court said it appeared that the initial affidavit of complaint was submitted before the investigation was complete. The statements in the affidavit were based on the Petitioner's statement to police, which was introduced at trial. After further investigation, the State determined that the evidence supported a first degree murder charge.

The court also found that the State did not violate Napue in allowing Sergeant Ashton to testify in conformity with the State's "lying in wait" theory, even though Sergeant Ashton had stated previously under oath in the initial affidavit of complaint that the evidence supported the conclusion that the altercation immediately followed a conversation that had deteriorated into an argument. Sergeant Ashton's statements in the initial affidavit of complaint were made before the investigation was complete, and the State's theory of the case evolved from the initial charge to the prosecution.

## II. Analysis

On appeal, the Petitioner asserts that (1) the jury foreperson demonstrated bias and violated the Petitioner's right to a fair and impartial jury; (2) he is ineligible for the death penalty because he is intellectually disabled; (3) trial counsel were ineffective during the guilt and penalty phases of the trial; (4) the prosecution engaged in misconduct in failing to disclose exculpatory evidence and presenting false and misleading testimony; (5) the trial court demonstrated bias; (6) the "acquittal-first instruction" violated the Petitioner's due process rights; (7) Tennessee's death penalty scheme is unconstitutional; and (8) cumulative error warrants a new trial.

### A. Juror Bias

The Petitioner submits that Juror Coke's presence on the jury violated his right to a fair trial and impartial jury. He contends that Ms. Coke's failure to disclose her history of domestic abuse and her criminal history raised the presumption of actual bias.

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. Challenges to juror qualifications generally fall into the following two categories: *propter defectum*, "on account of defect," or *propter affectum*, "on account of prejudice." See State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). General disqualifications based upon alienage, family relations, or some other statutory mandate are classified as *propter defectum* and must be challenged before the return of a jury verdict. Id. An objection based upon bias, prejudice, or impartiality is classified as *propter affectum* and may be made after the jury verdict. Id. A claim of juror bias or impartiality, therefore, may be asserted in a post-conviction relief petition. See Steven James Rollins v. State, No. E2010-01150-CCA-R3-PD, 2012 Tenn. Crim. App. LEXIS 680, at *41 (Knoxville, Aug. 31, 2012).

The jury selection process must be guarded carefully to ensure that the defendant has a fair trial and that the verdict is reached by an impartial trier of fact. Akins, 867 S.W.2d at 354. The Tennessee Constitution guarantees every defendant "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" Id. (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). "Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them in response to those natural and human instincts common to mankind interfere with the underpinnings of our justice system." Id. (citation omitted).

Voir dire allows for the impaneling of a fair and impartial jury through questions that permit counsel to intelligently exercise challenges. Id. Full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of preemptory and cause challenges. Id. at 355. Jurors, therefore, are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." Id. (quotations omitted).

The defendant must establish a prima facie case of bias or partiality. Id. "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." Id. Silence by a juror when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. Id. "Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." Id. at 356 (footnotes omitted). "The test is whether a reasonable,

impartial person would have believed the question, as asked, call for juror response under the circumstances." Id. at n.13. The juror's intent is not dispositive of the issue of bias. Id. at n.15.

A presumption of bias arises "when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias." Id. at 357. The presumption may be rebutted by an absence of "actual prejudice" or "actual partiality." Id. In determining whether the presumption is overcome, however, the court must view the totality of the circumstances and not merely the juror's self-serving claim of lack of partiality. Id. Actual prejudice has been established when the presumed bias is confirmed by the challenged juror's conduct during jury deliberations giving rise to the possibility that improper extraneous information was provided to the jury. Id.

Ms. Coke answered "no" when the questionnaire asked if she or anyone she knew had been a victim of violence. During voir dire, Ms. Coke did not respond when Co-Counsel asked her directly whether she had any prior experience with domestic violence. However, our review of the voir dire transcript reveals that when Co-Counsel questioned Ms. Coke, he pronounced her name as "Ms. Crook." Ms. Coke corrected him, and the trial court joked about the mistake. Co-Counsel then continued to question the remaining jurors without obtaining an answer from Ms. Coke.

In our view, a juror's failure to disclose that she was a victim of domestic violence in a capital murder trial involving domestic violence is not insignificant. The Tennessee Supreme Court has recognized that "potential bias arises if a juror has been involved in a crime or incident similar to the one on trial." Smith v. State, 357 S.W.3d 322, 347 (Tenn. 2011). The court further recognized that "the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." Id. Not only did Ms. Coke fail to disclose the information, she affirmatively represented on the jury questionnaire that she had not been the victim of domestic violence. Accordingly, a presumption of bias arises.

The presumption of bias may be overcome, though, by an absence of "actual prejudice" or "actual partiality." Akins, 867 S.W.2d at 357. As our supreme court has explained,

> While that presumption may be rebutted by an absence of actual prejudice, the court must view the totality of the circumstances, and not merely the juror's selfserving claim of lack of partiality, to determine whether the presumption

is overcome. Moreover, when the presumed bias is confirmed by the challenged juror's conduct during jury deliberations which gives rise to the possibility that improper extraneous information was provided to the jury, actual prejudice has been demonstrated.

Id.

The State contends that Ms. Coke's failure to disclose her past history as a victim of domestic violence was inadvertent. The State relies upon Ms. Coke's testimony at the post-conviction hearing that she must have rushed through the questionnaire. The post-conviction court, however, did not credit Ms. Coke's testimony and find that her failure to disclose her past history and her misrepresentation regarding her past history were inadvertent. Rather, the post-conviction court found that "[a]lthough Coke's failure to divulge the past abuse might call into question her impartiality, her assertion that she based her decision on the law and the facts, alone, indicates she was not 'actually' biased against petitioner." A juror's testimony about the jury's internal deliberative process, however, is improper absent "evidence of an extraneous or improper influence on the jury." Smith, 357 S.W.3d at 347, n.3 (discussing testimony of a juror whose family had been affected by the murder of his daughter's boyfriend and who stated that he gave the petitioner a fair trial and based his verdict on the evidence; cf. Walsh v. State, 166 S.W.3d 641, 649 (Tenn. 2005) (prohibiting a juror's testimony about the effect of internal information on deliberations). Ms. Coke's testimony about her basis for reaching the verdict also was barred by Tennessee Rule of Evidence 606(b), which states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The issue in this case does not involve a trial court making a determination during jury selection about whether a prospective juror was qualified despite relevant personal

experiences. Rather, the post-conviction court made the determination after the verdict was returned based upon the juror's testimony about the basis for her verdict. As a result, Rule 606(b) applies, and the post-conviction court should not have considered the evidence.

Finally, Ms. Coke's actions in providing false statements and failing to disclose information when requested, as well as the circumstances surrounding those misrepresentations and failure to disclose, dispel the State's claim that Ms. Coke's actions were inadvertent. Ms. Coke made false representations on the questionnaire regarding her experiences with domestic violence and her criminal history. She then failed to disclose her experiences with domestic violence when questioned during voir dire. We note that the post-conviction court also did not address Ms. Coke's additional false statements to inquiries on the questionnaire regarding whether she had ever been charged or convicted of a crime. Ms. Coke acknowledged during the post-conviction hearing that she had a prior conviction for driving under the influence. Although the mere fact of a conviction for driving under the influence is not material, such evidence demonstrates Ms. Coke's repeated lack of truthfulness.

In addition to being asked about domestic violence on the questionnaire, Ms. Coke was also asked during voir dire if she had any experience with domestic violence. While the discussion was diverted to other matters after counsel misstated Ms. Coke's name, the transcript of voir dire establishes that the jurors were aware of the importance of domestic violence. The transcript reflects:

> [DEFENSE COUNSEL]: Mr. Faulkner is accused of first-degree murder and whoever sits as jurors on this case is going to see some evidence that the state is going to present that they're alleging that Mr. Robert Faulkner killed his wife. Has any of you all ever been a victim of domestic violence? Ms. Smith?
>
> PROSPECTIVE JUROR: No.
>
> [DEFENSE COUNSEL]: Mr. Moore?
>
> PROSPECTIVE JUROR: No, sir.
>
> [DEFENSE COUNSEL]: Ms. Santana?
>
> PROSPECTIVE JUROR: No, sir.

THE COURT:  And let me say this, here again, if you have, you're welcome to come up here to the bench and we can talk about it.

[DEFENSE COUNSEL]:  Right.  I don't want to embarrass anybody, okay.  We're just trying to pick a fair and impartial jury, somebody who will listen to the testimony that's put on by the state.  Mr. Faulkner may or may not testify. . . . We were talking about domestic violence.  Mr. Burton-

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  -have you ever been a victim of domestic violence?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Been involved in domestic violence at all?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Kelly?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Watkins?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Mr. Linke?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Blumen?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Linke?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]: . . . . Ms. Rich?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Mr. Hooker?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]: Mr. Delbove, we've already spoken, haven't we-

PROSPECTIVE JUROR:  No, sir, to the question.

[DEFENSE COUNSEL]:  Okay.  Thank you.  Mr. Gatson?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Mr. Johnson?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Then I'll start down here.  Mr. Rooks?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Price?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Mr. Ranson?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Clark?

PROSPECTIVE JUROR:  No, sir.

[DEFENSE COUNSEL]:  Ms. Self?

PROSPECTIVE JUROR: No, sir.

[DEFENSE COUNSEL]: Ms. Clark?

PROSPECTIVE JUROR: No, sir.

[DEFENSE COUNSEL]: Ms.--Is it Crowson?

PROSPECTIVE JUROR: Crowson.

[DEFENSE COUNSEL]: Crowson. Ms. Crook?

PROSPECTIVE JUROR: Coke.

[DEFENSE COUNSEL]: Coke. I'm sorry.

PROSPECTIVE JUROR: Just like it's spelled. That's right.

THE COURT: You don't want to be a crook, do you? You want to be a coke.

(Laughing.)

[DEFENSE COUNSEL]: Mr. Hathcock?

PROSPECTIVE JUROR: No, sir.

[DEFENSE COUNSEL]: Ms. Woods.

PROSPECTIVE JUROR: No, sir.

[DEFENSE COUNSEL]: Mr. Rowan.

PROSPECTIVE JUROR: No, sir.

[DEFENSE COUNSEL]: Ms. Jones.

PROSPECTIVE JUROR: No, sir.

-97-

[DEFENSE COUNSEL]: Okay. So, none of you all have been a victim of domestic violence.

Have any of you all ever had any relatives or friends who have been involved in a serious domestic violence case that you know of? Okay.

Well, Mr. Faulkner, as I mentioned before, is accused of murdering his wife. And there's going to be some testimony involved in that. Do any of you all have any problems with listening to any testimony involving the murder of a spouse?

Now, in America we have a system to where 12 people are going to sit in judgment of another person who is accused of a crime. Now, will each of you all listen to the testimony that's going to be presented by the state, and if the defense puts on any proof, will each of you all listen objectively to all the proof and follow the law as Judge Craft is going to tell you what the law is at the time you're going to be asked to deliberate?

[All prospective jurors respond, "Yes, sir."]

Despite the emphasis placed on domestic violence by the defense, Ms. Coke failed to disclose her past experiences after she falsely represented on the questionnaire that she had never been a victim of domestic violence. Moreover, Ms. Coke's past experiences and the facts of the present case were similar. Like the victim, Ms. Coke was a victim of domestic violence in which she was hit on the head with a fist and a blunt object. Ms. Coke sought medical treatment for her injuries, and the experience was so significant that it contributed to her seeking counseling. "[T]he constitutional guaranty of trial by an impartial jury requires the jury to be free of even a reasonable suspicion of bias and prejudice." Hyatt v. State, 430 S.W.2d 129, 130 (Tenn. 1967); State v. Pender, 687 S.W.2d 714, 718 (Tenn. Crim. App. 1984). We cannot conclude that the trial was free of a reasonable suspicion of bias and prejudice, given the similarities of Ms. Coke's past experience and the facts of the case.

Not only did Ms. Coke serve on the jury, she was the foreperson. This fact further undermines confidence that the verdict of guilt and sentence of death were reached without prejudice.

This court recognizes that a prospective juror's personal experiences did not necessarily disqualify her from jury service in a factually similar case. In State v. Humphreys, 70 S.W.3d 752, 764-66 (Tenn. Crim. App. 2001), a driving under the influence

prosecution, a prospective juror had been a victim of a prior drunk driving incident, contributed financially to Mothers Against Drunk Driving, and did not drink alcohol. She stated unequivocally though, that she could follow the law and be a fair juror. The trial court declined to excuse her for cause, and this court concluded that there was not abuse of discretion. In Humphreys, the juror was questioned about her ability to be fair and impartial during voir dire, not after the verdict. The distinction is significant. First, Rule 606(b) did not prohibit the former, as it did the latter. Second, in Humphreys, the defense and the trial court were afforded the opportunity to evaluate the prospective juror's demeanor before accepting her as a juror. Cf. State v. Odom, 336 S.W.3d 541, 559 (Tenn. 2011) (noting that a trial judge's assessment of a juror's ability to uphold the oath is based upon responses to questions as well as nonverbal responses and is afforded deference).

In the present case, Ms. Coke testified generally during voir dire that she could be fair and impartial, but she did not disclose her relevant history and misrepresented her relevant history on the questionnaire. Her testimony that she based her verdict on the evidence and the law was inadmissible and came years after her jury service. Because of her false representations at the time of the trial, neither the defense nor the trial court had the opportunity to question her regarding her prior experience and her ability to decide the case impartially. Trial counsel testified that they relied on the jury questionnaires to rank the desirability of the prospective jurors. Both the defense and the trial court were deprived of the opportunity to evaluate Ms. Coke's demeanor and credibility. With Ms. Coke as the foreperson, the jury found the Petitioner guilty of first degree murder and sentenced him to death. Even if Ms. Coke's testimony that she was fair and based her verdict on the law and the evidence presented were admissible, we nevertheless conclude that the State failed to rebut the presumption that Ms. Coke was biased or prejudiced and could not serve as a fair and impartial juror.

The right to a jury that is fair and impartial is fundamental, and the denial of that right cannot be treated as harmless error. Odom, 336 S.W.3d at 556 (citing Gray v. Mississippi, 481 U.S. 648, 668 (1987)). Such errors are structural constitutional errors that compromise the integrity of the judicial process. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (citing State v. Garrison, 40 S.W.3d 426, 433 n.9 (Tenn. 2000)). Structural errors "necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Neder v. United State, 527 U.S. 1, 9 (1999). Structural errors are subject to automatic reversal because they deprive a defendant of a right to a fair trial. Rodriguez, 254 S.W.3d at 361.

Our system of justice cannot tolerate a trial with a tainted juror regardless of the strength of the evidence against the defendant. We conclude that the Petitioner was denied the right to a jury that was fair and impartial.

Accordingly, we reverse the post-conviction court's denial of post-conviction relief, vacate the Petitioner's conviction and sentence, and remand the case to the trial court for a new trial. We will address the remaining issues raised by the Petitioner in light of the possibility of further appellate review.

## B. Eligibility for the Death Penalty

The Petitioner argues that he is ineligible for the death penalty. First, he contends that he is intellectually disabled. Second, he contends that even if the evidence did not demonstrate that he is intellectually disabled, the proof established that he has partial fetal alcohol syndrome and that the effects of the disorder are the functional equivalent of intellectual disability. Finally, the Petitioner requests that this court conduct a new comparative proportionality review in light of the new evidence regarding his mental deficiencies and medical disorder.

## 1. Intellectual Disability

The Petitioner contends that he is intellectually disabled and, therefore, ineligible for the death penalty. However, the Petitioner did not raise the issue in his original or amended post-conviction petitions or in his appellate brief, and none of his mental health experts at the post-conviction hearing testified that he is intellectually disabled. The post-conviction court did not address the issue in its order denying post-conviction relief. Therefore, the issue is waived. See Tenn. Code Ann. § 40-30-106(g) (providing that a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented").

We note that in support of his claim that he is intellectually disabled, the Petitioner relies on a motion to reopen post-conviction proceedings that he filed in the post-conviction court on April 9, 2012, after he filed a notice of appeal from the denial of post-conviction relief on March 1, 2012. He claims that affidavits prepared by mental health professionals and attached to his motion to reopen establish that he is intellectually disabled.

In his motion to reopen, the Petitioner asserted that he was "actually innocent" of the crime due to his alleged intellectual disability and that Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), created a new constitutional right requiring the reopening of post-conviction proceedings. After filing the motion to reopen, the Petitioner filed a motion in this court seeking to stay the appeal and remand the case to the post-conviction court for consideration of his motion to reopen. On May 29, 2012, this court entered an order denying the

Petitioner's motion to stay the appeal and noting that this court had rejected both grounds upon which he was seeking to reopen post-conviction proceedings in David Keen v. State, No. W2011-00789-CCA-R28-PD (Tenn. Crim. App., at Jackson, June 29, 2011) (order). In December 2012, the Tennessee Supreme Court released its opinion in Keen, rejecting both bases upon which the Petitioner relied in his motion to reopen. Keen v. State, 398 S.W.3d 594 608-13 (Tenn. 2012).

In March 2013, the Petitioner filed an "Amended Motion to Reopen Petition for Relief from Death Sentence and Petition for Writ of Error Coram Nobis" in the post-conviction court, alleging that he was intellectually disabled and, therefore, ineligible for the death penalty. The Petitioner filed a second motion in this court requesting a stay of the appeal of the denial of post-conviction relief pending resolution of his amended motion to reopen and petition for a writ of error coram nobis. On May 3, 2013, this court entered an order denying the Petitioner's motion to stay this appeal.

When the Petitioner filed his first motion to reopen in the post-conviction court, raising his claim of intellectual disability, he had already filed his notice of appeal. It is well-settled that, unless the motion is one of those specified in Rule 4 of the Tennessee Rules of Appellate Procedure, "[t]he jurisdiction of the Court of Criminal Appeals attaches upon the filing of the notice of appeal and, therefore, the trial court loses jurisdiction." State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996). To that end, "[o]nce the trial court loses jurisdiction, it generally has no power to amend its judgment." Id. Therefore, the post-conviction court never had the opportunity to address the issue, and the Petitioner's claim of intellectual disability is not properly before us.

2. Partial Fetal Alcohol Syndrome

The Petitioner asserts that the effects of his partial fetal alcohol syndrome are the functional equivalent of intellectual disability and that as a result, he is ineligible for the death penalty. He claims that his moral culpability is diminished in the same way that those who are intellectually disabled are rendered ineligible for execution. He maintains that as a result, his death sentence violates the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution.

The penalty of death is qualitatively different from every other sentence, however long. Woodson v. North Carolina, 428 U.S. 280, 305 (1976). As a result, there is a corresponding need in capital cases for reliability in the determination that death is the appropriate punishment in a specific case. Id. As Justice Stewart noted,

The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejections of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

Furman v. Georgia, 408 U.S. 238, 306 (1972) (Stewart, J., concurring). Justice Stewart concluded that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." Id. at 310.

The "death is different" principle has led the United States Supreme Court to carve out exemptions from eligibility for capital punishment. A national consensus may develop holding that an immutable characteristic of the defendant so affects his individual responsibility and moral guilt that it precludes finding his "consciousness [is] materially more 'depraved' than that of any person guilty of murder," as is required for capital punishment to be lawful. See Godfrey v. Georgia, 446 U.S. 420, 433 (1980). The United States Supreme Court has set out four indicia to consider in determining the existence of such a consensus: (1) legislation enacted by the country's legislatures, including whether there is a pattern of movement toward precluding the execution of members of a particular group; (2) decisions of sentencing juries, appellate courts, and governors about whether to execute defendants in that group; (3) where appropriate, other indicia of national and international opinion; and (4) the court's own judgment. See Roper v. Simmons, 543 U.S. 551, 563-65 (2005). The United States Supreme Court has carved out exempted classes of persons from execution. See, e.g., id. at 551 (execution of prisoners who were under eighteen years of age at the time of the offense barred by the Eighth Amendment); Atkins v. Virginia, 536 U.S. 304 (2002) (execution of intellectually disabled individuals unconstitutional); Ford v. Wainwright, 477 U.S. 399 (1986) (execution of insane persons prohibited by the Eighth Amendment).

The Petitioner requests that this court "carve out" another excepted class of persons as exempted from the death penalty, i.e., those with partial fetal alcohol syndrome. According to the Petitioner, the functioning of a person with partial fetal alcohol syndrome is similar to the functioning of an intellectually disabled individual. The Petitioner states that as a result, those who have partial fetal alcohol syndrome also should be categorically exempt from the death penalty.

The Petitioner presented expert testimony during the post-conviction hearing that he suffered from partial fetal alcohol syndrome and the accompanying mental defect of cognitive disorder, not otherwise specified. Dr. Adler testified regarding the difficulties with

daily functioning experienced by those with fetal alcohol spectrum disorder. Deficits in adaptive functioning, however, is only one of the three criteria required for a finding of intellectual disability rendering a person ineligible for the death penalty in Tennessee. See Tenn. Code Ann. § 39-13-203(a). A defendant claiming to be intellectually disabled and, therefore, ineligible for the death penalty must also establish that he or she has "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below" and that the intellectual disability "manifested during the developmental period, or by the eighteen (18) years of age." Id. Dr. Adler testified that fetal alcohol spectrum disorder was not the equivalent of functional disability. He said that those with fetal alcohol spectrum disorder generally did not have an I.Q. of less than 70. According to Dr. Adler, only approximately nine percent of those with partial fetal alcohol syndrome had an I.Q. of less than 70. The average I.Q. for those with partial fetal alcohol syndrome was 90 and 79 for those with fetal alcohol syndrome.

We do not dispute that the deficiencies and limitations inherent in people who are intellectually disabled may also exist in those who, while not intellectually disabled, are considered mentally ill or cognitively impaired. See Christa Gail Pike v. State, No. E2009-00016-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 285, at *189 (Knoxville, Apr. 25, 2011), perm. to appeal denied, (Tenn. 2011). We have noted that "[t]he majority of states with capital statutes permit the jury to consider the [petitioner's] capacity to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of the law." Id. However, no consensus in the state legislation supporting a categorical exclusion for the mentally ill or cognitively impaired exists. See id. at **189-90. Moreover, federal and state courts have consistently declined to extend the United States Supreme Court's ruling in Atkins, barring the execution of intellectually disabled individuals, to the mentally ill. See, e.g., Joshua v. Adams, 231 Fed. Appx. 592, 593 (9th Cir. 2007); In re: Neville, 440 F.3d 220, 221 (5th Cir. 2006); Lawrence v. State, 969 So. 2d 294 (Fla. 2007); State v. Ketterer, 855 N.E.2d 48 (Ohio 2006); Matheney v. State, 833 N.E.2d 454 (Ind. 2005). Likewise, this court has declined to extend Atkins to bar the execution of those who are cognitively impaired or suffering from mental illness. See Christa Gail Pike, No. E2009-00016-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 285, at *190. Accordingly, the Petitioner is not entitled to relief regarding this issue.

3. Proportionality Review

The Petitioner requests that this court conduct another proportionality review in light of evidence that he presented during the post-conviction hearing regarding partial fetal alcohol syndrome. The Tennessee Supreme Court conducted a proportionality analysis on direct appeal and concluded that the death penalty was "not excessive or disproportionate." Faulkner, 154 S.W.3d at 63. The court specifically concluded that "the sentence of death in

this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Id. at 64. It is well established that post-conviction proceedings may not be employed to raise and re-litigate issues previously determined on direct appeal. See, e.g., Miller v. State, 54 S.W.3d 743, 747-48 (Tenn. 2001). Therefore, we conclude that the Petitioner is not entitled to relief on this issue.

## C. Ineffective Assistance of Counsel

The Petitioner asserts that he received ineffective assistance of counsel during the guilt and penalty phases of trial. In pertinent part, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Id. at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (quoting Strickland, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

If a petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Cronic, 466 U.S at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The reasonable probability standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011). In evaluating whether the petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Id. When challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." State v. Henley, 960 S.W.2d 572, 579-80 (Tenn. 1997) (quoting Strickland, 466 U.S. at 695); see Cullen, 131 S. Ct. at 1408.

1. Guilt Phase

-105-

The Petitioner submits that trial counsel were ineffective in failing to (1) investigate and present expert testimony negating the mental state for the charge of premeditated first degree murder; (2) investigate the charging documents; and (3) challenge the State's evidence and closing argument.

i.  Failure to Investigate and Present Expert Testimony

The Petitioner asserts that trial counsel were ineffective in failing to investigate properly and present expert testimony to support a voluntary intoxication defense and evidence of diminished capacity. Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules of counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 Tenn. Crim. App. LEXIS 524, at *134 (Jackson, July 1, 2009), perm. to appeal denied, (Tenn. 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. at **134-35. The United States Supreme Court has said that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

To succeed in a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the

witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id.

Once a petitioner presents a witness at the post-conviction hearing who he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense. Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). The court is justified in finding that counsel was not deficient by failing to call a witness if it determines that the witness's testimony would have been inadmissible at trial or that, even if admissible, would not have materially aided in the petitioner's defense at trial. Id. If the proffered testimony is both admissible and material, the post-conviction court must assess the credibility of the witness. Id. at 869-70.

The Petitioner asserts that trial counsel were ineffective in failing to retain an addictionologist and present evidence supporting voluntary intoxication. While voluntary intoxication is not a defense to prosecution for an offense, "intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a); see State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). A jury instruction regarding a defendant's voluntary intoxication at the time that he or she committed an offense is required "only if the intoxication was such that it compromised the defendant's capacity for whatever culpable mental state the offense required." Hatcher, 310 S.W.3d at 815 n.16.

We agree with the post-conviction court that simply asserting that the Petitioner was an addict who routinely abused alcohol and cocaine would not have been sufficient to establish that, due to his intoxication at the time of the offense, he was unable to form the culpable mental state for premeditated first degree murder. Regardless of the Petitioner's history of drug and alcohol addiction, he was required to establish that he, in fact, was intoxicated at the time of the offense.

As the post-conviction court correctly noted, the Petitioner was the only witness who could have testified that he used drugs before the offense and was intoxicated when he killed the victim. The court accredited Co-Counsel's testimony that he chose not to present the Petitioner as a witness at trial because the Petitioner "became totally confused and lost" when he testified during the suppression hearing and was unable to hold up on cross-examination by the State. The Petitioner relies upon the testimony of Ms. McNeely to support his claim of intoxication. During the post-conviction hearing, however, Ms. McNeely testified that a drug screen on January 13, 1999, approximately eight days before the victim's death, showed that the Petitioner had tried to drink liquids in an attempt to eliminate the drugs from his system. Ms. McNeely said she spoke with the Petitioner on January 20 or 21 but could not

recall the conversation. While Ms. McNeely testified during the penalty phase of the trial that the Petitioner admitted to her that he used cocaine on January 20, her testimony does not establish that the Petitioner was intoxicated when he killed the victim one day later. Moreover, the victim's statement to police that she suspected that the Petitioner had taken cocaine prior to an altercation between them on January 17 does not prove the Petitioner's contention that he was intoxicated when he killed the victim four days later.

The Petitioner also relies on Glenda Williams's testimony that he telephoned her on the day of the victim's death, told her that he did not "feel right," and told her that he felt "bad." This evidence, however, does not demonstrate that the Petitioner used drugs and alcohol on the day of the victim's death or that he was intoxicated at the time of the victim's death. Moreover, the post-conviction court accredited Lead Counsel's testimony that Ms. Williams refused to testify at trial.

The only other witness who could have testified about the Petitioner's drug use on the day of the victim's death was Terri Strickland. Ms. Strickland, however, did not testify at the post-conviction hearing. The Petitioner notes in his appellate brief that Ms. Strickland died before the post-conviction hearing. Regardless, Mr. Chapman had difficulty locating Ms. Strickland and persuading her to cooperate. While Ms. Strickland admitted to "partying" with the Petitioner on the day of the offense, she did not provide details regarding the amount of drugs they consumed or the Petitioner's behavior as a result of the drug use. As noted by the post-conviction court, trial counsel made a reasonable decision not to present Ms. Strickland as a witness at trial due to her questionable credibility and failure to cooperate.

Sergeant Ashton testified at trial that during his interview with the Petitioner, the Petitioner never claimed he was under the influence of alcohol or cocaine when he killed the victim. The Petitioner's statement to police reflected that he had clear memories about his actions before, during, and after the offense. Dr. Auble testified that the Petitioner was able to recall the circumstances of the offense and that his recollection was reasonably consistent with what she had learned about the events from the trial and the documentation she had reviewed. The Petitioner's clear memory about his actions before, during, and after the offense belies any claim that he was so intoxicated that he was unable to form the culpable mens rea of premeditation. See Hatcher, 310 S.W.3d at 816. Accordingly, trial counsel were not ineffective in failing to present evidence of voluntary intoxication during the guilt phase of the trial.

Next, the Petitioner contends that trial counsel were ineffective in failing to investigate and present evidence of diminished capacity based upon his cognitive disorder, not otherwise specified, that was derived from his partial fetal alcohol syndrome. According

to the Petitioner, trial counsel should have retained a neuropsychologist and other experts in fetal alcohol spectrum disorder. The State responds that trial counsel were reasonable in relying upon Dr. Steinberg to evaluate the Petitioner for possible mental conditions. We agree with the State.

The post-conviction court found that trial counsel had a proper understanding of the law regarding diminished capacity and properly directed Dr. Steinberg's evaluation of the Petitioner. The court accredited trial counsel's testimony that they had multiple discussions with Dr. Steinberg regarding their plan to present evidence of diminished capacity. Dr. Steinberg was provided with all of the materials prepared by Ms. Shettles, including information regarding fetal alcohol spectrum disorder. Lead Counsel thought he also provided Dr. Steinberg with a copy of case law regarding diminished capacity.

The post-conviction court initially found that while it appeared Dr. Steinberg was aware that a diagnosis of a mental disease or defect was needed to support a theory of diminished capacity, he was unable to make such a diagnosis. The post-conviction court later found that Dr. Steinberg had an unclear understanding of the parameters for admission of expert testimony relating to a defendant's diminished capacity to form the requisite culpable mental state due to a mental disease or defect. Thus, it appears that the post-conviction court made conflicting findings regarding Dr. Steinberg's knowledge of the evidence required to support a theory of diminished capacity. Regardless, Dr. Steinberg did not find that the Petitioner had a mental disease or defect.

The post-conviction court found that trial counsel were clear on the standards for admissibility of diminished capacity proof, and we conclude that trial counsel reasonably relied upon Dr. Steinberg to evaluate the Petitioner and determine whether additional testing by other mental health experts was needed. Dr. Steinberg was provided with extensive materials prepared by Ms. Shettles regarding the Petitioner. Dr. Brown testified that Ms. Shettles "went into more depth than [she had] ever seen a social historian go." The report included information regarding a possible diagnosis of fetal alcohol spectrum disorder.

According to the evidence presented in the post-conviction court, a diagnosis of fetal alcohol spectrum disorder included a mental impairment, such as cognitive disorder not otherwise specified. Dr. Steinberg administered a number of tests, including neuropsychological tests, but did not find a mental impairment. He acknowledged that the Petitioner received an abnormal test result, which "typically is marginally indicative [of] brain damage and need for further neuropsychological testing." Dr. Steinberg, however, stated that "upon closer inspection his difficulties noted above in math were largely responsible for this marginal score. Therefore, the result[s] of this test are seen as being

consistent with his above-mentioned [low average] intellectual functioning." Dr. Steinberg concluded that "[t]here were no indications of decline of cognitive/intellectual disabilities due to mental illness or neuropsychological problems." As a result, Dr. Steinberg did not recommend additional testing from other mental health experts. This court previously concluded that a defense attorney "is not required to question a diagnosis put forth by a professional expert in the field." Christa Gail Pike, No. E2009-00016-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 285, at *154. Therefore, trial counsel were not ineffective in failing to retain a neuropsychologist and experts in fetal alcohol spectrum disorder.

As found by the post-conviction court, trial counsel's arguing for the admission of Dr. Steinberg's testimony despite his inability to diagnose the Petitioner with a mental disease or defect did not establish that trial counsel misapprehended the state of the law. Rather, the record reflects that trial counsel attempted to persuade the trial court to expand the boundaries of diminished capacity. Moreover, trial counsel's failure to present evidence of diminished capacity was not based on their lack of knowledge of the standards of admissibility but was the result of Dr. Steinberg's failure to diagnose the Petitioner with a mental disease or defect. Accordingly, the Petitioner is not entitled to relief regarding this issue.

ii.    Failure to Investigate the Charging Documents

The Petitioner contends that trial counsel were ineffective in failing to investigate the charging documents. He faults trial counsel for failing to obtain public records, waiving the preliminary hearing, and failing to request Sergeant Ashton's written statement after he testified at the trial.

The Petitioner submits that trial counsel were ineffective in failing to obtain the affidavit charging second degree murder, the bond recommendation for the second degree murder charge indicating that the offense arose out of a domestic dispute, Sergeant Ashton's supplemental reports stating that the prosecutors showed him how to change the charge, and the LAW incident table noting that an officer had suspected the Petitioner of using alcohol.

However, even if trial counsel were deficient in failing to obtain the affidavit charging second degree murder, the bond recommendation for the second degree murder charge, and Sergeant Ashton's supplemental record, the Petitioner has failed to establish that any deficiency resulted in prejudice. The affidavit charging second degree murder stated that before the Petitioner attacked the victim, they were engaged in a conversation that evolved into an argument. It was essentially a summary of the Petitioner's confession, which was presented to the jury. The jury considered and rejected the Petitioner's contention that the

-110-

victim's death was the result of a sudden argument. As noted by the post-conviction court, the affidavit charging second degree murder was prepared before the investigation into the victim's death was complete. Sergeant Ashton testified during the post-conviction hearing that when the affidavit supporting the second degree murder charge was prepared, the investigation was ongoing. Upon reviewing the evidence, the prosecution determined that first degree murder was the proper charge. As a result, the charge was amended, and information was included in the affidavit regarding the Petitioner's prior threats and acts of violence against the victim. The affidavit supporting the first degree murder charge stated that the Petitioner previously had attacked the victim on January 17, 1999, by striking her on the head and threatening to kill her. The affidavit supporting the first degree murder charge also stated that on January 18, the Petitioner threatened to kill the victim on multiple occasions. Finally, the evidence of premeditation presented at trial precludes a reasonable probability that the information from the records would have altered the outcome of the trial.

During the post-conviction hearing, the Petitioner presented a LAW incident table, which noted suspicion that the Petitioner had consumed alcohol. The Petitioner, however, failed to present any evidence regarding the identity of the person who noted the suspicion or the basis for that suspicion. Sergeant Ashton denied that he made the notation. Absent such information, the Petitioner has failed to establish that the incident table would have been admissible at trial had trial counsel obtained the table. The Petitioner is not entitled to relief regarding this issue.

The Petitioner also asserts that Lead Counsel was ineffective in waiving the preliminary hearing. According to the Petitioner, Lead Counsel could have questioned Sergeant Ashton during the preliminary hearing regarding the decision to change the second degree murder charge to first degree murder. However, Lead Counsel testified that based on his years of experience in the Shelby County Criminal Court, the State would not provide discovery until after the preliminary hearing but probably would provide a defendant's statement if the defendant waived the hearing. The post-conviction court properly found that Lead Counsel made a reasonable tactical decision to waive the hearing in order to obtain discovery materials. Accordingly, Lead Counsel was not deficient in waiving the hearing.

The Petitioner also faults trial counsel for failing to request the affidavit supporting the second degree murder charge, the bond recommendation regarding the second degree murder charge, the supplemental reports, and the LAW incident table following Sergeant Ashton's testimony at trial. According to the Petitioner, the documents constituted witness statements pursuant to Tennessee Rule of Criminal Procedure 26.2. However, just as trial counsel's failure to obtain the documents before trial did not result in prejudice, trial counsel's failure to obtain them following Sergeant Ashton's testimony also did not result in prejudice. Moreover, Sergeant Ashton denied being the officer who had indicated the

possible use of alcohol by the Petitioner on the LAW incident table. Therefore, the Petitioner is not entitled to relief regarding this issue.

iii.        Failure to Challenge the State's Evidence

The Petitioner submits that trial counsel were ineffective in failing to challenge the State's evidence at trial and in failing to object to the State's closing argument. The Petitioner specifically contends that trial counsel failed to (1) challenge the State's contention that the assault on the victim occurred for a minimum of six minutes; (2) object to evidence of the victim's state of mind; and (3) redact the Petitioner's nickname from his statement to police.

According to the Petitioner, trial counsel were ineffective in failing to challenge testimony from Dr. O.C. Smith and Paulette Sutton that the assault occurred for a minimum of six minutes. Their testimony was based upon their finding that clotted blood had been "cast off" the victim and that blood in a clinical setting required at least six minutes to clot. Dr. Smith offered such testimony in the guilt phase on cross-examination by trial counsel, while Ms. Sutton offered such testimony in the penalty phase during direct examination by the State. The Petitioner submits that rebutting their testimony was critical because the State relied upon their testimony as proof of premeditation.

The post-conviction court accredited Co-Counsel's testimony that he requested that the trial court approve funds to retain a forensic pathologist. We note that the better practice would have been for trial counsel to have made all funding requests by filing written motions. In any event, the trial court denied the Co-Counsel's oral requests. Accordingly, trial counsel were not deficient in failing to retain a forensic pathologist to review the findings of Dr. Smith and Ms. Sutton and to present a forensic pathologist as a witness at trial to rebut those findings.

The post-conviction court found that trial counsel were deficient in failing to challenge Dr. Smith's testimony on cross-examination. Co-Counsel testified that he interviewed Dr. Smith for two and one-half hours in preparation for trial. Co-Counsel said the testimony of Dr. Smith and Ms. Sutton differed from the information they had provided him during the interview. Co-Counsel, however, stated that during the interview, Ms. Sutton educated him on blood spatter and what the evidence would mean at trial. Co-Counsel did not clarify whether his conversation with Ms. Sutton included findings that the assault occurred for a minimum of six minutes.

Even if trial counsel were deficient in failing to challenge Dr. Smith's testimony regarding the length of the assault, the deficiency did not result in prejudice. Dr. Davis testified during the post-conviction hearing that Dr. Smith's conclusions were "not out of the bounds of possibility." Moreover, Dr. Smith testified at trial that determining the length of time that the assault occurred was difficult.

Even if such evidence had been rebutted at trial through cross-examination, other evidence supporting premeditation was extensive. The Petitioner threatened to kill the victim on multiple occasions in the days leading up to the murder. He also assaulted and injured her a few days before her death. The Petitioner told the police that he struck the victim on the head seven or eight times with a frying pan and a metal horseshoe. He acknowledged knocking her to the floor after the second blow and continuing to strike her while she was on the floor. Dr. Smith testified at trial that the victim received a minimum of thirteen blows on her head. The force of the blows caused bruising to the victim's brain, and one of her eyes was recessed into her head. After killing the victim, the Petitioner made attempts to hide the crime. He disposed of the murder weapons and his bloody clothes in a viaduct. He also took the victim's car and abandoned it at a location away from the victim's house. The Petitioner then hid out at a friend's home. Based upon the strong evidence of premeditation, any deficiency by trial counsel in failing to challenge Dr. Smith's conclusion regarding the length of the assault on cross-examination did not result in prejudice.

Ms. Sutton testified during the penalty phase, and her testimony related to the heinous, atrocious, or cruel aggravating circumstance that the State sought to establish. The jury, however, did not find that aggravating circumstance in sentencing the Petitioner to death. See Faulkner, 154 S.W.3d at 56 n.2. Accordingly, the Petitioner has failed to establish that any deficiency by trial counsel in challenging Ms. Sutton's testimony regarding the length of the attack resulted in prejudice.

The Petitioner also maintains that trial counsel were ineffective in failing to object to the use of the victim's state of mind as evidence of premeditation. According to the Petitioner, trial counsel were ineffective in failing to cross-examine Officer Worthy or otherwise present the recording of a 911call made by the victim on January 17 or 18, 1999, during which the victim reported that the Petitioner had called her and stabbed himself while on the telephone with her. The Petitioner maintains that the recording rebuts evidence that the victim called 911 because she was injured or because the Petitioner threatened to kill her.

After the jury had been selected but before the State put on any proof, the trial court conducted what it referred to as a "404 hearing." During the hearing, the State presented testimony from several witnesses regarding injuries and threats the victim had reported

receiving from the Petitioner on January 17, 1999. Officer Worthy testified that on January 18, she spoke with the victim at the police station. The victim was upset and nervous. She was talking extremely fast, her hands were shaking, and the left side of her face was swollen. The victim reported to Officer Worthy that on January 17 at approximately 10:30 p.m., she went to the home of the Petitioner's grandmother to give the Petitioner some clothes. The victim and the Petitioner argued, and the Petitioner struck the victim with his fist on the left side of her face. He also held an ashtray over her head and threatened to kill her. As the victim was running out of the house, the Petitioner threw a chair up against the wall. The victim reported that at approximately 11:30 p.m., the Petitioner called her and said that he had stabbed himself. The victim reported that on January 18, she received multiple calls from the Petitioner threatening to kill her.

The trial court ruled that the victim's statements about her going to the home of the Petitioner's grandmother and the Petitioner's calling and reporting that he had stabbed himself were hearsay and did not fall within the excited utterance exception to the hearsay rule. The court found that the victim's statements regarding the threats were probative of the issue of premeditation and that the probative value outweighed the danger of unfair prejudice.

During the pretrial hearing, the State presented the testimony of Jimmy Lee Blaydes, who had worked with the victim at Piggly Wiggly. Mr. Blaydes testified that on the night of January 21, 1999, he walked the victim to her car after her shift ended. Mr. Blaydes said that the victim was shaking and that he asked her what was wrong. The victim said she was afraid that the Petitioner was at her home waiting on her and that he was going to kill her. The trial court ruled that Mr. Blaydes could not testify that the victim said the Petitioner was waiting on her at home. However, the trial court allowed Mr. Blaydes to testify that the victim was afraid of the Petitioner as a then existing mental condition. The court found that evidence of the victim's fear was relevant to show whether her allegations regarding the threats by the Petitioner were true.

Finally, the State presented the testimony of Twyla King, the victim's daughter, who testified that she spoke with the victim on the telephone on January 19, 1999. The victim was upset and reported the incident at the home of the Petitioner's grandmother during which the Petitioner hit her. The victim said she reported the incident to the police. The trial court ruled that Ms. King could testify about the victim's fear but disallowed her testimony regarding the reported argument between the victim and the Petitioner.

The Petitioner contends that trial counsel should have objected to the evidence regarding the victim's fear of him. Trial counsel, however, did argue against the admission

of such testimony, and the trial court rejected trial counsel's arguments. The trial court later clarified that the evidence of the victim's fear was not relevant to establish that the Petitioner committed the offense but was relevant to show that the victim's report to the police was more likely true. Trial counsel were not deficient in this regard.

The Petitioner also contends that trial counsel were ineffective in failing to cross-examine Officer Worthy or otherwise present evidence regarding the 911 call during which the victim reported that the Petitioner had stabbed himself. During the pretrial hearing, however, the trial court ruled that testimony about the victim's report of the Petitioner's stabbing himself was inadmissible. The victim's 911 call about the Petitioner's stabbing himself was similar to Officer Worthy's testimony during the pretrial hearing, and the Petitioner does not specify how the call would have been otherwise admissible. Accordingly, the Petitioner is not entitled to relief on this issue.

Next, the Petitioner faults trial counsel for failing to file a motion in limine seeking to redact his nickname, "Skillet," from his statement to police. The post-conviction court, however, accredited Lead Counsel's testimony that he sought to suppress any reference to the Petitioner's nickname but was unsuccessful. Moreover, reference to the Petitioner's nickname at trial was limited, and in light of the strength of the State's case at trial, any deficiency by trial counsel in arguing for the exclusion of any reference to the Petitioner's nickname did not result in prejudice.

The Petitioner also argues that trial counsel were ineffective in failing to object to portions of the prosecution's closing argument during the guilt phase of trial. Closing arguments are a "valuable privilege" and should not be unduly restricted. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon an abuse of that discretion." Id. We have explained that "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). The generally recognized areas of prosecutorial misconduct in closing arguments occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence of the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those that are matters of common public knowledge. Id. at 6.

The Petitioner asserts that the State's arguments that the victim had the keys in her hand and that the house was dark when Mr. King arrived were not supported by the evidence. While the prosecutor argued that the victim had her keys in her hand, the prosecutor later quoted from the Petitioner's statement in which he admitted that after killing the victim, he took the car keys that were on the table in the hallway. The trial court later instructed the jury that "whatever you heard in the proof is what you're going to consider." Moreover, the comment that the house was dark when Mr. King arrived was made by Co-Counsel during his closing argument, not the prosecutor.

The Petitioner submits that the State's argument regarding whether the victim's home was clean was improper. However, trial counsel objected to the argument at trial, and the trial court overruled the objection.

The Petitioner asserts that the State improperly argued that the defense failed to meet its burden of proof because it did not produce evidence showing that the Petitioner drove the car erratically, attempted suicide, or suggested marital counseling. The record, though, reflects that the State did not suggest that the defense failed to meet its burden of proof. Therefore, the Petitioner is not entitled to relief on this issue.

According to the Petitioner, the State improperly argued that he was predisposed to violence against the victim. However, even if this argument was improper, we conclude that any deficiency by trial counsel in failing to object to the argument did not result in prejudice based upon the strong evidence of guilt and the trial court's instruction that the jury's decision was to be based upon the proof presented.

2. Penalty Phase

The Petitioner asserts that trial counsel were ineffective during the penalty phase of the trial. Specifically, he argues that trial counsel failed to (1) investigate and present mitigating evidence and (2) object to the State's closing argument.

i. Failure to Present Mitigating Evidence

The Petitioner contends that trial counsel were ineffective in failing to investigate and present evidence during the penalty phase regarding his addiction, fetal alcohol spectrum disorder, and "functional" intellectual disability. The Petitioner further contends that trial counsel were deficient in failing to present mitigating evidence of his childhood.

Counsel does not have a constitutional duty to present mitigating evidence at the penalty phase of a capital trial but has a duty to investigate and prepare for both the guilt and penalty phases. See Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). Counsel does not have an absolute duty to investigate particular facts or a certain line of defense; however, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. In determining whether counsel breached this duty, this court reviews counsel's performance for reasonableness under prevailing professional norms, which include a context-dependent consideration of the challenged conduct as viewed from counsel's perspective at that time. Wiggins v. Smith, 539 U.S. 510, 523 (2003) (citations omitted).

Counsel is not required to investigate every conceivable line of mitigation evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. Id. at 533. Likewise, counsel is not required to interview every conceivable witness. Hendricks, 70 F.3d at 1040. This court will not conclude that counsel's performance was deficient for failing to discover all mitigating evidence, if, after a reasonable investigation, counsel has not been put on notice that such evidence exists. See Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted).

We review the following factors in determining whether trial counsel were ineffective in failing to present mitigating evidence: (1) the nature and extent of the mitigating evidence that was available but not presented by trial counsel; (2) whether trial counsel presented substantially similar mitigation evidence to the jury in either the guilt or penalty phase of the proceedings; and (3) whether the evidence of applicable aggravating factors was so strong that mitigating evidence would not have affected the jury's determination. Goad, 938 S.W.2d at 371 (citations omitted).

For the same reasons that trial counsel were not deficient in failing to present evidence of fetal alcohol spectrum disorder during the guilt phase of the trial, trial counsel were not deficient in failing to present such evidence during the penalty phase. Dr. Steinberg was provided with information about the use of alcohol by the Petitioner's mother during her pregnancy. Dr. Steinberg, however, did not find that the Petitioner exhibited cognitive impairment and did not recommend additional testing by a neuropsychologist or an expert in fetal alcohol spectrum disorder. Likewise, Dr. Steinberg did not find that the Petitioner was the "functional equivalent" of intellectually disabled. Instead, he concluded that the Petitioner's intellectual functioning was low average. Trial counsel acted reasonably in relying upon Dr. Steinberg's conclusions.

For the same reasons that trial counsel were not deficient in failing to retain and present an addictionologist during the guilt phase of the trial, trial counsel were not deficient in failing to present such testimony during the penalty phase. Moreover, trial counsel presented evidence of the Petitioner's drug use and addiction during the penalty phase of the trial through Dr. Steinberg and Ms. McNeely. Dr. Steinberg testified that the Petitioner was a chronic abuser of cocaine, alcohol, and marijuana. Dr. Steinberg said the Petitioner was using cocaine on a frequent basis around the time of the victim's death. Dr. Steinberg concluded that the Petitioner was prone to impulsive behavior and that his ability to suppress his impulses was greatly compromised due to the stressors he had experienced and his intoxication from cocaine. Dr. Steinberg also said the Petitioner's cocaine use considerably lowered his ability to deal with the stressors that he was experiencing at the time of the victim's death. Likewise, Ms. McNeely testified regarding the Petitioner's drug treatment and his drug use near the time of the victim's death.

The Petitioner also asserts that trial counsel were deficient in failing to present evidence regarding his childhood, including

> physical beatings from his stepfather, which sometimes caused him to flee the house and seek refuge on his father's porch; the alcohol addiction of his mother, including heavy drinking throughout her pregnancy with [the Petitioner]; the alcohol and heroin addiction of his father; the hellish neighborhood environment in which [the Petitioner] lived; or [the Petitioner's] removal from the family home due to abuse and neglect.

According to the Petitioner, trial counsel should have presented testimony from Willie Mae Avery, Glenda Williams, Denise Oher, Dolores Rose, Anna Clark, Warden Douglas, and Glori Shettles.

Ms. Avery did not testify at the post-conviction hearing, and evidence was presented at the hearing that she was deceased. As stated previously, to succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. Black, 794 S.W.2d 752. "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id.

Regarding Ms. Williams, the post-conviction court accredited Lead Counsel's testimony that she refused to testify at trial. The post-conviction court found that at the time of trial, it was unclear whether Ms. Oher was using drugs. The court further found that it was

questionable whether Ms. Oher would have been available and whether her credibility would have prevented her from being an effective witness. The post-conviction court accredited Lead Counsel's testimony that he did not present Warden Douglas as a witness because Warden Douglas informed him that he would testify that the Petitioner had been a violent person while incarcerated for a prior offense.

Nevertheless, the post-conviction court found that trial counsel were deficient in failing to present a full social history to the jury and that they should have presented testimony regarding the Petitioner's "deplorable" childhood and family history. The court noted that trial counsel could have presented such evidence through Delores Rose. The court further noted that Dr. Steinberg was aware of the details of the Petitioner's childhood and could have testified about his background. Trial counsel offered no explanation during the post-conviction hearing for their failure to present such evidence during the penalty phase of the trial. Therefore, we agree with the post-conviction court and conclude that trial counsel were deficient in failing to present a full social history to the jury.

We conclude, however, that trial counsel's deficiency did not result in prejudice. The jury found one aggravating circumstance to support the death penalty: that the Petitioner had prior convictions for felonies whose statutory elements involve the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2). In support of the aggravating circumstance, the State presented evidence that the Petitioner had prior convictions for second degree murder, assault with intent to commit first degree murder, assault with intent to commit robbery, and assault with intent to commit voluntary manslaughter. The Petitioner also had four prior robbery convictions.

Our supreme court summarized the mitigating evidence presented by trial counsel as follows:

> Mitigation testimony showed that [the Petitioner] was subjected to neglect and abuse as a child, that his parents were alcoholics and one used drugs, and that he was placed in foster care. The defense presented expert testimony that, at the time of the murder, [the Petitioner] had a predisposition toward impulsive behavior that was made significantly worse by a number of stressors, ranging from the loss of his job to the suicide of a close friend. The expert testified that [the Petitioner] had the ability to form intent but that once his emotions were aroused under stressful circumstance he could not suppress them and his ability to "cap" his behavior was diminished. There was some evidence that [the Petitioner] was using crack cocaine at or about the time of the murder.

Faulkner, 154 S.W.3d at 63.

Therefore, the jury heard some testimony regarding the Petitioner's childhood, as well as evidence regarding his mental state and the stressors that he was experiencing at the time of the offense. The jury rejected the evidence and imposed the death penalty. Based upon the mitigating evidence presented and the strong evidence supporting the aggravating circumstance, the Petitioner has failed to show a reasonable probability that the presentation of additional evidence regarding his childhood would have resulted in a different sentence.

ii.      Failure to Object to the State's Closing Argument

The Petitioner faults trial counsel for failing to object to portions of the State's closing argument during the penalty phase. He asserts that the State improperly argued that each of the prior convictions was a separate aggravating circumstance. However, while the State argued that it was alleging nine separate aggravating circumstances, eight of which were the prior violent felony aggravating circumstance, the trial court only instructed the jury regarding the prior violent felony aggravating circumstance as a single aggravating circumstance, and the aggravating circumstance only appeared as a single aggravating circumstance on the verdict form.

The Petitioner also submits that the State improperly argued that the jury should focus upon the loss to the community. The prosecutor was referring to the loss to the victim's family, including her daughter and grandchildren. His reference consisted of one sentence: the offense "takes away from our community because Twyla King is part of our community." The prosecutor then focused on the loss of the victim to her family. The prosecutor did not ask that the jury send a message to the community and did not improperly seek to inflame the jury.

Finally, the Petitioner submits that the prosecutor improperly argued that psychology was unable to recognize meanness or evil. Based upon the Petitioner's violent behavior, the prosecutor characterized the Petitioner as "mean" and "vicious" and downplayed the importance of the evidence presented by the mental health experts by stating that psychology did not recognize that some people were simply mean. However, even if this statement was improper, trial counsel's failure to object to the argument did not result in prejudice due to the strength of the evidence supporting the aggravating circumstance found by the jury.

D.  Trial Court Bias

-120-

The Petitioner contends that the trial court demonstrated bias in its actions involving the State's amendment of its notice to seek the death penalty. The Petitioner further contends that the prosecution improperly failed to inform the defense of the trial court's actions.

Initially, we note that the Petitioner did not raise the issue in the trial court or on direct appeal. See Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"). In any event, the record reflects that Co-Counsel advised the trial court about the improper notice and the trial court, in turn, advised the prosecution. Co-Counsel said he never considered filing a motion for the trial court to recuse itself. The post-conviction court did not find that the trial court acted improperly and found that the trial court's actions did not demonstrate actual bias against the Petitioner. Nothing preponderates against that finding. Moreover, despite the Petitioner's claims that the State failed to inform the defense of the trial court's actions before trial, the record reflects that the trial court, the State, and trial counsel thoroughly discussed the events shortly before the trial began. Thus, the Petitioner was aware before trial of the facts which he now claims support his argument of bias by the trial court. The Petitioner is not entitled to relief regarding this issue.

## E. Prosecutorial Misconduct

The Petitioner raises multiple grounds of prosecutorial misconduct. He specifically claims that (1) the State's failure to disclose multiple documents violates Brady v. Maryland, 373 U.S. 83 (1963); (2) the State presented false and misleading testimony in violation of Napue v. Illinois, 360 U.S. 264 (1959); and (3) the prosecutor improperly expressed his personal opinion during his closing argument.

### 1. Brady Violation

The Petitioner submits that the State's failure to disclose Sergeant Ashton's supplemental report stating that the prosecution showed him how to change the charge from second degree murder to first degree murder and the LAW incident report indicating a suspicion that the Petitioner was using alcohol violated Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the United States Supreme Court held suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady, 373 U.S. at 87.

"Evidence 'favorable to the accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence also has been defined as "'evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Id. at 56-57 (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). The duty to disclose exculpatory evidence includes all "favorable information" regardless of whether the evidence is admissible at trial. Id. at 56.

A defendant must prove the following four prerequisites to establish a violation of due process under Brady:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

> 2. The State must have suppressed the information;

> 3. The information must have been favorable to the accused; and

> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is considered material and its nondisclosure a violation of due process "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995) (quotations omitted). In determining materiality,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonably probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. at 434 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)).

The post-conviction court correctly found that even if the State had a duty to disclose the documents, the information in the documents was not material. The Petitioner initially was charged with second degree murder while the investigation was ongoing. The statements in the affidavit supporting the second degree murder charge were based on the Petitioner's statement, which was introduced at trial. The State later determined that the evidence discovered as a result of the investigation supported a first degree murder charge.

No evidence was presented at the post-conviction hearing to identify the officer who indicated on the LAW incident table that the Petitioner was suspected of using alcohol. During the post-conviction hearing, Sergeant Ashton denied that he made the notation. Even if the Petitioner consumed alcohol before he killed the victim, the report did not establish that the Petitioner was unable to form the mental state necessary to support a first degree murder conviction. Accordingly, the Petitioner is not entitled to relief regarding this issue.

2. Napue Violation

The Petitioner submits that the prosecution improperly allowed Sergeant Ashton to testify in conformity with the State's "lying in wait" theory even though Sergeant Ashton stated in the affidavit of complaint charging second degree murder that the altercation immediately followed a conversation that deteriorated into an argument. In Napue, the United States Supreme Court held that "a conviction obtained through the use of false evidence, known to be such by representatives of the State," deprives a defendant of due process. 60 U.S. at 269; see State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result occurs when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. Therefore, when a witness testifies falsely, either on direct or cross-examination, the State has an affirmative duty to correct the false testimony. Spurlock, 874 S.W.2d at 617. To prevail on his claim that the State knowingly presented false testimony, the Petitioner must establish by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 Tenn. Crim. App. LEXIS 221, at *25 (Knoxville, Mar. 15, 1995), perm. to appeal denied, (Tenn. 1995).

We cannot conclude that Sergeant Ashton's testimony at the trial was false. As found by the post-conviction court, Sergeant Ashton's statements in the initial affidavit of complaint charging second degree murder were made before the investigation was complete. Sergeant Ashton simply was repeating the Petitioner's version of the events, and the State's theory of the case evolved as the investigation continued. The prosecution later determined

-123-

that first degree murder was the more appropriate charge. Moreover, the Petitioner's statement, upon which the affidavit charging second degree murder was based, was introduced at trial and was considered and rejected by the jury. Therefore, the Petitioner is not entitled to relief on this issue.

3.      Improper Closing Arguments

According to the Petitioner, the prosecutor committed prosecutorial misconduct when he stated during his closing argument that the Petitioner's statement was "phony baloney." The Petitioner argues that the prosecutor's comment amounted to an expression of his personal opinion. However, the Petitioner waived this issue by failing to raise it on direct appeal. See Tenn. Code Ann. § 40-30-106(g).

F. Acquittal First Jury Instruction

The Petitioner asserts that the trial court erred in instructing the jury that it had to unanimously agree to acquit on the charge of first degree murder before they could consider second degree murder as a lesser-included offense. Again, because the Petitioner failed to raise this issue on direct appeal, this issue is waived. See Tenn. Code Ann. § 40-30-106(g). In any event, our supreme court has upheld the validity of this jury instruction. See State v. Davis, 266 S.W.3d 896, 905 (Tenn. 2008).

G.  Constitutionality of the Death Penalty

The Petitioner submits that his equal protection rights were violated by the lack of statewide standards for pursuing the death penalty. The Tennessee Supreme Court has rejected general challenges to the unlimited discretion to seek the death penalty vested in prosecutors in this state. See State v. Thomas, 158 S.W.3d 361, 407 (Tenn. 2005); State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000) (Appendix). Moreover, this court has concluded that Bush v. Gore, a voting rights case relied on by the Petitioner, does not apply in the context of a criminal prosecution. See David Keen v. State, No. W2004-02159-CCA-R3-PD, 2006 Tenn. Crim. App. LEXIS 442, at *157 (Jackson, June 5, 2006), perm. to appeal denied, (Tenn. 2006). The Petitioner is not entitled to relief on this issue.

The Petitioner argues that the death penalty impinges on his fundamental right to life and the prohibition against cruel and unusual punishment. The Tennessee Supreme Court has rejected these claims. See, e.g., State v. Sexton, 368 S.W.3d 371, 427 (Tenn. 2012); State v. Kiser, 284 S.W.3d 227, 275-76 (Tenn. 2009).

According to the Petitioner, his death sentence was imposed in an arbitrary and capricious manner because (1) uniform standards or procedures for jury selection did not exist to ensure open inquiry regarding potentially prejudicial subject matter; (2) the death qualification process skewed the make-up of the jury and resulted in a "guilt-prone" jury; (3) he was prohibited from addressing each juror's misconceptions about matters relevant to sentencing; (4) he was prohibited from presenting final closing argument in the penalty phase; (5) the jury was required to agree unanimously to a life verdict in violation of Mills v. Maryland, 486 U.S. 367 (1988), and McKoy v North Carolina, 494 U.S. 433 (1990); (6) the jury likely believed that they were required to agree unanimously to the existence of mitigating circumstances due to the failure to instruct the jury on the meaning and function of mitigating circumstances and the failure to instruct the jury of the effect of a non-unanimous verdict; and (7) the jury was not required to make the ultimate determination that death is the appropriate penalty. The Petitioner raised these issues on direct appeal, and this court rejected them. See State v. Robert Faulkner, No. W2001-02614-CCA-R3-DD, 2003 Tenn. Crim. App. LEXIS 836, at **100-04 (Jackson, Sept. 26, 2003), affirmed by, Faulkner, 154 S.W.3d at 52.

The Petitioner argues that his rights pursuant to article I, sections 8, 14, and 16 of the Tennessee Constitution and Amendments 5 and 8 of the United States Constitution were violated because the aggravating factors upon which the State relied were not included in the indictment. The Petitioner also raised this issue on direct appeal, and this court rejected the claim. See id. at **82-89.

The Petitioner contends that the proportionality review process was not conducted in a manner sufficient to satisfy the federal due process clause or the state constitutional "law of the land" clause. He further contends that the appellate review process was not meaningful because (1) the courts could not reweigh evidence due to the absence of written findings regarding mitigating circumstances; (2) the information relied upon for comparative review was inadequate and incomplete; and (3) the methodology, in which only cases where a death sentence was upheld are reviewed, is fundamentally flawed. The Petitioner raised these issue on direct appeal, and this court rejected the claims. See id. at *113.

Finally, the Petitioner asserts that Tennessee's current protocols for carrying out executions are illegal under state and federal laws. This claim has been rejected. See, e.g., Sexton, 368 S.W.3d at 427; Kiser, 284 S.W.3d at 275-76.

H. Cumulative Error

-125-

The Petitioner asserts that the cumulative effect of the errors rendered both the guilt and penalty phases fundamentally unfair. We have rejected the Petitioner's claims that he is intellectually disabled and, thus, ineligible for the death penalty, that he received ineffective assistance of counsel during the guilt and penalty phases of the trial, that the prosecution failed to disclose exculpatory evidence, that the prosecution presented false and misleading testimony, that the trial court demonstrated bias, that the "acquittal-first instruction" violated his due process rights, and that Tennessee's death penalty scheme is unconstitutional. We, however, conclude that the Petitioner was denied his right to a fair and impartial jury and that the denial of this right is structural error requiring automatic reversal.

### III.  Conclusion

We conclude that the Petitioner was denied the right to a fair and impartial jury and that the denial of that right is structural error requiring automatic reversal. Therefore, we reverse the judgment of the post-conviction court, vacate the Petitioner's conviction and sentence of death, and remand the case to the trial court for a new trial.


_____
NORMA McGEE OGLE, JUDGE

-126-